IN THE COURT OF COMMON PLEAS, STARK COUNTY, OHIO

# NANCY S. REINBOLD
## STARK COUNTY CLERK OF COURTS

MEDLINE DIAMED LLC

          PLAINTIFF,

    VS.                      CASE NUMBER :   **2011CV00128**

DIAMED USA LLC ,ET AL         ASSIGNED JUDGE :   **JOHN G. HAAS**

          DEFENDANT,

# SUMMONS

January 12, 2011

TO THE FOLLOWING NAMED DEFENDANT:
    MICHAEL FRIED
    2547 RIVER RD
    MANASQUAN, NJ 08736

YOU HAVE BEEN NAMED A DEFENDANT IN A COMPLAINT FILED IN STARK COUNTY COURT OF COMMON PLEAS, STARK COUNTY COURT HOUSE, CANTON, OHIO 44702 BY:
    MEDLINE DIAMED LLC -
    3670 PROGRESS ST
    CANTON, OH 44705                            PLAINTIFF.

A COPY OF THE COMPLAINT IS ATTACHED HERETO.  THE NAME AND ADDRESS OF THE PLAINTIFF'S ATTORNEY IS:
    LEONIDAS PLAKAS
    220 MARKET AVE SOUTH EIGHTH FLOO
    CANTON, OH 44702

YOU ARE HEREBY SUMMONED AND REQUIRED TO SERVE UPON THE PLAINTIFF'S ATTORNEY, OR UPON THE PLAINTIFF, IF HE HAS NO ATTORNEY OF RECORD, A COPY OF AN ANSWER TO THE COMPLAINT WITHIN TWENTY-EIGHT DAYS AFTER THE SERVICE OF THIS SUMMONS ON YOU, EXCLUSIVE OF THE DAY OF SERVICE. YOUR ANSWER MUST BE FILED WITH THE COURT WITHIN THREE DAYS AFTER THE SERVICE OF A COPY OF THE ANSWER ON THE PLAINTIFF'S ATTORNEY.

IF YOU FAIL TO APPEAR AND DEFEND, JUDGMENT BY DEFAULT WILL BE RENDERED AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.



NANCY S. REINBOLD
CLERK OF COURTS
STARK COUNTY, OHIO

*J. Schneider*

J. SCHNEIDER, DEPUTY CLERK





FILED

JAN 1 2 2011

NANCY S. REINBOLD
STARK COUNTY OHIO
CLERK OF COURTS

### IN THE COURT OF COMMON PLEAS
### STARK COUNTY, OHIO

**MEDLINE DIAMED, LLC**
3670 PROGRESS STREET
CANTON, OHIO 44705

    Plaintiff,

-vs.-

**DIAMED USA, LLC**
C/O SCOTT WAKSER,
STATUTORY AGENT
3670 PROGRESS STREET
CANTON, OHIO 44705

-and-

**COMMUNITY SURGICAL SUPPLY OF
TOMS RIVER, INC.**
1390 ROUTE 37 W
TOMS RIVER, NEW JERSEY 08755

-and-

**JERROLD FRIED**
28 PACIFIC AVE
BAYVILLE, NEW JERSEY 08721

-and-

**MICHAEL FRIED**
2547 RIVER ROAD
MANASQUAN, NEW JERSEY 08736

-and-

CASE NO: **2011CV00128**

JUDGE:

COMPLAINT:
FRAUD;
BREACH OF CONTRACT;
MISAPPROPRIATION OF TRADE
SECRETS, R.C. § 1333.61, ET SEQ.;
BREACH OF FIDUCIARY DUTY;
UNFAIR COMPETITION, R.C. § 4165.02
ET SEQ.;
COMMON LAW UNFAIR
COMPETITION;
TORTIOUS INTERFERENCE;
CIVIL CONSPIRACY;
SPOLIATION OF EVIDENCE; AND
INJUNCTIVE RELIEF



**HOWARD FRIED**
138 CEDAR RUN ROAD
BAYVILLE, NEW JERSEY 08721

-and-

**LINDA LIBASSI**
3 BRANCHWOOD PLACE
BAYVILLE, NEW JERSEY 08721

-and-

**LAURA CRONIN**
107 DRIFTWOOD LANE
LANOKA HARBOR, NEW JERSEY 08734

-and-

**MELISSA HAITHCOCK**
12 UNION PLACE
KEANSBURG, NEW JERSEY 07734

 Defendants.

 Now comes Plaintiff, Medline DiaMed, LLC ("Medline DiaMed"), and for its Complaint against Defendants DiaMed USA, LLC ("DiaMed USA"), Community Surgical Supply of Toms River, Inc. ("CSS"), Jerrold Fried, Michael Fried, Howard Fried,[1] Linda Libassi, Laura Cronin, and Melissa Haithcock, (collectively, "Defendants"), hereby states as follows:

## INTRODUCTION

1. Medline DiaMed spent millions of dollars to purchase a business owned and operated by CSS and the Fried Brothers known as DiaMed USA. However, with the assistance of three trusted former employees, CSS has now become a competitor of Medline DiaMed, and, at the direction of the Fried Brothers, is using stolen trade secret information to wage an illegal campaign against Medline DiaMed. This campaign constitutes a breach of the purchase agreement between Medline DiaMed and DiaMed

---

[1] Jerrold Fried, Michael Fried, and Howard Fried are brothers and collectively referred to herein as the "Fried Brothers."

USA, rendering several representations and warranties made by CSS and the Fried Brothers through DiaMed USA fraudulent.

2.      The objective of this assault is to steal Medline DiaMed's customers, divert potential and existing sales, and ultimately destroy Medline DiaMed's business. The attack is the culmination of a conspiracy between Medline DiaMed's former employees, the Fried Brothers, and their company, CSS. The two-pronged illegal plan consisted of CSS, by and through the Fried Brothers, soliciting Medline DiaMed's former employees to divert business while they were employed by DiaMed USA and Medline DiaMed, and then illegally accessing Medline DiaMed's computer system to steal volumes of Medline DiaMed's confidential trade secret information to divert even more business. The former trusted employees are now employed by the Fried Brothers through CSS, and they are all using this information to cause disastrous and irreparable harm to Medline DiaMed. In an effort to stop this ongoing illegal activity and to remedy the devastating harm that has been done, Medline DiaMed brings the instant cause of action and seeks immediate injunctive relief.

## SUMMARY OF THE CASE

3.      Libassi, Cronin, and Haithcock were employed by DiaMed USA, a medical supply distributorship that operated primarily in the office-based physician market with its principal place of business located in Canton, Stark County, Ohio. Libassi, Cronin, and Haithcock all worked for DiaMed USA in its New Jersey sales area. Libassi and Cronin worked as sales representatives. Haithcock worked as an administrative support assistant. DiaMed USA treated Libassi, Cronin, and Haithcock very well and they were all highly compensated employees.

4.      Before working with DiaMed USA, Libassi, Cronin, and Haithcock were former employees of CSS, one of DiaMed USA's owning members. CSS is a distributor of oxygen, respiratory, and durable home medical equipment located in New Jersey. Jerrold Fried, Michael Fried, and Howard Fried are

brothers and are the owners/managing officers of CSS. Due to its ownership interest in DiaMed USA, and pursuant to the operating agreement of DiaMed USA, CSS was prohibited from competing with DiaMed USA, soliciting customers of DiaMed USA, or soliciting employees of DiaMed USA. As a result, until recently, CSS has refrained from entering into the office based medical supply market.

5.      On or about October 28, 2010, Medline Industries, Inc. purchased the assets of DiaMed USA through its wholly owned subsidiary, Medline DiaMed. The assets purchased by Medline DiaMed included all customer accounts, business processes and methods, intellectual property, inventory, and the extensive goodwill developed by DiaMed USA. This purchase by Medline Industries, Inc. was hailed as a significant step toward spurring economic growth and job stability in Stark County, Ohio.[2] As a part of this transaction, CSS and the Fried Brothers made numerous warranties and representations through DiaMed USA that were relied upon by Medline DiaMed, such as that (i) DiaMed USA had been operated in the ordinary course of business, (ii) no written notice has been received that any key employee plans to terminate their employment, and (iii) that none of the top 20 customers of DiaMed USA have indicated they plan to diminish their business with DiaMed USA. The vast majority of DiaMed USA's employees, including Libassi, Cronin, and Haithcock, accepted employment with Medline DiaMed commencing upon the completion of this transaction. Medline DiaMed currently employs 31 people in its Stark County, Ohio facilities alone, and hopes to hire many more in the future.

6.      Upon information and belief, before the transaction between Medline DiaMed and DiaMed USA was completed, Libassi, Cronin, Haithcock, and the Fried Brothers formulated and put into action an illegal plan (the "Plan") to target Medline DiaMed's clients.[3] The objective of the Plan was to

---

[2] *See, Medline Buys Canton-Based DiaMed USA*, CantonRep.com, Nov. 17, 2010, attached hereto and incorporated herein as **Exhibit A.**

[3] The terms "clients" and "customers" will be used interchangeably in this pleading.

4

divert sales from Medline DiaMed and induce Medline DiaMed's clients to cease doing business with Medline DiaMed and become clients of CSS or a related entity. The Plan was formulated and implemented by Defendants while Libassi and Cronin were employees of both DiaMed USA and Medline DiaMed, and before they officially became employed by CSS or another entity.

7.     In furtherance of the Plan, CSS and the Fried Brothers conspired with Libassi and Cronin to divert customers from DiaMed USA to CSS, rendering the representations and warranties made by DiaMed USA through CSS and the Fried Brothers false and misleading (Counts I and II). As part of the illegal Plan, Libassi, Cronin, Haithcock, the Fried Brothers, and CSS have illegally accessed Medline DiaMed's computer databases and misappropriated Medline DiaMed's trade secrets, including customer and sales information, in an effort to further divert Medline DiaMed's clients to CSS (Count III). In connection with the Plan, Libassi and Cronin breached their fiduciary duty of loyalty to Medline DiaMed by conspiring to divert customers from Medline DiaMed to CSS while they were still employed by Medline DiaMed (Count IV).     Further, by engaging in the Plan, Libassi, Cronin, Haithcock, the Fried Brothers, and CSS have tortiously interfered with Medline DiaMed's prospective business or economic advantage, engaged in unfair competition in violation of both statutory and common law, and illegally conspired with one another to effectuate the Plan (Counts V, VI, VII, VIII). Finally, Libassi, Cronin, Haithcock, the Fried Brothers, and CSS have engaged in overt efforts to conceal the Plan by spoliating evidence (Count IX).

8.     As explained herein, Haithcock revoked her acceptance of employment with Medline DiaMed on October 28, 2010. Libassi and Cronin resigned employment with Medline DiaMed on December 11, 2010. Upon information and belief, they all immediately then began their employment with CSS. Among other conduct, Haithcock, Libassi, and Cronin have continued their blatant solicitation of Medline DiaMed's clients through the use of Medline DiaMed's trade secrets. To date, it is estimated

that CSS, the Fried Brothers, Libassi, Cronin, and Haithcock's illegal use of Medline DiaMed's trade secrets has already resulted in at least 50 Medline DiaMed clients transferring their accounts to CSS or a related entity, with lost revenue to Medline DiaMed expected to exceed $1.7 million.

## THE PARTIES

9.      Medline DiaMed is an Illinois limited liability company with its principal place of business at 3670 Progress Street, Canton, Stark County, Ohio 44705. Medline DiaMed distributes its office-based physician products nationwide, and has distribution centers in Ohio, Tennessee, and New Jersey.

10.     DiaMed USA is an Ohio limited liability company with its former principal place of business at 3670 Progress Street, Canton, Stark County, Ohio, 44705.

11.     Libassi is a resident of the State of New Jersey, residing in Bayville, Ocean County. She was formerly an employee of DiaMed USA and Medline DiaMed, and upon information and belief, is currently employed by CSS. Libassi has maintained continuous and systematic contacts with the State of Ohio, including employment by an Ohio limited liability company, numerous appearances in Ohio in connection with her employment, daily engagement with Ohio by telephone, email, mail, and facsimile in connection with her employment, and misappropriating and using electronic information located in Ohio, all of from which this cause of action arises.

12.     Cronin is a resident of the State of New Jersey, residing in Lanoka Harbor, Ocean County. She was formerly an employee of Medline USA and Medline DiaMed, and upon information and belief, is currently employed by CSS. Cronin has maintained continuous and systematic contacts with the State of Ohio, including employment by an Ohio limited liability company, numerous trips to Ohio in connection with her employment, daily engagement with Ohio by telephone, email, mail, and facsimile in connection with her employment, and misappropriating and using electronic information located in Ohio, all of from which this cause of action arises.

13.     Haithcock is a resident of the State of New Jersey, residing in Keansburg, Monmouth County. She was formerly an employee of DiaMed USA, and upon information and belief, is currently employed by CSS. Haithcock has maintained continuous and systematic contacts with the State of Ohio, including employment by an Ohio limited liability company, numerous appearances in Ohio in connection with her employment, daily engagement with Ohio by telephone, email, mail, and facsimile in connection with her employment, and misappropriating and using electronic information located in Ohio, all of from which this cause of action arises.

14.     Upon information and belief, Jerrold Fried is a resident of the State of New Jersey, residing in Bayville, Ocean County. He is currently employed as Vice-President of CSS. Jerrold Fried has maintained continuous and systematic contacts with the State of Ohio, including indirect ownership of an Ohio limited liability company, ownership of a New Jersey corporation with Ohio offices and an Ohio foreign for-profit corporation license, appearances in Ohio in connection with these ownership interests, frequent engagement with Ohio by telephone, email, mail, and facsimile in connection with these ownership interests, and misappropriating and using electronic information located in Ohio, all of from which this cause of action arises. In addition, Jerrold Fried is a partner in a New Jersey limited partnership, The Fried Group, LP, that owns real property in Ohio.

15.     Upon information and belief, Michael Fried is a resident of the State of New Jersey, residing in Manasquan, Monmouth County. He is currently employed as Vice-President of CSS. Michael Fried has maintained continuous and systematic contacts with the State of Ohio, including the acceptance of the appointment of statutory agent as a natural person who is a resident of the State of Ohio on behalf of The Fried Group, LP pursuant to R.C. § 1782.04(A) and CSS pursuant to R.C. § 1703.041(A). Further, additional contacts include indirect ownership of an Ohio limited liability company, ownership of a New Jersey corporation with Ohio offices and an Ohio foreign for-profit corporation

license, numerous appearances in Ohio in connection with these ownership interests, frequent engagement with Ohio by telephone, email, mail, and facsimile in connection with these ownership interests, and misappropriating and using electronic information located in Ohio, all of from which this cause of action arises. Finally, Michael Fried is a partner in a New Jersey limited partnership, The Fried Group, LP, that owns real property in Ohio.

16. Upon information and belief, Howard Fried is a resident of the State of New Jersey, residing in Bayville, Ocean County. He is currently employed as President of CSS. Howard Fried has maintained continuous and systematic contacts with the State of Ohio, including indirect ownership of an Ohio limited liability company, ownership of a New Jersey corporation with Ohio offices and an Ohio foreign for-profit corporation license, appearances in Ohio in connection with these ownership interests, frequent engagement with Ohio by telephone, email, mail, and facsimile in connection with these ownership interests, and misappropriating and using electronic information located in Ohio, all of from which this cause of action arises. In addition, Howard Fried is a partner in a New Jersey limited partnership, The Fried Group, LP, that owns real property in Ohio.

17. CSS is a New Jersey corporation with its principle place of business located at 1390 Route 37 W., Toms River, New Jersey 08755. In addition to its New Jersey offices, CSS also has offices in Ohio, New York, and Pennsylvania. CSS has maintained continuous and systematic contacts with the State of Ohio, including ownership of an Ohio limited liability company, daily use of telephone, email, mail, and facsimile in connection with doing business in Ohio, and misappropriating and using electronic information located in Ohio, all of from which this cause of action arises. Further, additional contacts include the maintenance of Ohio offices, the appointment of a statutory agent in Ohio, holding an Ohio foreign for-profit corporation license, and leasing real property in Ohio.

## FACTUAL BACKGROUND

### *Medline DiaMed Invested Millions of Dollars in Purchasing the Accounts and Goodwill of DiaMed USA*

18.     DiaMed USA was a medical supply distributorship located in Stark County, Ohio. DiaMed USA operated primarily in the office-based physician market, and distributed medical supply products across the country.

19.     DiaMed USA was jointly owned by CSS and DiaMed, Inc. CSS is a distributor of oxygen, respiratory, and durable home medical equipment located in New Jersey. Jerrold Fried, Michael Fried, and Howard Fried are brothers and are the owners/managing officers of CSS. Due to its ownership interest in DiaMed USA, and pursuant to the operating agreement of DiaMed USA, CSS was prohibited from competing with DiaMed USA, soliciting customers of DiaMed USA, or soliciting employees of DiaMed USA. As a result, until recently, CSS has refrained from entering into the office based medical supply market.

20.     DiaMed, Inc. is an Ohio corporation led by its President, Scott Wakser. DiaMed, Inc. is jointly owned by Mr. Wakser and Douglas Sharpe, who are 50% co-owners. Like DiaMed USA, DiaMed, Inc. distributed medical supplies in the office-based physician market from the Stark County, Ohio location. DiaMed, Inc. joined with CSS to form DiaMed USA as a result of a capital investment by CSS in the approximate amount of $1,000,000.00.

21.     Through the efforts of Scott Wakser, DiaMed USA was a dramatic success. In two years, the business had grown significantly.

22.     In the summer of 2010, DiaMed USA began to explore the possibility of selling its medical supply distributorship business. After testing the market, DiaMed USA received interest from two medical supply organizations. Medline Industries, Inc. offered DiaMed USA a very fair price, and further agreed to employ all of DiaMed USA's current employees, in both Ohio and elsewhere. The

9

offer from the other medical supply organization was for a slightly higher price, but would have resulted in the termination of a significant number of DiaMed USA's staff. Nevertheless, this offer was never formalized or reduced to writing. CSS and the Fried Brothers preferred to pursue the larger sum of money, showing no interest in preserving Ohio jobs. However, driven by DiaMed, Inc., the offer of Medline Industries, Inc. was pursued.

23.     After substantial negotiation, Medline Industries, Inc. and DiaMed, USA reached an agreement. Medline DiaMed was formed by Medline Industries to purchase all of the assets, customer accounts, trade secrets, intellectual property, business methods, and employees from DiaMed USA at a price of approximately $6,000,000.00. The sale was finalized and effective October 28, 2010. As a result of the sale, CSS and the Fried Brothers received approximately $3,000,000.00, representing a return of 300% on their investment in DiaMed USA two years prior.

24.     Medline DiaMed and DiaMed USA's agreement was memorialized by an Asset Purchase Agreement ("APA"), attached hereto and incorporated herein as **Exhibit B**.[4]  As a part of the transaction, DiaMed USA, through its owners CSS and DiaMed, Inc., made several material representations and warranties specifically articulated in the APA. Set forth in Section 3.1 of the APA, the representations and warranties made by DiaMed USA included:

(k)     Events Subsequent to Most Recent Financial Statement. Since the Most Recent Financial Statements, there has not been any material adverse change to the Purchased Business and Seller has conducted the Purchased Business in all material respects in the ordinary course of business.  Without limiting the foregoing, since the Most Recent Financial Statements, none of the following have occurred:

* * *

(ii)    any material changes to the terms of employment, rate of compensation or level of benefits of any employee, other than in the ordinary course of business in accordance with Seller's past practices;

---

[4] To their voluminous nature, the schedules accompanying the APA have been omitted.

      (iii)    any acquisition or disposition by the Purchased Business of any asset outside the ordinary course of business, other than the sale of inventory in the ordinary course of business;

      (iv)    any loss or damage to any material asset of the Purchased Business;

      (v)    Seller's entry into any material agreement, commitment or other obligation in connection with or relating to the Purchased Business, outside the ordinary course of business; and

* * *

(o)    Employees.

      (i)    Except as set forth on Schedule 3.1(o), no key employee or significant group of employees has provided written notice to Seller that he, she or they plans to terminate employment with the Purchased Business during the next twelve (12) months. …

* * *

(r)    Customers; Suppliers.

      (i)    Schedule 3.1(r) lists the twenty (20) largest customers of the Purchased Business by gross revenues for the calendar year 2009 and sets forth opposite the name of each such customer the percentage of gross revenue attributable to each such customer. To the knowledge of Seller (a) there exists no material disagreement between Seller and such customers, and (b) no such customer has indicated that it will stop, or materially diminish its business with the Purchased Business.

* * *

(t)    Disclosure. To the Seller's Knowledge, no representation or warranty by Seller in this Agreement or in any exhibit, schedule, written statement, certificate or other document delivered or to be delivered to the Buyer pursuant hereto or in connection with the transactions contemplated hereby contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact required to be stated therein or necessary to make the statements contained therein, in light of the circumstances under which made, not misleading.

APA, pp. 6-13 (hereinafter, the "Representations and Warranties").

25.    The Representations and Warranties were each a material part of the transaction between Medline DiaMed and DiaMed, USA. Medline DiaMed specifically relied upon the accuracy and truthfulness of the Representations and Warranties to insure that it was receiving the value that it paid

for the assets of DiaMed USA, including customer accounts, intellectual property, business methods, trade secrets, and employees.

*Medline DiaMed Has Developed Extensive, Proprietary*
*Information In Order to Gain a Competitive Advantage*

26.     As a part of its purchase of DiaMed USA and as continued after the purchase, Medline DiaMed has made a significant investment in acquiring, developing, and enhancing relationships with its clients for whom it supplies office-based physician medical products.

27.     Medline DiaMed has also made a significant investment in obtaining and compiling a substantial body of confidential and proprietary information and trade secrets that is critical to its ability to serve existing and prospective clients and to compete for their business.   This information includes, but is not limited to, the combination of knowledge of (a) the identity of clients and prospective clients, including the identity of the key decision maker, purchasing history, projected supply needs, desired sales terms, delivery preferences, financial information, and service expectations; (b) suppliers and wholesalers that are willing and available to provide the products necessary to satisfy the needs of clients and prospective clients; and (c) its pricing structures and margins.

28.     The client relationships and confidential and proprietary information that Medline DiaMed has acquired are essential to the success of its business.

29.     To preserve and protect the value of its investment and resulting client goodwill, Medline DiaMed treats the confidential and proprietary client and prospect information described herein as trade secrets, and has taken specific measures to preserve the information's secrecy and to protect Medline DiaMed's relationships with its clients and prospects.

30.     Both DiaMed USA and Medline DiaMed invested a substantial amount of time, money, and resources to teach Libassi, Cronin, and Haithcock, among other things, their business methods,

processes, and confidential and proprietary information concerning their business, customers, and prospects.

31.     During their employment with DiaMed USA and Medline DiaMed, Libassi, Cronin, and Haithcock had access to and used the client and prospect lists acquired by Medline DiaMed, as well as other highly confidential and proprietary information generated and/or obtained by Medline DiaMed. Such confidential and proprietary information includes, but is not limited to, the identities and specifications of clients and prospective clients, including their medical supply purchasing history, projected supply needs, desired sales terms, delivery preferences, financial information, and service information, and Medline DiaMed's business plans, pricing structures, and margins.

32.     As Libassi, Cronin, and Haithcock were well aware, Medline DiaMed maintained a highly confidential and proprietary electronic database of its clients and prospects on its secure computer network server located in its Ohio office, to which Libassi and Cronin, through the use of secure passwords, had direct access to facilitate the duties of their employment with Medline DiaMed. Medline DiaMed management personnel frequently advised Libassi, Cronin, and other trusted employees to enter client and prospect information into the database regularly where Medline DiaMed could securely maintain such information. In addition, sales history reports, customer deviations reports, pricing sheets, and other forms of sensitive, proprietary information were also maintained on this secure server.

33.     DiaMed USA, and subsequently Medline DiaMed, took reasonable steps to ensure the confidentiality of its trade secrets and proprietary information. Protocols for logging into the computer network server are only granted to employees. Access requires the employee to know and use two usernames and passwords, which must be different from each other. By way of operation, after the employee connects to the secure network, they are prompted for their first set of credentials. Next, the

13

employee connects to the ERP Prophet 21® software, where they are asked for the second, different user name and password. Only then may the trade secrets and proprietary information of Medline DiaMed be accessed, and such access has never been granted to any non-DiaMed employees. Moreover, while general access to Medline DiaMed's secure servers is granted to many employees of Medline DiaMed, only select, trusted employees are granted access to Medline DiaMed's confidential proprietary information and trade secrets.

34.     In addition to its use of password-protected servers, DiaMed USA and Medline DiaMed maintained confidentiality policies internally with its employees. By way of example, the employee handbook of DiaMed USA reads:

### Confidential Information

All DiaMed employees are obligated to maintain confidentiality, even after they are no longer employed by DiaMed.

Additionally, our customers and suppliers entrust DiaMed with important information relating to their health, lives and business. The nature of this relationship requires maintenance of confidentiality. In safeguarding the information received, DiaMed earns the respect and further trust of our customers and suppliers.

If you are questioned by someone outside the company or your department and you are concerned about the appropriateness of giving them certain information, you are not required to answer. Instead, as politely as possible, refer the request to your supervisor.

No one is permitted to remove or make copies of any DiaMed records, reports, or documents without prior management approval. Disclosure of confidential information could lead to termination, as well as other possible legal action.[5]

DiaMed USA and Medline DiaMed also included confidentiality covenants in their employment agreements to further safeguard their trade secrets. As will be more specifically described below, Libassi, Cronin, and Haithcock were well aware of DiaMed USA and Medline DiaMed's substantial efforts to ensure the confidentiality of their trade secret and proprietary information.

---

[5] DiaMed USA, LLC Employee Handbook, attached hereto and incorporated herein as **Exhibit C.**

14

### *Libassi, Cronin, and Haithcock were Critical to*
### *Medline DiaMed's New Jersey and Nationwide Success*

35.    The use of effective sales agents is at the heart of Medline DiaMed's business.  Their job is to generate new business from existing clients and to develop new business.  In turn, their efforts are supported by administrative staff located at Medline DiaMed's Ohio office.  Nearly all of Medline DiaMed's sales are generated from the use of its sales agents.

36.    Due to the varying medical supplies required by office-based physicians, sales agents are required to know the full spectrum of Medline DiaMed's products and services.  In addition, it is important that the sales agents understand and appreciate the needs of the clients whom they are servicing.  As a result, it is necessary to provide sales agents access to the confidential trade secrets of Medline DiaMed, including customer lists, sales history reports, customer deviations reports, pricing sheets, cost sheets, and other forms of sensitive information in order for the sales agents to successfully market Medline DiaMed's products.

37.    Libassi, Cronin, and Haithcock were all formerly employed by CSS.  When DiaMed USA was formed by CSS's investment in DiaMed, Inc., Libassi, Cronin, and Haithcock all became employees of DiaMed USA.  Their employment became effective January 1, 2008.

38.    During their employment with DiaMed USA, Libassi and Cronin were sales agents, and Haithcock was an administrative support assistant.  All three operated in DiaMed USA's New Jersey sales territory, comprising the entirety of DiaMed USA's New Jersey sales team.  The majority of Libassi and Cronin's sales originated from New Jersey and were supported and processed by the Ohio office.   From New Jersey, Haithcock provided assistance in managing the accounts receivables generated from these sales.  While they typically worked from home, at times, Libassi and Cronin would work out of CSS's office in New Jersey.  Haithcock operated from office space within CSS's New Jersey location where she interfaced directly with DiaMed USA's Canton, Ohio office.

39.     Before the finalization of the APA, Libassi, Cronin, and Haithcock all accepted employment with Medline DiaMed, as did the vast majority of DiaMed USA's employees. Medline DiaMed fully expected that Libassi, Cronin, and Haithcock would faithfully perform their employment on behalf of Medline DiaMed, and continue to grow the business that it purchased.

### The Plan:
### A Two-Pronged Attack to Steal and Divert
### Business from Medline DiaMed to CSS

40.     Prior to Medline Industries, Inc.'s acquisition of DiaMed USA, the Fried Brothers had disclaimed any intent to enter into the physician-office based medical supply market. These intentions were reiterated during negotiations of the purchase of DiaMed USA by Medline Industries, Inc. However, CSS and the Fried Brothers felt that they had left money on the table by accepting Medline Industries, Inc.'s offer. They then set out to get this money back – by illegally stealing trade secrets and clients from Medline DiaMed.

41.     Upon information and belief, in or around September 2010, CSS, and the Fried Brothers constructed the Plan, which involved, among other components: (a) conspiring with Libassi, Cronin, and Haithcock with the purpose of causing them to leave Medline DiaMed after employment was accepted; (b) offering positions with CSS to Libassi, Cronin, and Haithcock with the purpose of positioning CSS to unfairly compete with Medline DiaMed; (c) encouraging Libassi, Cronin, and Haithcock to identify and convince the clients of DiaMed USA and Medline DiaMed to place their business with CSS or a related entity; and (d) encouraging Libassi, Cronin, and Haithcock to misappropriate and use Medline DiaMed's trade secrets to divert additional Medline DiaMed clients to CSS. Upon information and belief, the above actions were undertaken both before and after the execution of the APA, and both before and after Libassi, Cronin, and Haithcock resigned from DiaMed USA/Medline DiaMed.

16

42.     As further explained herein, upon information and belief, over the following months Libassi, Cronin, Haithcock, CSS, and the Fried Brothers worked to enact the Plan.  The Plan culminated with the resignation of Haithcock on October 28, 2010 (two days after she had accepted employment with Medline DiaMed), the coordinated and abrupt resignations of Libassi and Cronin on Saturday, December 11, 2010, the solicitations of dozens of Medline DiaMed's clients (including while Libassi and Cronin were still employed by DiaMed USA and Medline DiaMed), and the diversion of numerous Medline DiaMed clients to CSS.

43.     Upon information and belief, throughout 2010, Libassi, Cronin, and Haithcock frequently communicated with each other, and with CSS and the Fried Brothers, about Medline DiaMed's business and the Plan, in person, on Facebook, by telephone and/or by email.  These email communications were on Medline DiaMed's computer systems, and also on home or personal computers that the Defendants used.  Explained more fully below, it is believed that one simple example includes the following exchange that occurred on Facebook between Haithcock and Cronin:

 **Melissa Haithcock** Feel like CRAP!!!
December 8 at 2:51pm · Like

 **Laura Cox Cronin** No time to feel like crap...get better we have a lot of shit to do!
· Like

 **Melissa Haithcock** NO KIDDING!!!!
· Like

Write a comment...

This communication occurred after Haithcock revoked her acceptance of employment with Medline DiaMed and just three days *before* Cronin and Libassi resigned from Medline DiaMed.

17

### The First Prong:
### Disloyally Diverting Business to CSS While
### Employed by DiaMed USA and Medline DiaMed

44.    As part of the Plan, and at the direction of Haithcock, CSS and the Fried Brothers, Libassi and Cronin acted contrary to their employer's interests by, among other things, improperly diverting customers from DiaMed USA and Medline DiaMed to CSS while employed by DiaMed USA and Medline DiaMed. These diversions were not disclosed by CSS and the Fried Brothers at the time of the APA, rendering the Representations and Warranties set forth in the APA false and misleading. Moreover, as these diversions occurred even after Libassi and Cronin accepted employment with Medline DiaMed, their actions constitute an unequivocal breach of the duty of loyalty that they owed to their employer.

45.    By way of one example, on September 30, 2010, prior to the purchase of DiaMed USA's assets by Medline DiaMed, Libassi solicited and obtained an order for office workstations from Star Career Academy located in Egg Harbor Township, New Jersey. The Star Career Academy had been a customer of DiaMed USA, and subsequently Medline DiaMed, since 2008. The equipment sought by Star Career Academy was valued at over $48,000.00. However, instead of placing the order through her employer DiaMed USA and obtaining the office equipment from a supplier of DiaMed USA, Libassi placed the order through CSS in an effort to further the Plan. The order was fulfilled on or about November 23, 2010 by Dave's Furniture in New Jersey, a supplier who has never done business with DiaMed USA. Jerrold Fried directly participated in this diversion by offering to present to the customer model office equipment in an effort to further persuade them to bring their business to CSS.

46.    As another example, prior to her resignation from Medline DiaMed, on approximately November 29, 2010, Libassi solicited and obtained an additional order for office supplies from the Star Career Academy. However, as a part of the Plan, instead of placing the order with her employer,

18

Medline DiaMed, Libassi placed the order with CSS. This order was fulfilled with products shipped by CSS and received by the Star Career Academy on or about December 13, 2010. Thereafter, on December 15, 2010, Star Career Academy placed another order for office supplies with Libassi. Libassi again placed this order with CSS, even though this is a customer of Medline DiaMed.

47.     As a further example, before resigning her employment with Medline DiaMed, Cronin solicited and obtained an order for office supplies from Dr. William Humen of Jersey City, New Jersey. Dr. Humen had been a customer of DiaMed USA, and subsequently Medline DiaMed, since 2008. During this solicitation, Cronin confirmed to Dr. Humen the existence of the Plan, and stated that "Linda [Libassi] and the Fried Brothers are starting a new company," but they "need time so they don't get into trouble." In an effort to effectuate the Plan, Cronin obtained a substantial order for medical supplies from Dr. Humen, but only placed a small fraction of the order with her employer, Medline DiaMed. The remainder of the order was held so that Cronin could place the order with CSS at the end of January when the Defendants felt it would be "safe" to start accepting sizeable orders.

48.     Further, while employed by Medline DiaMed, Libassi directly placed orders through CSS for product that was carried by, and should have been placed with, Medline DiaMed. To illustrate, while employed by Medline DiaMed, Libassi solicited and obtained an order for medical supplies from Ocean Orthopedic Associates of Toms River New Jersey. Though the order was placed for products offered by Medline DiaMed, in facilitation of the Plan and in direct violation of her duties to her employer, Libassi placed this order directly with CSS instead of her employer, Medline DiaMed.

### The Second Prong:
### Stealing Trade Secrets from Medline DiaMed in
### Order to Steer Even More Business to CSS

49.     The Plan has further been facilitated by theft and misappropriation by Cronin and Libassi of Medline DiaMed's confidential trade secrets, which, upon information and belief, has been encouraged, facilitated, and directed by Haithcock, the Fried Brothers, and CSS.

50.     By way of illustration, on November 1, 2010, during her employment with Medline DiaMed and three days after the finalization of the APA, Libassi began forwarding emails that contained confidential trade secrets in her Medline DiaMed issued email account to her own personal Gmail email address.  This activity is confirmed by images generated from Medline DiaMed's secure email servers:

| | | |
|---|---|---|
| 'lindalibassi1972@gmail.com' | FW: | Sat 12/11/2010 10:38 AM |
| 'lindalibassi1972@gmail.com' | FW: | Thu 12/9/2010 8:26 AM |
| 'lindalibassi1972@gmail.com' | FW: Follow-up on Sony 110HG and EKG paper | Wed 12/8/2010 12:14 PM |
| 'lindalibassi1972@gmail.com' | FW: NEW - MEDLINE DIAMED DIADVANTAGE SHEET - VERSION # MD02 | Wed 12/8/2010 12:12 PM |
| 'lindalibassi1972@gmail.com' | | Tue 12/7/2010 2:48 PM |
| 'lindalibassi1972@gmail.com' | FW: pricing | Tue 12/7/2010 11:49 AM |
| 'lindalibassi1972@gmail.com' | FW: Demed Product Cost | Tue 12/7/2010 11:48 AM |
| 'lindalibassi1972@gmail.com' | FW: 19" TRANSPORT WHEELCHAIR | Tue 12/7/2010 11:42 AM |
| 'lindalibassi1972@gmail.com' | FW: white boards | Wed 12/1/2010 12:22 PM |
| 'lindalibassi1972@gmail.com' | FW: | Wed 12/1/2010 10:58 AM |
| 'lindalibassi1972@gmail.com' | FW: Employment agreements | Wed 12/1/2010 10:57 AM |
| 'lindalibassi1972@gmail.com' | FW: | Fri 11/19/2010 11:29 AM |
| 'lindalibassi1972@gmail.com' | FW: FINAL ---- DIADVANTAGE ORDER FORM_REPS_MD01_111710.xls | Fri 11/19/2010 11:28 AM |
| 'lindalibassi1972@gmail.com' | | Mon 11/15/2010 8:10 AM |
| 'lindalibassi1972@gmail.com' | FW: CLIENT LETTER | Fri 11/12/2010 9:20 AM |
| 'lindalibassi1972@gmail.com' | FW: thank you | Fri 11/12/2010 8:45 AM |
| 'lindalibassi1972@gmail.com' | FW: New employee packet | Mon 11/1/2010 2:00 PM |

The information contained in these emails includes Medline DiaMed's customer identities, product prices, and product costs.  If Libassi were faithfully performing her duties as a Medline DiaMed employee, there would be no reason to forward this information to her personal email account.  In fact, this is expressly prohibited by Medline DiaMed policies.  These actions occurred to enable Libassi to misappropriate for her own use and the use of Cronin, Haithcock, the Fried Brothers, and CSS the trade secrets of Medline DiaMed and facilitate the Plan.

51.    In addition, on the day of her abrupt resignation, Libassi entered Medline DiaMed's secure network servers multiple times and copied volumes of Medline DiaMed's confidential trade secret information. Libassi's access occurred on Saturday, December 11, 2010 at 9:24 AM, 10:35 AM, and 2:51 PM, as confirmed by Medline DiaMed's network access logs. The confidential files that were copied included:

- Customer_List.xls. A spreadsheet containing all of Medline DiaMed's New Jersey customer names, account numbers, phone numbers, fax numbers, addresses, and email addresses.

- RadGridExport.xls. A spreadsheet containing Medline DiaMed's customer deviations from month to month, including year to date sales of Medline DiaMed's customers.

- CUSTOEMR.xls. A spreadsheet containing sales tracing of Medline DiaMed's customers.

- Sales History Report.pdf. A document listing the sales history of all Medline DiaMed's customers.

- Sales History Report LC.pdf and Sales History Report LC2.pdf. Documents listing the sales history of all Medline DiaMed's customers serviced by Cronin.

- Sales History Report LL.pdf. Documents listing the sales history of all Medline DiaMed's customers serviced by Libassi.

- geffner sales analysis (2).xls. A spreadsheet containing information relating to a significant customer of Medline DiaMed, Dr. Rami Geffner, of Fork River, New Jersey.

Upon information and belief, these files, each of which contain highly confidential trade secret information of Medline DiaMed, are being used by Libassi, Cronin, Haithcock, CSS, and the Fried Brothers in furtherance of the Plan.

52.    The same day Libassi accessed Medline DiaMed's secure servers to copy Medline DiaMed's confidential trade secret information, upon information and belief, she also accessed Medline DiaMed's business management software. Once accessed, she modified over 52 active orders containing 104 products that were solicited by Libassi and Cronin and placed with Medline DiaMed by changing the status of these orders to "cancelled" or "deleted." The net effect of the modifications

caused the products requested by these orders to not be shipped by Medline DiaMed to its customers. Upon information and belief, Libassi re-submitted these pending orders to Cronin, Haithcock, and the Fried Brothers for fulfillment by CSS in furtherance of the Plan.

53.     After Libassi entered Medline DiaMed's secure server to steal and modify Medline DiaMed's confidential trade secrets and proprietary information in furtherance of the Plan, she tried to cover her tracks to conceal detection of the Plan by Medline DiaMed. Fortunately, as explained below, these efforts failed. Highly confidential trade secret information deserves effective security systems. Medline DiaMed has both. Medline DiaMed's secure server monitoring and audit software confirms Libassi's theft as well as her efforts to conceal her wrongdoing in furtherance of the Plan.

54.     Libassi continues to take active steps to utilize the confidential trade secret information she misappropriated by soliciting Medline DiaMed's customers for placement with CSS in furtherance of the Plan. By way of one example, using the confidential customer information she obtained from Medline DiaMed, on December 15, 2010, Libassi sent the following text message: "Good morning everyone its linda libassi going forward this will be my new cell number." Upon information and belief, this text message was sent to scores of Medline DiaMed's clients, and was a part of a deliberate attempt by Libassi to utilize Medline DiaMed's confidential information to drive business to her new employer, CSS, in furtherance of the Plan.

55.     Not only is the Fried Brothers' and CSS's involvement in the Plan confirmed by the actions of Cronin and Libassi, but it is also confirmed by their own actions. In late November / early December 2010, Jerrold Fried contacted wholesaler JAL Associates, a medical supplier of Medline DiaMed. During this conversation, Jarrold Fried confirmed the existence of the Plan, and further stated that CSS would be attempting to provide office-based medical supplies to the current customers of Medline DiaMed.

22

### The Fraud

56.     Upon information and belief, CSS and the Fried Brothers' enactment of the Plan before the finalization of the APA rendered the Representations and Warranties false and misleading.   To illustrate, by creating and effectuating the Plan, it was false that there had not been any material adverse change to the assets, customer accounts, employees, and goodwill purchased by Medline DiaMed.   It was additionally false that DiaMed USA had conducted its operations in all material respects in the ordinary course of business.   It was false that no terms of employment of any employee had materially changed, and it was false that DiaMed USA had not received notice of any planned termination of any key employee.   Finally, it was false that DiaMed USA had no knowledge that any of its 20 largest customers has indicated that it will stop or materially diminish its business with DiaMed USA.

57.     Through DiaMed USA, CSS and the Fried Brothers made the false and misleading Representations and Warranties with the specific intent to defraud Medline DiaMed.   Medline DiaMed relied upon the Representations and Warranties to its detriment by paying approximately $6,000,000.00 for the assets, customer accounts, and goodwill of DiaMed USA.   Had Medline DiaMed known of CSS and the Fried Brothers' fraud, it would have never purchased DiaMed USA.

### The Cover-Up

58.     In an effort to prevent detection of the Plan by Medline DiaMed, Libassi, Cronin, Haithcock, the Fried Brothers, and CSS have engaged in substantial efforts to conceal the Plan.   While the full dynamic of the Plan continues to be uncovered by Medline DiaMed, it is clear that their cover-up efforts have failed.

59.     As one example, after Libassi misappropriated Medline DiaMed's confidential trade secret information in furtherance of the Plan while she was employed by Medline DiaMed by forwarding emails containing this information from her Medline DiaMed email account to her own personal Gmail

account (in violation of Medline DiaMed policy), she deleted the emails containing confidential trade secret information from the inbox of her Medline DiaMed account. She left other benign, non-sensitive emails in her Medline DiaMed email inbox unaltered. Presumably, Libassi thought that after she destroyed the trade secret information residing in the inbox of her Medline DiaMed email account, Medline DiaMed would not realize this information resided in her inbox, and the misappropriation would remain undetected. However, Libassi neglected to delete the emails from the outgoing box of her Medline DiaMed email account. Therefore, not only can Medline DiaMed confirm the trade secrets stolen by Libassi, but Medline DiaMed can demonstrate Libassi's failed attempts to conceal these efforts.

60. It is also apparent that CSS and the Fried Brothers participated in the cover-up of the Plan. By way of illustration, for all emails sent to CSS by Medline DiaMed, Medline DiaMed's email software generates a return receipt. This receipt notifies Medline DiaMed when an email is opened or modified. At the same time Medline DiaMed was receiving information from its customers confirming the existence of the Plan, on December 16, 2010, Medline DiaMed began to receive scores of email return receipts notifying Medline DiaMed that emails received by CSS from Medline DiaMed were being deleted. Medline DiaMed had never received these types of email return receipts from CSS before. It was readily apparent that CSS was purging its systems of all emails received from Medline DiaMed in an effort to destroy the emails that evidenced the Plan.

### The Effects of the Plan Upon Medline DiaMed

61. Upon information and belief, the Plan has already resulted in the loss of dozens of Medline DiaMed's clients being steered to CSS. As a result of the Plan, it is estimated that at least 50 Medline DiaMed clients have already transferred their accounts to CSS or a related entity, with lost revenue to Medline DiaMed expected to exceed $1.7 million. If the Plan continues, Medline DiaMed's business will be irreparably harmed. The Plan must be stopped immediately.

24

## COUNT I
## FRAUD

62.    Medline DiaMed restates each preceding paragraph as if fully rewritten herein.

63.    As alleged hereinabove, through DiaMed USA, CSS and the Fried Brothers deliberately concealed the existence of the Plan and similar facts that rendered the Representations and Warranties false and misleading, and were silent when a duty existed to reveal these facts to Medline DiaMed.

64.    Through DiaMed USA, CSS and the Fried Brothers knew the Representations and Warranties were false and misleading, or were at a minimum, recklessly indifferent to the truth and accuracy of the Representations and Warranties.

65.    DiaMed USA, through CSS and the Fried Brothers, made the Representations and Warranties with the intent to induce Medline DiaMed to pay approximately $6,000,000.00 for the assets of DiaMed USA, including its customer accounts, business processes and methods, intellectual property, inventory, and the extensive goodwill developed by DiaMed USA.

66.    Medline DiaMed USA justifiably relied upon the Representations and Warranties made by DiaMed USA, through CSS and the Fried Brothers, by paying approximately $6,000,000.00 for the above mentioned assets of DiaMed USA.

67.    As a direct and proximate result of DiaMed USA, CSS, and the Fried Brothers' fraud, Medline DiaMed has suffered and will continue to suffer, substantial damages and irreparable harm for which no remedy exists.

68.    As DiaMed USA, CSS, and the Fried Brothers have willfully and maliciously engaged in the fraud alleged hereinabove, Medline DiaMed is entitled to recover their reasonable attorneys' fees and punitive damages.

## COUNT II
## BREACH OF CONTRACT

69.     Medline DiaMed restates each preceding paragraph as if fully rewritten herein.

70.     The APA constituted a valid, binding contract between Medline DiaMed and DiaMed USA, duly supported by consideration.

71.     DiaMed USA breached the Representations and Warranties of the APA as alleged herein above.

72.     As a direct and proximate result of DiaMed USA's breach of contract, Medline DiaMed has suffered and will continue to suffer, substantial damages and irreparable harm for which no remedy exists.

## COUNT III
## MISAPPROPRIATION OF TRADE SECRETS
## R.C. § 1333.61, ET SEQ.

73.     Medline DiaMed restates each preceding paragraph as if fully rewritten herein.

74.     As alleged hereinabove, Medline DiaMed has acquired and developed confidential trade secret information.  That confidential trade secret information includes, but is not limited to, confidential business information and procedures, sales history reports, customer deviations reports, pricing sheets, and other forms of sensitive, proprietary information, the public dissemination of which would cause immediate and irreparable harm to Plaintiff's business.

75.     Throughout the course of Libassi, Cronin, and Haithcock's employment with DiaMed USA and Medline DiaMed, Libassi, Cronin, and Haithcock had access to, received, and utilized the confidential trade secret information owned by Medline DiaMed.

76.     Libassi, Cronin, and Haithcock have a duty to Medline DiaMed to maintain the secrecy of Medline DiaMed's confidential trade secret information.

26

77.    CSS and the Fried Brothers have a duty to refrain from utilizing Libassi, Cronin, and Haithcock to acquire or otherwise provide the confidential trade secret information of Medline DiaMed for use by CSS and/or the Fried Brothers.

78.    Upon information and belief, Libassi, Cronin, Haithcock, CSS, and the Fried Brothers have maliciously, knowingly, intentionally, and willfully, without the consent of Medline DiaMed, misappropriated the confidential trade secret information of Medline DiaMed, and Libassi, Cronin, Haithcock, CSS, and the Fried Brothers are using said trade secrets and confidential information for their own benefit in order to unfairly compete with Medline DiaMed.

79.    The misappropriation of Medline DiaMed's trade secrets by Libassi, Cronin, Haithcock, CSS, and the Fried Brothers has clearly caused permanent and irreparable damage to Medline DiaMed for which no adequate remedy at law exists.

80.    Accordingly, pursuant to R.C. § 1333.62, MedLine DiaMed is entitled to relief enjoining Libassi, Cronin, Haithcock, CSS, and the Fried Brothers from utilizing Medline DiaMed's trade secret information.

81.    In addition, pursuant to R.C. §§ 1333.63 and 1333.64, Medline DiaMed is entitled to recover damages for Libassi, Cronin, Haithcock, CSS and the Fried Brothers' misappropriation, and is entitled to recover treble damages and attorney fees for this willful and malicious conduct.

82.    As a direct and proximate result of Libassi, Cronin, Haithcock, CSS, and the Fried Brothers' improper and unlawful use of Medline DiaMed's confidential information and trade secrets, Medline DiaMed has suffered and will continue to suffer immediate, irreparable, and permanent damage to its business, business good will, and general standing in the community for which no adequate remedy at law exists.

## COUNT IV
## BREACH OF FIDUCIARY DUTY

83.    Medline DiaMed restates each preceding paragraph as if fully rewritten herein.

84.    At all times during their employment with Medline DiaMed, Libassi and Cronin had a fiduciary duty of good faith loyalty to act in its best interests. At all times during the course of their employment with Medline DiaMed, Libassi and Cronin were obligated to act exclusively in Medline DiaMed's best interests, and were prohibited from acting in a manner contrary to Medline DiaMed's legitimate business interests.

85.    After their resignation from Medline DiaMed, Libassi and Cronin continued to owe Medline DiaMed fiduciary duties with respect to the confidential and proprietary information and/or trade secrets to which they had gained access during the course of their employment with Medline DiaMed, as well as the client transactions on behalf of Medline DiaMed that they had worked on or were working on at the time of their resignation.

86.    At the encouragement and direction of Haithcock, CSS, and the Fried Brothers, Libassi and Cronin breached their fiduciary duties to Medline DiaMed as described hereinabove. This breach was willful and malicious. As a direct and proximate result of Libassi and Cronin's breaches of their fiduciary duties, Medline DiaMed has suffered and will continue to suffer, substantial damages, harm, and irreparable harm for which no remedy exists. In addition, Libassi and Cronin are obligated to disgorge all compensation paid by Medline DiaMed during the period of their disloyalty.

## COUNT V
## UNFAIR COMPETITION
## R.C. § 4165.02

87.    Medline DiaMed restates each preceding paragraph as if fully rewritten herein.

88.    The acts and conduct of Libassi, Cronin, Haithcock, CSS, and the Fried Brothers set forth hereinabove constitute unfair competition, as defined by R.C. § 4165.02, et seq.

28

89. Libassi, Cronin, Haithcock, CSS, and the Fried Brothers' unfair competition includes, but is not limited to:

- Passing off the goods of Medline DiaMed as the goods of another;

- Causing a likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of CSS's goods;

- Causing a likelihood of confusion or misunderstanding as to affiliation, connection, or association between Medline DiaMed and CSS; and

- Representing that CSS's goods have sponsorship, approval, or characteristics that they do not have.

90. The unfair competition by Libassi, Cronin, Haithcock, CSS, and the Fried Brothers has clearly caused permanent and irreparable damage to Medline DiaMed for which no adequate remedy at law exists.

91. Accordingly, pursuant to R.C. § 4165.03(A)(1), MedLine DiaMed is entitled to relief enjoining Libassi, Cronin, Haithcock, CSS, and the Fried Brothers from utilizing Medline DiaMed's trade secret information.

92. In addition, Libassi, Cronin, Haithcock, CSS, and the Fried Brothers' conduct as alleged hereinabove has damaged and will continue to damage Medline DiaMed and Medline DiaMed's good will and reputation, and has resulted in losses to Medline DiaMed and an elicit gain of profit to Libassi, Cronin, Haithcock, CSS, and the Fried Brothers in an amount to be proven at trial pursuant to R.C. § 4165.03(A)(2).

93. Libassi, Cronin, Haithcock, CSS, and the Fried Brothers have willfully and maliciously engaged in the unfair practices alleged hereinabove, thereby entitling Medline DiaMed to recover their reasonable attorneys' fees pursuant to R.C. § 4165.03(B) and punitive damages.

29

## COUNT VI
## OHIO COMMON LAW UNFAIR COMPETITION

94.     Medline DiaMed restates each preceding paragraph as if fully rewritten herein.

95.     The persistent and continuous acts and conduct of Libassi, Cronin, Haithcock, CSS, and the Fried Brothers alleged hereinabove, including but not limited to, misappropriation of Medline DiaMed's trades secrets, breaching and encouraging the breach of fiduciary duties owed to Medline DiaMed, and encouraging the deceitful diversion of customers to CSS, constitute unfair competition pursuant to the common law of the State of Ohio.

96.     Libassi, Cronin, Haithcock, CSS, and the Fried Brothers' conduct as alleged above has damaged, and will continue to damage, Medline DiaMed's good will and reputation and has resulted in losses to Medline DiaMed and an elicit gain of profit to Libassi, Cronin, Haithcock, CSS, and the Fried Brothers in an amount to be proven at trial

97.     Libassi, Cronin, Haithcock, CSS, and the Fried Brothers have engaged in the conduct alleged hereinabove with actual malice, therefore entitling Medline DiaMed to an award of punitive damages and attorneys' fees.

## COUNT VII
## TORTIOUS INTERFERENCE

98.     Medline DiaMed restates each preceding paragraph as if fully rewritten herein.

99.     Medline DiaMed has and had valid contractual relationships and business expectancies with its clients which created a reasonable probability of future economic benefit to Medline DiaMed.

100.    As a result of Libassi, Cronin, Haithcock, CSS, and the Fried Brothers' conduct, many of these customers have transferred some or all of their business to CSS.

101.    Libassi, Cronin, Haithcock, CSS, and the Fried Brothers had actual knowledge of the contractual relationships and business expectancies Medline DiaMed has and had with its clients.

102. Libassi, Cronin, Haithcock, CSS, and the Fried Brothers have intentionally interfered and continue to interfere with Medline DiaMed's client relationships and expectancies by using confidential trade secret information to engage in direct and active competition with Medline DiaMed, even while Libassi and Cronin were still employed by Medline DiaMed.

103. Medline DiaMed had a reasonable and objective expectation that absent the misconduct alleged herein, Medline DiaMed would have continued the contractual relationships and/or realized the business expectancies it had with its clients and accordingly received substantial future economic benefits.

104. Libassi, Cronin, Haithcock, CSS, and the Fried Brothers' intentional interference induced or caused termination of the relationships and/or failure to realize the business expectancies that Medline DiaMed had with its clients.

105. Despite knowing about Medline DiaMed's expectation of the economic advantage that would result from Medline DiaMed's ongoing contractual relationships with its customers, Libassi, Cronin, and Haithcock have, on behalf of CSS and the Fried Brothers, contacted and solicited these customers that they serviced while at Medline DiaMed and/or used Medline DiaMed's confidential information to induce those customers to terminate their relationships with Medline DiaMed and move their business to CSS.

106. Libassi, Cronin, Haithcock, CSS, and the Fried Brothers engaged in their intentional interference with malice towards Medline DiaMed and through improper means and methods. The improper means and methods employed include, but are not limited to: (a) Libassi, Cronin, Haithcock, CSS, and the Fried Brothers' misappropriation of Medline DiaMed's trade secrets; (b) breaching and encouraging the breach of fiduciary duties to Medline DiaMed; and (c) engaging in statutory and common law unfair competition with respect to the Plan as alleged herein.

107.    As a result of the intentional and interfering conduct of Libassi, Cronin, Haithcock, CSS, and the Fried Brothers, Medline DiaMed has been injured and damaged, and will continue to be injured and damaged.

108.    Medline DiaMed has suffered, and will continue to suffer, substantial harm, damage, and irreparable damage as a result of Libassi, Cronin, Haithcock, CSS, and the Fried Brothers' interference with its contractual relationships and business expectancies.

## COUNT VIII
## CIVIL CONSPIRACY

109.    Medline DiaMed restates each preceding paragraph as if fully rewritten herein.

110.    Libassi, Cronin, Haithcock, CSS, and the Fried Brothers unlawfully combined, in a manner not competent for a single actor, to commit the unlawful conduct described above in an effort to injure Medline DiaMed.    The unlawful conduct includes, but is not limited to: (a) the concerted misappropriation of Medline DiaMed's trade secrets; (b) breaching and encouraging the breach of fiduciary duties to Medline DiaMed; and (c) engaging in statutory and common law unfair competition with respect to the Plan as alleged herein.

111.    Libassi, Cronin, Haithcock, CSS, and the Fried Brothers engaged in this unlawful civil conspiracy willfully, with malicious purpose, and in bad faith.

112.    Medline DiaMed has suffered, and will continue to suffer, substantial harm, damage, and irreparable damage as a result of Libassi, Cronin, Haithcock, CSS, and the Fried Brothers' civil conspiracy.

## COUNT IX
## SPOLIATION OF EVIDENCE

113.    Medline DiaMed restates each preceding paragraph as if fully rewritten herein.

32

114.    Libassi, Cronin, Haithcock, CSS, and the Fried Brothers were in possession of a multitude of evidentiary documents, including emails, spreadsheets, and word processing documents, that were used in connection with the effectuation of the Plan as alleged herein.

115.    Libassi, Cronin, Haithcock, CSS, and the Fried Brothers had a duty to preserve this evidence as they knew or had reason to know that litigation was probable concerning the Plan as alleged herein.

116.    Upon information and belief, Libassi, Cronin, Haithcock, CSS, and the Fried Brothers have willfully destroyed this evidence.

117.    Defendants' intentional destruction of this evidence has deprived Medline DiaMed of the ability to discover the full scope of the Plan and the full extent of the injury caused to Medline DiaMed by the Plan as alleged herein.

118.    Libassi, Cronin, Haithcock, CSS, and the Fried Brothers have engaged in the conduct alleged hereinabove with actual malice, therefore entitling Medline DiaMed to an award of punitive damages.

## COUNT X
## INJUNCTIVE RELIEF

119.    Medline DiaMed restates each preceding paragraph as if fully rewritten herein.

120.    Medline DiaMed is likely to succeed on the merits of its cause of action because Libassi, Cronin, Haithcock, CSS, and the Fried Brothers' conduct is patently illegal, as set forth herein.

121.    As set forth above, Libassi, Cronin, Haithcock, CSS, and the Fried Brothers have misappropriated, and have utilized, are utilizing, and/or are about to utilize and continue to utilize the confidential business information regarding Medline DiaMed's business, thereby providing CSS with an unfair competitive advantage against and over Medline DiaMed.

122.    As a direct and proximate result of Libassi, Cronin, Haithcock, CSS, and the Fried Brothers' unlawful misappropriation, transfer, disclosure, use, and intended use of Medline DiaMed's confidential business information, Libassi, Cronin, Haithcock, CSS, and the Fried Brothers are

33

causing, and will continue to cause, great and irreparable interference and damage to Medline DiaMed's business, customer relations, and goodwill, which damage cannot be compensated adequately in money damages.

123. These irreparable injuries will continue to be suffered by Medline DiaMed unless and until Libassi, Cronin, Haithcock, CSS, and the Fried Brothers are enjoined by this Honorable Court from using Medline DiaMed's confidential information, ordered to cease diverting customers and/or sales from Medline DiaMed, ordered to cease competing with Medline DiaMed in the office-based physician market, ordered to cease all solicitation of Medline DiaMed's customers, and further ordered and/or compelled to destroy and/or return all of the aforementioned confidential business information to Medline DiaMed.

**WHEREFORE**, Plaintiff, Medline DiaMed, LLC demands judgment against Defendants DiaMed USA, LLC, Community Surgical Supply of Toms River, Inc., Jerrold Fried, Michael Fried, Howard Fried, Linda Libassi, Laura Cronin, and Melissa Haithcock as follows:

A. A preliminary injunction and permanent injunction;

B. Disgorgement of all profits realized as a result of the wrongful conduct alleged herein;

C. Compensatory damages in excess of $25,000.00;

D. Punitive damages in an amount to be determined at trial;

E. Attorneys' fees in an amount to be determined by the Court, pursuant to both the common and statutory law of this State and the State of Delaware;

F. Treble damages pursuant to the statutory law of this State;

G. Prejudgment and post judgment interest in accordance with the statutory rate;

H. Costs of the within action; and

I. Any further relief that this Court deems just and equitable.

DATED:     January 12, 2011     Respectfully submitted,

**TZANGAS, PLAKAS, ·**
**MANNOS & RAIES, LTD.**

_(signature)_

Lee E. Plakas (0008628)
Gary A. Corroto (0055270)
Edmond J. Mack (0082906)
220 Market Avenue South
Eighth Floor
Canton, Ohio 44702
Telephone:    (330) 455-6112
Facsimile:    (330) 455-2108
Email:    emack@lawlion.com

*Attorneys for Plaintiffs*

**TO THE CLERK:**

Please issue service of summons and complaint in this action against the Defendants at the addresses listed in the caption of the Complaint and deliver the same to counsel for Plaintiff for service by process server.

_(signature)_

Edmond J. Mack
*Attorney for Plaintiffs*