Medline buys Canton-based DiaMed USA - Canton, OH - CantonRep.com    http://www.cantonrep.com/news/x290100839/Medline-buys-Canton-b...



# Medline buys Canton-based DiaMed USA

CantonRep.com staff report
Posted Nov 17, 2010 @ 11:30 AM

Recommend    Be the first of your friends to recommend this.



CANTON — Medline Industries, which recently purchased property to open an office in Canton, has acquired DiaMed USA, a Canton-based physician office supplier.

Medline Industries is the nation's largest privately held manufacturer and distributor of healthcare supplies and services.

"This acquisition is an excellent strategic fit for Medline and will substantially increase our base of service for physicians and home care customers," David Greenberg, Medline's executive vice president of strategy, said in a statement.

"DiaMed shares our vision and commitment to providing outstanding service, which will only be enhanced with the addition of Medline's products and resources."

Corporate headquarters for DiaMed USA are at 3670 Progress St. NE. DiaMed USA was founded in 1995, according to the company's website.

The business will be operating under the name Medline DiaMed, LLC.

Medline is the first tenant in the Mills Industrial Park at Faircrest Street and Sherman Church Avenue SW, a joint venture of the Canton Regional Chamber of Commerce Foundation and the DeHoff Family Foundation. The company previously said it plans to create 25 to 30 permanent full-time jobs in an energy-efficient and environmentally friendly building, estimated to be 300,000 square feet.

Medline manufactures and distributes more than 100,000 products to hospitals, extended-care facilities, surgery centers, home care dealers and agencies. It has more than 900 dedicated sales representatives nationwide to support its product line and cost management services.

Medline serves as the primary distributor to more than 450 major hospitals and healthcare systems.

Copyright 2010 CantonRep.com. Some rights reserved

## Popular Videos

     

| Optimism Surrounds Bipartisan Agreements | Holiday Bargain Battle | US Senate scraps gay military ban | Pregnant Woman Attacked | Kidnapped Woman Found | Suspected Killer's Victim Count Unknown |

Mortgage Rates Hit 2.99%
With rates lower than ever, now is the time to refinance
www.SeeRefinanceRates.com

EHSI Buys Biotech Leader
Breaking News- EHSI just acquired biotech leader celulas
www.TheStemCellGroup.com

1 Tip To Lose Stomach Fat
Follow This 1 Simple Diet Tip And Lose 9 Lbs A Week
CDKitchen.com

Ads by Yahoo!

Comments (1)
gottheanswer
1 month ago
Report Abuse
You must be logged in to report abuse.



## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") dated as of October [__], 2010, is by and between Medline DiaMed, LLC, an Illinois limited liability company (the "Buyer"), and DiaMed USA, LLC, an Ohio limited liability company (the "Seller"). Buyer and Seller may each be referred to as a "Party," and collectively, the "Parties."

### RECITALS

A.    Seller operates a medical supply distributorship that operates primary in the office based physician market (the "Purchased Business") and leases from Medical Diagnostic Services, Ltd. ("MDS") land and improvements located at 3670 Progress Street, N.E., Canton, Ohio, 44705 which is used in connection with the Purchased Business (the "Facility");

B.    Buyer wishes to purchase or acquire from Seller, and Seller wishes to sell, assign, convey, deliver and transfer to Buyer the Purchased Assets (as defined below), and Buyer has agreed to assume the Assumed Liabilities, all for the Purchase Price and upon the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants, representations and warranties made herein, the mutual benefits to be derived hereby, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I
## SALE AND PURCHASE OF THE ASSETS
## AND ASSUMPTION OF LIABILITIES

1.1    Purchased Assets.  Subject to and upon the terms and conditions set forth in this Agreement, at the Closing, Seller will transfer, or cause to be transferred, to Buyer, and Buyer will purchase or acquire from Seller, all right, title and interest of Seller, in and to only those assets, properties and rights specifically set forth below in this Section 1.1 (the "Purchased Assets"), free and clear of all Liens other than Permitted Liens:

(a)    The accounts receivable specifically listed on Schedule 1.1(a) (the "Accounts Receivable");

(b)    The inventory, raw materials and work-in-progress specifically listed on Schedule 1.1(b);

(c)    The contracts, agreements, employment agreements (including restrictive covenants with current and former employees), leases, and purchase orders specifically listed on Schedule 1.1(c) (collectively, the "Assumed Contracts");

(d)    All furniture, fixtures and equipment used in the operation of the Purchased Business and owned by Seller;

Formatted: DocID

1709970


PLAINTIFF'S EXHIBIT
B

(e)     All books, records, copies of manuals, advertising matter, catalogues, price lists, correspondence, mailing lists, lists of customers, lists of vendors, distribution lists, photographs, production data, sales and promotional materials and records, purchasing materials and records, personnel records, manufacturing and quality control records and procedures, specifications, engineering data, equipment manuals, test data, blueprints, research and development files, records, data and laboratory books, media materials, accounting records, sales order files and litigation files that, in each case, are used in the operation of the Purchased Business; and

(f)     All goodwill, telephone numbers and other intangible assets relating to the Purchased Business and the Intellectual Property identified on Schedule 1.1(f).

1.2     Excluded Assets. Notwithstanding the provisions of Section 1.1, Seller shall retain and Buyer shall not purchase or acquire any assets, properties or rights other than the Purchased Assets (the "Excluded Assets"). The Excluded Assets include but are not limited to:

(a)     All of Seller's cash and cash equivalents;

(b)     Seller's organizational documents and financial and tax records;

(c)     All right of Seller in and to any incentive rebates earned prior to Closing, including, without limitation, such incentive rebates from the vendors set forth on Schedule 1.2(c);

(d)     All rights of Seller to any income, franchise, employment, payroll, property or other tax refunds;

(e)     All ownership and other rights with respect to Seller's employee benefit plans and any assets related thereto;

(f)     All rights that accrue to Seller under this Agreement and the Ancillary Agreements;

(g)     Certain receivables owed by one or more member of Seller to Seller and set forth on Schedule 1.2(g);

(h)     Certain loan receivables owed to Seller by certain officers of Seller as set forth on Schedule 1.2(h);

(i)     Certain commission receivables as set forth on Schedule 1.2(i);

(j)     All deferred costs, deposits, advances, credits and expenses that have been prepaid by the Seller;

(k)     The personal property of any employees of Seller, including pictures, artwork, and other office décor; and

(l)     Seller's State of Ohio Pharmaceutical License.

1709970                                    2

1.3     Assumption of Liabilities. Subject to the terms and conditions set forth herein, at the Closing, Buyer shall assume, pay, honor and discharge when due: (i) only those liabilities, obligations and commitments of Seller under the Assumed Contracts arising after the Closing Date or relating to the period after the Closing Date, but only to the extent such liabilities or obligations did not arise out of a breach or default by Seller or any of its Affiliates of such Assumed Contracts on or before the Closing Date, and (ii) the purchase orders, loan obligations, and trade payables specifically listed on Schedule 1.3 ((i) and (ii) are collectively referred to as the "Assumed Liabilities").

1.4     Excluded Liabilities.

(a)     Buyer shall not be the successor to Seller, and except as expressly set forth in Section 1.3 above, Buyer shall not assume and shall not be liable or responsible for (collectively, the "Excluded Liabilities"):

(i)     any debt, obligation or liability of the Seller, any Affiliate of Seller, or any shareholder or any of their Affiliates; or

(ii)     any debt, obligation or liability related to the Purchased Assets, the Facility or any claim against any of the foregoing, of any kind, whether known or unknown, contingent, absolute, or otherwise, to the extent arising on or prior to the Closing and related to the period on or prior to the Closing.

(b)     Without limiting the foregoing, the term Excluded Liabilities shall include the following liabilities of Seller:

(i)     Liabilities related to or arising from transactions between Seller and any Affiliate of Seller, including any inter-company payables;

(ii)     Liabilities for Taxes of the Seller of any kind;

(iii)     Liabilities for damage or injury (real or alleged) to person or property arising from the ownership, possession or use of any product manufactured, assembled, processed, treated, distributed, sold or serviced, directly or indirectly, or any service rendered by Seller on or prior to the Closing Date, including any product liability and product warranty claims;

(iv)     Liabilities to and claims asserted by current and former employees of Seller, including those for wages and compensation, accident, disability, health (including unfunded medical liabilities) and worker's compensation insurance or benefits, and all other liabilities and obligations to employees in connection with Seller's operation of the Purchased Business and the Purchased Assets;

(v)     Liabilities arising from or relating to claims or liabilities for benefits or pay under any Employee Benefit Plan, Seller's compensation policies, individual employment contracts or collective bargaining agreements, any severance payment, including those related to any alleged termination of employment solely as a result of the transactions contemplated hereby, or WARN Act liabilities;

t709970                                    3

(vi)    Liabilities for expenses, Taxes or fees incurred by Seller, incidental to the preparation of this Agreement, preparation or delivery of materials or information requested by Buyer, and the consummation of the transactions contemplated hereby, including all broker, counsel and accounting fees, sales, stamp, or transfer Taxes, payments or bonuses that become due or are otherwise required to be made as a result of or in connection with the Closing or as a result of any change of control or similar provisions;

(vii)    Liabilities relating to or arising from litigation or any other disputes with third parties, if any, pending at the Closing;

(viii)    Liabilities related to Excluded Assets;

(ix)    Liabilities due to products sold or services rendered by Seller or any of its Affiliates on or prior to the Closing Date with respect to patent, trademark or copyright litigation or disputes, including actions for infringement;

(x)    Liabilities arising from or in connection with any administrative ruling or other order, stipulation or decree of any federal, state or local agency, or the violation of any federal, state or local Law with respect to events, actions or occurrences occurring on or prior to the Closing Date;

(xi)    Liabilities relating to the operation prior to Closing of the Facility or any other real property, buildings, improvements or other premises utilized by Seller or its Affiliates, including liabilities arising from any environmental Laws;

(xii)    Liabilities to any of Seller's directors, officers, shareholders, agents or representatives;

(xiii)    Liabilities relating to the debt of Seller or any of their Affiliates or other persons; and

(xiv)    all other Liabilities of Seller or related to the Facility, the Purchased Assets or the Purchased Business on or prior to Closing Date.

## ARTICLE II
## PURCHASE PRICE AND CLOSING

2.1    Purchase Price. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall (a) pay or cause to be paid to Seller an amount equal to the sum of $6,000,000 (the "Purchase Price"), and (b) assume the Assumed Liabilities. The Purchase Price shall be payable at the Closing by wire transfer of immediately available funds to such bank account or accounts as designated by Seller. However, the Purchase Price is subject to a dollar-for-dollar reduction, as follows:

(a)    The Purchase Price is subject to a dollar-for-dollar reduction in the event Buyer does not collect at least 90% of the accounts receivable identified on Schedule 1.1(a) within 270 days of the Closing Date. Buyer shall hold back and retain $75,000 of

1709970                                    4

the Purchase Price at Closing until the 270th day post-Closing, at which time the Buyer shall either: (i) retain all or some portion of this hold back amount as a Purchase Price reduction (in the event collections were less than 90%), or (ii) distribute the entire hold back amount to the Seller as Purchase Price (in the event collections were equal to or greater than 90%). In the event the Purchase Price reduction, if any, is greater than $75,000, then Seller shall pay to Buyer the difference between $75,000 and the reduction. Notwithstanding the foregoing, should Buyer collect 90% or more of the accounts receivable identified on Schedule 1.1(a) prior to the 270th day, it shall promptly forward the entire $75,000 hold back amount to Seller; and

(b)    Buyer shall hold back and retain an additional $75,000 of the Purchase Price at Closing until the 5th day post-Closing, at which time the Buyer shall either: (i) confirm the existence of all of the inventory specified on Schedule 1.1(b) and distribute the entire additional $75,000 to Seller as Purchase Price, or (b) retain and reduce from the Purchase Price the portion of the $75,000 by which the inventory was less than the amount set forth on Schedule 1.1(b). Notwithstanding the foregoing, should Buyer confirm the existence of all of the inventory specified on Schedule 1.1(b) prior to the 5th day, or should Buyer fail to complete its examination of the inventory within such 5 day period, it shall promptly forward the entire additional $75,000 hold back amount to Seller.

2.2    Place and Date. The closing of the sale and purchase of the Purchased Assets and the assignment and assumption of the Assumed Liabilities (the "Closing") shall take place simultaneously with the execution of this Agreement and the Ancillary Agreements by both Parties, which execution may take place via facsimile, with such original documents to follow in overnight courier, or such other time and place upon which the Parties may agree. The day on which the Closing actually occurs is referred to as the "Closing Date." The Closing shall be deemed to have taken place at 12:01 a.m. Eastern Standard Time on the Closing Date.

2.3    Documents to be Delivered by Seller. At or prior to the Closing, Seller shall deliver or cause to be delivered to Buyer:

(a)    A bill of sale and assumption agreement, in a form attached as Exhibit A ("Bill of Sale and Assumption Agreement"), transferring the Purchased Assets to Buyer, free and clear of any and all Liens other than Permitted Liens;

(b)    A fully executed Facility lease, in a form attached as Exhibit B, between Buyer and MDS;

(c)    Releases, including termination statements under the Uniform Commercial Code of any financing statements filed against any Purchased Assets, evidencing discharge, removal and termination of all security interests or mortgages, other than Permitted Liens, to which the Purchased Assets are subject; or a payoff letter with appropriate authorization to file UCC termination statements; and

(d)     Fully executed employment and non-competition agreements between Buyer and Scott Wakser ("Wakser") and Doug Sharpe ("Sharpe"), respectively, attached as Exhibit C.

2.4     Documents to be Delivered by Buyer.  At the Closing, Buyer shall deliver or cause to be delivered to Seller the Purchase Price, the Facility Lease attached as Exhibit B, a fully executed Bill of Sale and Assumption Agreement, attached as Exhibit A, and the employment and non-competition agreements with Wakser and Sharpe, respectively, attached as Exhibit C.

2.5     Purchase Price Allocation.  The Purchase Price and the Assumed Liabilities, including amounts realized for income Tax purposes and other related items, shall be allocated among the Purchased Assets in accordance with Schedule 2.5 (as such schedule may be amended or revised by applicable Law and the mutual agreement of the Parties hereto) and in accordance with Section 1060 of the Code.  Each of the Parties hereto shall report the purchase and sale of the Purchased Assets on all income Tax Returns (including IRS Form 8594) in accordance with the values set forth in Schedule 2.5.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

3.1     Representations and Warranties of Seller.  Seller represents and warrants to Buyer as follows:

(a)     Authorization.  Seller has the corporate power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is a party, to perform fully its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by Seller of this Agreement and each of the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated thereby have been duly authorized by all requisite corporate action of Seller.  This Agreement and each of the Ancillary Agreements to which it is a party are, legal, valid and binding obligations of Seller, enforceable against it in accordance with their respective terms, subject to the effect of any applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or similar laws relating to or affecting creditors' rights generally and subject, as to enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(b)     Corporate Status.  Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Ohio, with full corporate power and authority to carry on the operation of the Purchased Business and to use the Purchased Assets.

(c)     No Conflicts.  The execution, delivery and performance by Seller of this Agreement and each of the Ancillary Agreements to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not (i) violate or conflict with the articles of organization or the operating agreement of Seller, (ii) violate,

conflict with or result in a breach or termination of, or otherwise give any Person additional rights or compensation under, or the right to terminate or accelerate, or constitute (with notice or lapse of time, or both) a default under the terms of any Assumed Contract or by which any of the Purchased Assets are bound or (iii) result in the creation or imposition of any Lien with respect to, or otherwise have an adverse effect upon, the Purchased Assets. Except as specified in Schedule 3.1(c), no Consent is required to be obtained from any Person or Governmental Authority or made by Seller in connection with the execution and delivery of this Agreement and the Ancillary Agreements to which it is a party, or the consummation of the transactions contemplated hereby or thereby.

    (d)    <u>Litigation</u>.

    (i)    There is no action, claim, suit, Order or proceeding pending, or to Seller's Knowledge, threatened, by or against Seller in connection with or relating to the transactions contemplated by this Agreement or which could (i) prevent consummation of any of the transactions contemplated by this Agreement; or (ii) affect adversely the right of Buyer to own the Purchased Assets, to operate the Purchased Business (and no such injunction, judgment, order, decree, ruling or charge is in effect).

    (ii)    Except as set forth on Schedule 3.1(d) Seller is not: (i) subject to any outstanding injunction, judgment, Order, decree, ruling or charge in connection with or relating to the Purchased Assets or the Purchased Business; or (ii) a party or, to Seller's Knowledge, threatened to be made a party to any action, suit, proceeding, hearing or investigation in connection with or relating to the Purchased Assets or the Purchased Business of, in or before any court or quasi-judicial or administrative agency of any federal, state local or foreign jurisdiction or before any arbitrator.

    (e)    <u>Purchased Assets</u>.

    (i)    Seller is the sole and exclusive legal and equitable owner of all right, title and interest in and has good and valid title to all of the Purchased Assets. None of the Purchased Assets which Seller purports to own are subject to (A) any title defect or objection; (B) any contract of lease, license or sale; (C) any Lien of any kind or character, direct or indirect, whether accrued, absolute, contingent or otherwise, except Permitted Liens; (D) any royalty or commission arrangement; or (E) any claim, covenant or restriction, other than Permitted Liens.

    (ii)    The tangible Purchased Assets are in good operating condition and repair (reasonable wear and tear excepted and subject to the use and age of such assets), and are suitable for the purposes for which they are presently being used, in accordance with Seller's past practices.

    (f)    <u>Contracts</u>.

    (i)    Schedule 1.1(c) sets forth a true and complete list of all of the Assumed Contracts. Seller has previously furnished or made available to Buyer a true and complete copy of each such Assumed Contract.

1709970

7

(ii)     Each Assumed Contract is in full force and effect and is legal, valid and enforceable against the Seller and, to Sellers' Knowledge, the other parties thereto in accordance with the terms thereof. Seller has not, and to Seller's Knowledge, no other party thereto has, taken any action that would constitute a default under or a breach of any Assumed Contract. Seller has not received or given notice of an intention to cancel or terminate an Assumed Contract or to exercise or not exercise options or rights under an Assumed Contract. Seller has not received written, or to Seller's Knowledge, oral notice of a default, offset or counterclaim under any Assumed Contract, or any other written, or to Seller's Knowledge, oral communication asserting noncompliance.

(g)     Brokers, Finders, etc. All negotiations relating to this Agreement, the Ancillary Agreements, and the transactions contemplated hereby and thereby, have been carried on without the participation of any Person acting on behalf of Seller in such manner as to give rise to any valid claim against Buyer for any brokerage or finder's commission, fee or similar compensation.

(h)     Governmental Approval. Schedule 3.1(h) contains an accurate, correct and complete list of each material Governmental Approval currently issued to Seller related to the operation of the Purchased Business. The Governmental Approvals are valid and in full force and effect and there are no pending, or, to Seller's Knowledge, threatened, proceedings which would result in the termination, revocation, limitation or impairment of any Governmental Approval. Seller has all Governmental Approvals as are necessary in order to enable it to operate the Purchased Business as it is presently conducted.

(i)     Compliance with Laws. Except as set forth on Schedule 3.1(i) and to Seller's Knowledge, Seller is in compliance in all material respects with all Laws applicable to the operation of the Purchased Business. Except as set forth on Schedule 3.1(i), Seller has complied in all material respects with all licensing requirements, decrees, awards or orders applicable to the operation of the Purchased Business. Except as set forth in Schedule 3.1(i), as of the date of this Agreement, Seller has received no written notice from any Governmental Authority asserting that Seller is in violation of any Law.

(j)     Financial Statements. Seller has delivered the following financial statements (collectively, the "Financial Statements") to Buyer with respect to the Purchased Business: (i) balance sheets and income statements as of and for the fiscal years ended December 31, 2008 and December 31, 2009, and (ii) an interim balance sheet through September 2010 and a statement of income and expenses as of and for the month ended September, 2010 (the items referenced in (ii) are collectively referred to as the "Most Recent Financial Statements"). Except for the Most Recent Financial Statements, the Financial Statements (including the notes thereto) have been prepared in accordance with GAAP consistently applied throughout the periods covered thereby (except as may be indicated in the notes thereto). The Financial Statements in all material respects present fairly the financial position of Seller taken as a whole as of such dates and the results of operations of Seller for such periods (except for the absence of

1709970                                         8

accruals and customary year-end adjustments with respect to the Most Recent Financial Statements).

(k)     Events Subsequent to Most Recent Financial Statement. Since the Most Recent Financial Statements, there has not been any material adverse change to the Purchased Business and Seller has conducted the Purchased Business in all material respects in the ordinary course of business. Without limiting the foregoing, since the Most Recent Financial Statements, none of the following have occurred:

(i)     any material changes in management personnel;

(ii)     any material changes to the terms of employment, rate of compensation or level of benefits of any employee, other than in the ordinary course of business in accordance with Seller's past practices;

(iii)     any acquisition or disposition by the Purchased Business of any asset outside the ordinary course of business, other than the sale of inventory in the ordinary course of business;

(iv)     any loss or damage to any material asset of the Purchased Business;

(v)     Seller's entry into any material agreement, commitment or other obligation in connection with or relating to the Purchased Business, outside the ordinary course of business; and

(vi)     any default of any material commitment or obligation of Seller in connection with or relating to the Purchased Business.

(l)     Tax Matters.

(i)     In each case except as would not result in an adverse effect on the Purchased Assets or the Purchased Business, (A) Seller has duly filed or will cause to be filed all Tax Returns required to be filed by it and (B) Seller has paid or will cause to be paid all Taxes required to be paid pursuant to such returns or otherwise required to be paid by it, and there are no other Taxes payable on account of Seller's operations.

(ii)     Seller has withheld and paid or will cause to be withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, or other third party in connection with or relating to the Purchased Business, and all Forms W-2 and 1099 required with respect thereto have been or will be properly completed and timely filed.

(iii)     In each case except as would not result in an adverse effect on the Purchased Assets or the Purchased Business, (A) there is no Tax audit or examination now pending or, to the Knowledge of Seller, threatened with respect to Seller, (B) no waiver of any statute of limitations relating to Taxes has been executed or given by Seller

1709970

9

or (C) no elections, consents, waivers, conventions or agreements have been filed or entered into in respect of any tax or taxing authority.

(m) Intellectual Property.

(i) In each case except as would not result in an adverse effect on the Purchased Assets or the Purchased Business, and to the Knowledge of Seller (A) Seller has not in any material respect interfered with, infringed upon, misappropriated or violated any Intellectual Property rights of third parties, (B) Seller has not received any charge, complaint, claim, demand or notice alleging any such interference, infringement, misappropriation or violation (including any claim that Seller must license or refrain from using any Intellectual Property rights of any third party) and (C) no third party has interfered with, infringed upon, misappropriated or violated any Intellectual Property rights of Seller in any material respect.

(ii) Schedule 3.1(m) identifies each patent, registered trademark, trade name, registered service mark, Internet domain name, registered copyright, and computer software item (other than unmodified off the shelf software used under "clickwrap" or similar software license) used by Seller in connection with the Purchased Business. Seller owns or has the right to use under valid license or other permission, all Intellectual Property listed on Schedule 3.1(m).

(n) Product Liability. To Seller's Knowledge, Seller has no material liability arising out of any injury to individuals or property as a result of the ownership, possession, or use of any product manufactured, sold, leased, or delivered by the Purchased Business prior to the Closing Date.

(o) Employees.

(i) Except as set forth on Schedule 3.1(o), no key employee or significant group of employees has provided written notice to Seller that he, she or they plan(s) to terminate employment with the Purchased Business during the next twelve (12) months. To the Seller's Knowledge, Seller has not committed any material unfair labor practice and has complied in all material respects with all applicable employment and labor laws of federal, state, local, and foreign governments relating to or in connection with the Purchased Business.

(ii) Seller is not a party to any collective bargaining agreement or bound to any other agreement with a labor union covering any employees of the Purchased Business. There have not been, and there are not pending or, to the Knowledge of Seller, threatened, any labor disputes, work stoppages, requests for representation, pickets, work slow-downs due to labor disagreements or any collective actions or arbitrations that involve employees of the Purchased Business. There is no unfair labor practice, charge or complaint pending, unresolved or, to the Knowledge of Seller, threatened before the National Labor Relations Board or any state or local administrative agency related to or in connection with the Purchased Business. To the Seller's Knowledge, no event has occurred or circumstance exist that may provide the

basis of any work stoppage or other labor dispute related to or in connection with the Purchased Business.

          (iii)    To the Seller's Knowledge, Seller is not a party to any contract which restricts it from relocating, closing or terminating any of its operations or facilities related to or in connection with the Purchased Business or any portion thereof. Seller has not effectuated a "plant closing" (as defined in the WARN Act) or a "mass lay-off" (as defined in the WARN Act), in either case affecting any site of employment or facility of the Business, except in accordance with the WARN Act. Seller will not take any action prior to the Closing that will trigger liability or notice requirements under the WARN Act or any similar state or local law regarding the closing of operations or reductions in force.

          (iv)    Other than as set forth in Schedule 3.1(o), there are no employment agreements or restrictive covenant agreements between Seller and any employees of the Purchased Business. Schedule 3.1(o) sets forth a true, correct and complete roster of all employees of the Purchased Business, together with their current compensation.

      (p)    Employee Benefit Plans.

          (i)    Schedule 3.1(p) sets forth a true and complete list of each Employee Benefit Plan, each written employment, severance, retention, termination, consulting or retirement contract and each bonus or incentive compensation, vacation plan or policy (other than any governmental program), and any related trust as to which Seller or any ERISA Affiliate maintains or ever has maintained or to which any of them has contributed or has any obligation to contribute, which relates to the Purchased Business or employees of the Purchased Business.

          (ii)    To the Seller's Knowledge, each Employee Benefit Plan (and each related trust, insurance contract or fund) complies in form and in operation in all material respects with the applicable requirements of ERISA, the Code and other applicable laws.

          (iii)    All contributions which are due have been paid to each such Employee Benefit Plan which is an "employee pension benefit plan" (within the meaning of ERISA) and all contributions for any period ending on or before the Closing Date which are not yet due have been paid to each such employee pension benefit plan or accrued in accordance with the past custom and practice of Seller. All premiums or other payments for all periods ending on or before the Closing Date have been paid with respect to each such Employee Benefit Plan which is an employee welfare benefit plan (within the meaning of ERISA).

          (iv)    Seller does not have any obligation to contribute to or any material liability under or with respect to any Employee Benefit Plan that is a "multiemployer plan" (within the meaning of ERISA).

          (v)    Buyer shall assume no obligations of any kind or nature with respect to any and all Employee Benefit Plans of Seller or any Affiliate of Seller.

      (q)    Environmental, Health and Safety Matters.

1709970            11

(i)     To the Seller's Knowledge, Seller has complied and is in compliance, in each case in all material respects, with all Environmental, Health, and Safety Requirements in connection with or relating to its use of the Facility, the Purchased Assets and the Purchased Business.

(ii)    Without limiting the generality of the foregoing, Seller has obtained, has complied, and is in compliance with, in each case in all material respects, all material permits, licenses and other authorizations that are required pursuant to Environmental, Health, and Safety Requirements for Seller's occupation of the Facility and the operation of the Purchased Business.

(iii)   Seller has not received any written notice, report or other information regarding any actual or alleged material violation of Environmental, Health, and Safety Requirements, or any material liabilities or potential material liabilities (whether accrued, absolute, contingent, unliquidated or otherwise), including any material investigatory, remedial or corrective obligations, arising under Environmental, Health, and Safety Requirements in connection with or relating to the Facility, the Purchased Assets and the Purchased Business.

(iv)    Except as set forth in Schedule 3.1(q), and to Seller's Knowledge, none of the following exists at the Facility: (1) underground storage tanks, (2) asbestos-containing material in any friable and damaged form or condition, (3) materials or equipment containing polychlorinated biphenyls, or (4) landfills, surface impoundments, or disposal areas.

(v)     Seller has not treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, manufactured, distributed, or released any substance, including without limitation any hazardous substance, or owned or operated any property or facility (and no such property or facility is contaminated by any such substance) so as to give rise to any current or future material liabilities, including any material liability for response costs, corrective action costs, personal injury, property damage, natural resources damages or attorney fees, pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), the Solid Waste Disposal Act, as amended or any other Environmental, Health, and Safety Requirements.

(vi)    Neither this Agreement nor the consummation of the transactions that are the subject of this Agreement will result in any material obligations for site investigation or cleanup, or notification to or consent of government agencies or third parties, pursuant to any of the so-called "transaction-triggered" or "responsible property transfer" Environmental, Health, and Safety Requirements.

(r)     Customers; Suppliers.

(i)     Schedule 3.1(r) lists the twenty (20) largest customers of the Purchased Business by gross revenues for the calendar year 2009 and sets forth opposite the name of each such customer the percentage of gross revenue attributable to each such

L709970                              12

customer. To the Knowledge of Seller (a) there exists no material disagreement between Seller and such customers, and (b) no such customer has indicated that it will stop, or materially diminish its business with the Purchased Business.

(ii)     To the Knowledge of Seller, no material supplier of the Purchased Business has indicated that it will stop, or materially decrease the rate of, supplying materials, products or services to the Purchased Business.

(s)     Insurance. Seller has previously furnished or made available to Buyer with a true and complete copy each material insurance policy (including policies providing property, casualty, liability, and workers' compensation coverage and bond and surety arrangements) with respect to which Seller is a party, a named insured, or otherwise the beneficiary of coverage, in connection with or relating to the Facility, the Purchased Assets or the Purchased Business. With respect to each such insurance policy, the policy is in full force and effect and no party is, or would be with notice or lapse of time, in material breach or default or has repudiated any material provision of the policy. Seller has also previously furnished or made available to Buyer any material self-insurance arrangements in connection with or relating to the Facility, the Purchased Assets and the Purchased Business.

(t)     Disclosure. To the Seller's Knowledge, no representation or warranty by Seller in this Agreement or in any exhibit, schedule, written statement, certificate or other document delivered or to be delivered to the Buyer pursuant hereto or in connection with the transactions contemplated hereby contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact required to be stated therein or necessary to make the statements contained therein, in light of the circumstances under which made, not misleading.

3.2     Representations and Warranties of Buyer. Buyer represents and warrants to Seller as follows:

(a)     Corporate Status; Authorization. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois and has full corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite corporate action of Buyer. This Agreement and each of the Ancillary Agreements to which it is a party, is a valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, subject to the effect of any applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or similar laws relating to or affecting creditors' rights generally and subject, as to enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

1709970                                        13

(b)    No Conflicts.  The execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not (i) violate or conflict with the articles of organization or the operating agreement or other organizational documents of Buyer, or (ii) violate, conflict with or result in a breach or termination of, or otherwise give any Person additional rights or compensation under, or the right to terminate or accelerate, or constitute (with notice or lapse of time or both) a default under the terms of any note, deed, mortgage, other contract or other instrument or oral understanding to which Buyer is a party that, in the case of either (i) or (ii), has a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement and the Ancillary Agreements to which it is a party. Except as specified in Schedule 3.2(b), no Consent is required to be obtained or made by Buyer in connection with the execution and delivery of this Agreement or the Ancillary Agreements to which it is a party or the consummation of the transactions contemplated hereby or thereby.

(c)    Litigation.  There is no action, claim, suit, Order or proceeding pending, or to Buyer's knowledge, threatened, by or against or affecting Buyer in connection with or relating to the transactions contemplated by this Agreement.

(d)    Brokers, Finders, etc.  All negotiations relating to this Agreement, the Ancillary Agreements, and the transactions contemplated hereby and thereby, have been carried on without the participation of any Person acting on behalf of Buyer in such manner as to give rise to any valid claim against Seller for any brokerage or finder's commission, fee or similar compensation.

(e)    Disclosure.  To the Buyer's knowledge, no representation or warranty by Buyer in this Agreement or in any exhibit, schedule, written statement, certificate or other document delivered or to be delivered to the Seller pursuant hereto or in connection with the transactions contemplated hereby contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact required to be stated therein or necessary to make the statements contained therein, in light of the circumstances under which made, not misleading.

## ARTICLE IV
## COVENANTS OF THE PARTIES

4.1    Public Announcements.  Buyer and Seller shall consult with each other and mutually agree upon any press release or public announcement pertaining to this Agreement and the transactions contemplated hereby, and no Party shall issue any such press release or make any such public announcement prior to such consultation and agreement.  Notwithstanding the foregoing, a Party may make any public disclosure it believes in good faith may be required by Law or the rules or regulations of any United States securities exchange, in which case the Party required to make the release or announcement shall use its commercially reasonable efforts to allow the other Party reasonable time to comment on such release or announcement in advance of such issuance.

4.2   Further Assurances. From and after the execution and delivery of this Agreement and until the Closing Date, each of the Parties will use all reasonable efforts to take all action and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement. After the Closing, Buyer and Seller shall each execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such other instruments of sale, assignment, conveyance and transfer and shall take all such other action as may be reasonably required for the consummation of the transactions contemplated hereby in accordance with the terms of this Agreement and each Ancillary Agreement. Following Closing, Seller shall refer to Buyer as promptly as practicable any telephone calls, letters, orders, notices, requests, inquiries and other communications that are material and relate to the Business.

4.3   Accounts Receivable. Seller shall promptly remit to Buyer any and all amounts received by Seller in respect of Accounts Receivable and any other accounts receivable relating to the Purchased Business.

4.4   Consent of Third Parties. Notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute an agreement to transfer any Governmental Approval, Assumed Contract, contract or other agreement or arrangement or any claim, right or benefit arising thereunder or resulting therefrom if a transfer or an attempt to make such a transfer without the Consent of a Government Authority or third party would constitute a breach or violation thereof or adversely affect the rights of Buyer of Seller thereunder; and any transfer to Buyer by Seller of any interest under any such Governmental Approval, Assumed Contract, contract or other agreement or arrangement that requires the Consent of a Government Authority or third party shall be made subject to such Consent being obtained. Seller shall use all reasonable efforts to obtain such Consents prior to the Closing Date. In the event any such Consent is not obtained on or prior to the Closing Date, Seller shall continue to use all reasonable efforts to obtain any such Consent after the Closing Date until such time as such Consent has been obtained, and Seller and Buyer will reasonably cooperate with each other in any lawful arrangement to provide that Buyer will receive the interest of Seller in the benefits (to the extent and only so long as Seller fulfills all obligations thereunder) under any such Government Approval, contract or other agreement or arrangement, including performance by Seller as agent. Buyer shall indemnify and hold Seller harmless from and against any and all costs, expenses or liabilities related to Seller performing as Buyer's agent as contemplated by this Section 4.4 with respect to those Governmental Approvals and Consents not transferred at Closing pursuant to this Section 4.4. Notwithstanding anything to the contrary herein, Seller's obligations under this Section 4.4 shall terminate on the second anniversary of the Closing Date or for any specific Governmental Approval or Consent upon Buyer receiving such or the equivalent.

4.5   Employees. Effective as of the Closing Date, the employment by the Seller of each employee located at the Facility and listed in Schedule 4.5 shall terminate. The Buyer shall offer employment, effective as of the Closing, to each such employee listed in Schedule 4.5, which offers of employment shall be at substantially comparable positions and levels of compensation and benefits. Each such employee listed in Schedule 4.5 who accepts Buyer's offer of employment, shall become an employee of Buyer as of the Closing and shall cease to be an employee of Seller.

1709970                           15

4.6     Covenants Not To Compete Or Solicit.

(a)     For a period four (4) years from the Closing Date, Seller agrees not to, directly or indirectly, by or for itself or as an agent of another or through others as their agent:

(i)     operate a business that competes in any respect with the Purchased Business in the Territory, as defined below, in the acute care, office based physician or surgery center markets;

(ii)     own (excluding any interest in any investment of not more than two percent in the equity of a competing business whose securities are regulated under the Securities Exchange Act of 1934, as amended), manage, operate, fund, be compensated by, participate in, knowingly render advice to, have any right to or interest in any other business directly or indirectly engaged in providing products or services competitive with those of the Purchased Business in the Territory in the acute care, office based physician or surgery center markets;

(iii)     divulge, communicate, or disclose any nonpublic information concerning the Purchased Business other than information that (a) becomes generally available to the public after the date hereof, (b) is subsequently provided to Seller or any of its Affiliates by a third party without restriction on disclosure, provided that such third party developed or possesses the information independently of, and not in violation of any agreement with Buyer or any third party, or (c) is required to be disclosed by Seller under legal process or Law; or

(iv)     solicit for employment or employ any present employee of the Buyer or any employee identified on Schedule 4.5, provided, however, that the foregoing covenant shall not apply to any such employee who is terminated by Buyer or has not been employed by Buyer in the Purchased Business for a period of 12 months.

(b)     As used herein, "Territory" means the fifty states of the United States of America and the District of Columbia. The Parties hereto acknowledge and agree that the restrictions set forth in this Section 4.6 are reasonable in terms of duration, geographic area and otherwise, that any remedy at law for any breach of the provisions of this Section 4.6 would be inadequate, and that, in addition to any other remedy, Buyer shall be entitled to enforce such restrictions by specific performance, injunction or other any other available equitable remedy without any requirement to post bond in connection therewith.

(c)     This Section 4.6 shall not apply to Community Surgical Supply of Toms River, Inc., Michael Fried, Jerry Fried, Howard Fried, Diamed, Inc., Wakser, or Sharpe. Wakser and Sharpe, respectively, shall execute the non-competition agreements attached as Exhibit C.

1709970

16

# ARTICLE V
# INDEMNIFICATION

5.1     Indemnification by Seller. Seller covenants and agrees to defend, indemnify and hold harmless Buyer and its respective officers, directors, employees, agents, advisers, representatives and Affiliates (collectively, the "Buyer Indemnitees") from and against, and pay or reimburse Buyer Indemnitees for, any and all claims, liabilities, obligations, losses, fines, penalties, costs, royalties, proceedings, deficiencies or damages (whether absolute, accrued, conditional or otherwise and whether or not resulting from third party claims), including expenses and reasonable attorneys' fees, court costs, amounts paid in settlement, judgments, reasonable attorneys' fees or other reasonable expenses for investigating and defending (collectively, "Losses"), to the extent actually incurred by any of Buyer Indemnitees based upon:

(i)     any inaccuracy of any representation or warranty made by Seller herein or under any Ancillary Agreement or in connection herewith or therewith;

(ii)     any failure of Seller to perform any covenant or agreement hereunder or under any Ancillary Agreement or fulfill any other obligation in respect hereof or thereof; and

(iii)     any Excluded Liabilities.

5.2     Indemnification by Buyer. Buyer covenants and agrees to defend, indemnify and hold harmless Seller and its respective officers, directors, employees, agents, advisers, representatives and Affiliates (collectively, the "Seller Indemnitees") from and against, and pay or reimburse Seller Indemnitees for, any and all Losses actually incurred by any of Seller Indemnitees based upon:

(i)     any inaccuracy in any representation or warranty made by Buyer herein or under any Ancillary Agreement or in connection herewith or therewith;

(ii)     any failure of Buyer to perform any covenant or agreement herein or under any Ancillary Agreement or fulfill any other obligation in respect hereof or thereof;

(iii)     the Assumed Liabilities; and

(iv)     the operation of the Purchased Business after the Closing.

5.3     Notice and Opportunity to Defend.

(a)     Notice of Asserted Liability. As soon as is reasonably practicable after Seller or Buyer becomes aware of any claim that such party has under Section 5.1 or 5.2 that may result in a Loss (a "Liability Claim"), such party (the "Indemnified Party") shall give written notice of such Liability Claim (a "Claims Notice") to the other party (the "Indemnifying Party"). A Claims Notice must describe the Liability Claim in reasonable detail and must indicate the amount (estimated, if necessary and to the extent feasible) of the Loss that has been or may be suffered by the Indemnified Party. No delay in or

failure to give a Claims Notice by the Indemnified Party to the Indemnifying Party pursuant to this Section 5.3 will adversely affect any of the other rights or remedies that the Indemnified Party has under this Agreement or alter or relieve the Indemnifying Party of its obligation to indemnify the Indemnified Party to the extent that such delay or failure has not materially prejudiced the Indemnifying Party; provided, however, that all Liability Claims made in connection with this Agreement must be made within the relevant time periods set forth in Section 5.4.

(b)     Opportunity to Defend. The Indemnifying Party has the right, exercisable by written notice to the Indemnified Party within 30 days after receipt of a Claims Notice from the Indemnified Party of the commencement or assertion of any Liability Claim in respect of which indemnity may be sought under this Article VII, to assume and conduct the defense of such Liability Claim in accordance with this Agreement with counsel selected by the Indemnifying Party. If the Indemnifying Party does not assume the defense of a Liability Claim in accordance with this Section 5.3(b), the Indemnified Party may continue to defend the Liability Claim. If the Indemnifying Party has assumed the defense of a Liability Claim as provided in this Section 5.3(b), the Indemnifying Party will not be liable for any legal expenses subsequently incurred by the Indemnified Party in connection with the defense of the Liability Claim; provided, however, that if the Indemnifying Party fails to take reasonable steps necessary to defend diligently such Liability Claim, the Indemnified Party may assume its own defense, and the Indemnifying Party will be liable for all reasonable costs or expenses paid or incurred in connection with such defense. The Indemnifying Party or the Indemnified Party, as the case may be, has the right to participate in (but not control), at its own expense, the defense of any Liability Claim which the other is defending as provided in this Agreement. The Indemnifying Party, if it has assumed the defense of any Liability Claim as provided in this Agreement, may not, without the prior written consent of the Indemnified Party, consent to a settlement of, or the entry of any judgment arising from, any such Liability Claim that grants any injunctive or equitable relief, as the case may be, on the affected business of the Indemnified Party. The Indemnified Party may not, without the prior written consent of the Indemnifying Party, settle any Liability Claim.

5.4    Survival.

(a)     The representations and warranties in this Agreement shall survive the Closing and will terminate on the first anniversary of the Closing Date, except that Seller's representations and warranties in Sections 3.1(a), 3.1(b) and 3.1(e)(i) shall survive indefinitely and Seller's representations and warranties in Section 3.1(l) shall survive for a period of seven (7) years following the Closing Date. Notwithstanding the foregoing, any claim for indemnification that is asserted by written notice as provided in Section 5.3 within the applicable survival period shall survive until resolved by the parties or pursuant to a final non-appealable judicial determination.

(b)     The covenants of the Parties hereto contained in Article IV of this Agreement shall, subject to the express terms thereof, survive the Closing according to their terms.

1709970                                    18

5.5     Indemnification Limitations.

(a)     No Liability Claim by Buyer Indemnitees shall be asserted against Seller until the dollar value of the all Liability Claims exceeds $50,000 (the "Deductible") and upon the aggregate of all Liability Claims exceeding the Deductible, the Buyer Indemnitees shall be indemnified for all Liability Claims that are in excess of the Deductible.

(b)     The maximum aggregate liability of Seller for all Liability Claims of the Buyer Indemnitees shall be $3,000,000, provided, however, that the foregoing $3,000,000 liability limitation shall not apply to Liability Claims: (1) arising under Section 5.1(iii), (2) relating to any claimed breach of the covenants set forth in this Agreement or the Ancillary Agreements, or (3) relating to any claimed inaccuracy in Sections 3.1(a), (b), (l), (o), (p) or (q).

(c)     In case any event shall occur which would otherwise entitle either Party to assert a Liability Claim pursuant to this Article V, no Loss, damage or expense shall be deemed to have been sustained by such Party to the extent of any proceeds received by such Party from any insurance policies with respect thereto.

(d)     Notwithstanding anything contained in this Agreement to the contrary and except for matters involving fraud or willful misconduct, Buyer shall not be able to avoid the limitations expressly set forth in Sections 5.4 and 5.5 by electing to pursue some other remedy outside of Article V.

## ARTICLE VI
## MISCELLANEOUS

6.1     Expenses.  Except as otherwise provided in this Agreement, Seller and Buyer shall bear their respective expenses, costs and fees (including attorneys' fees) in connection with the transactions contemplated hereby, including the preparation, execution and delivery of this Agreement and compliance herewith.

6.2     Purchased Assets and Purchased Business Being Transferred.  Buyer acknowledges and agrees that, except as specifically set forth herein, the Purchased Assets and Purchased Business are being sold by Seller "AS IS," "WHERE IS" and "WITH ALL FAULTS." THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT ARE THE SOLE AND EXCLUSIVE WARRANTIES PROVIDED BY SELLER UNDER THIS AGREEMENT OR OTHERWISE.  SELLER MAKES NO OTHER REPRESENTATIONS AND/OR WARRANTIES (EXPRESS, IMPLIED OR STATUTORY), INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND DISCLAIMS SAME.

6.3     Severability.  If any provision of this Agreement, including any phrase, sentence, clause, section or subsection is inoperative or unenforceable for any reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative, or unenforceable to any extent whatsoever.

1709970                              19

6.4    Notices. All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if (a) delivered personally, (b) mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, or (c) sent by next-day or overnight mail or delivery or (d) sent by facsimile.

       (i)    if to Seller to:

> DiaMed USA, LLC
> c/o Diamed, Inc.
> 2909 Carrington Street
> North Canton, Ohio  44720
> Attn:  Scott Wakser
> Fax no.
> *and*
> DiaMed USA, LLC
> c/o Community Surgical Supply of Toms River, Inc.
> 1390 Route 37 W
> Toms River, NJ  08757
> Attn:  Michael Fried
> Fax no. (732) 244-7588
> *with a copy to*:
> Terrence H. Link II, Esq.
> Roetzel & Andress, L.P.A.
> 222 S. Main St.
> Akron, Ohio  44308
> Fax no.  330-376-4577

      (ii)    if to Buyer to:

> Medline Industries, Inc.
> One Medline Place
> Mundelein, Illinois  60060
> Attention:  Alex Liberman
> Fax Number:  (847) 949-2633

or, in each case, at such other address as may be specified in writing to the other parties hereto.

All such notices, requests, demands, waivers and other communications shall be deemed to have been received (w) if by personal delivery on the day after such delivery, (x) if by certified or registered mail, on the seventh business day after the mailing thereof, (y) if by next-day or overnight mail or delivery, on the day delivered, (z) if by facsimile, on the next day following the day on which such facsimile was sent, provided that a copy is also sent by certified or registered mail.

6.5    Headings. The headings contained in this Agreement are for purposes of convenience only and shall not affect the meaning or interpretation of this Agreement.

1709970

20

6.6     Entire Agreement. This Agreement (including the Schedules and Exhibits hereto), the Ancillary Agreements, and any other documents executed pursuant to this Agreement constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof.

6.7     Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument.

6.8     Governing Law; Consent to Jurisdiction. This Agreement shall be governed in all respects, including as to validity, interpretation and effect, by the internal laws of the State of Delaware, without giving effect to the conflict of laws rules thereof.

6.9     Binding Effect. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, successors and permitted assigns.

6.10    Assignment. This Agreement shall not be assignable or otherwise transferable by any party hereto without the prior written consent of the other party.

6.11    No Third Party Beneficiaries. Nothing in this Agreement shall confer any rights upon any person or entity other than the Parties hereto and their respective heirs, successors and permitted assigns.

6.12    Amendment; Waivers, etc. This Agreement may be amended by the mutual agreement of the Parties at any time. No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the party against whom enforcement of the amendment, modification, discharge or waiver is sought. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the party granting such waiver in any other respect or at any other time.

6.13    Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local or foreign statute or law will be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation. Any reference to the singular in this Agreement shall also include the plural and vice versa.

## ARTICLE VII
## DEFINITIONS

7.1     Definition of Certain Terms. The terms defined in this Section 7.1, whenever used in this Agreement (including in the Schedules), shall have the respective meanings indicated below for all purposes of this Agreement. All references herein to a Section, Article or

Schedule are to a Section, Article or Schedule of or to this Agreement, unless otherwise indicated.

Affiliate of a Person means a Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the first Person. "Control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a person, whether through the ownership of voting securities, by contract or otherwise, as trustee or executor, or otherwise.

Agreement means this Asset Purchase Agreement, including the Disclosure Schedules.

Ancillary Agreements means such agreements and instruments entered into between Seller and Buyer to consummate the transactions contemplated hereby.

Assumed Contracts has the meaning set forth in Section 1.1(c).

Assumed Liabilities has the meaning set forth in Section 1.3.

Buyer has the meaning set forth in the Preamble.

Buyer Indemnitees has the meaning set forth in Section 5.1.

Claims Notice has the meaning set forth in Section 5.3(a).

Closing has the meaning set forth in Section 2.2.

Closing Date has the meaning set forth in Section 2.2.

Code means the Internal Revenue Code of 1986, as amended.

Consent means any consent, approval, authorization, waiver, permit, franchise, concession, agreement, license, exemption or order of, registration, certificate, declaration, application or filing with, or report or notice to, any Person, including, but not limited to, any Governmental Authority.

Disclosure Schedules means the agreements or matters listed in disclosure schedules to this Agreement.

Employee Benefit Plan means any: (a) nonqualified deferred compensation or retirement plan or arrangement; (b) qualified defined contribution retirement plan or arrangement which is an Employee Pension Benefit Plan (as defined in ERISA Section 3(2)); (c) qualified defined benefit retirement plan or arrangement which is an Employee Pension Benefit Plan (including any Multiemployer Plan as defined in ERISA Section 3(37)); or (d) Employee Welfare Benefit Plan (as defined in ERISA Section 3(1)) or material fringe benefit, other retirement, bonus or incentive plan or program.

1709970                                        22

Environmental, Health and Safety Requirements means all federal, state and local statutes, regulations, ordinances and similar provisions having the force and effect of law, all judicial and administrative orders and determinations, worker health and safety, and pollution or protection of the environment, including without limitation all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any hazardous materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise or radiation.

ERISA means the Employee Retirement Income Security Act of 1974, as amended.

ERISA Affiliate means each entity that is treated as a single employer with Seller for purposes of Code Section 414.

Excluded Assets has the meaning set forth in Section 1.2.

Excluded Liabilities has the meaning set forth in Section 1.4.

Facility has the meaning set forth in the Recitals.

GAAP means United States generally accepted accounting principles as in effect as of the Closing Date.

Governmental Approval means any permit, license, registration, consent, order, administrative consent order, certificate, approval, application or other authorization issued by any Governmental Authority.

Governmental Authority means any nation or government, any state or other political subdivision thereof, any governmental entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality of the United States, any State of the United States or any political subdivision thereof, and any tribunal or arbitrator(s) of competent jurisdiction, and any self-regulatory organization.

Indemnified Party has the meaning set forth in Section 5.3(a).

Indemnifying Party has the meaning set forth in Section 5.3(a).

Intellectual Property means (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, trade names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (d) all mask works and

1709970                          23

all applications, registrations, and renewals in connection therewith, (e) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (f) all computer software (including data and related documentation), and (g) all copies and tangible embodiments thereof (in whatever form or medium).

Law mean any law, statute, code, regulation, rule, ordinance, requirement, directive, restriction, order, judgment, decree, announcement or other binding action or requirement of any Governmental Authority.

Liability Claim has the meaning set forth in Section 5.3(a).

Lien means any mortgage, pledge, hypothecation, claim, security interest, encumbrance, lease, sublease, license, occupancy agreement, adverse claim or interest, easement, covenant, encroachment, burden, title defect, title retention agreement, voting trust agreement, interest, equity, option, lien, right of first refusal, charge or other restrictions or limitations of any nature whatsoever, including those that may arise under any Contracts.

Losses has the meaning set forth in Section 5.1.

Orders means any order, judgment, injunction, award, decree, ruling, charge or writ of any Governmental Authority.

Party has the meaning set forth in the Preamble.

Permitted Liens means (a) Liens for Taxes and assessments or governmental charges or levies, in each case not yet due and payable, (b) Liens of landlords, carriers, warehousemen, mechanics and materialmen arising in the ordinary course of business under applicable Law and (c) Liens created by Buyer.

Person means any natural person, firm, partnership, association, corporation, limited liability company, trust, business trust, Governmental Authority or other entity.

Purchased Assets has the meaning set forth in Section 1.1.

Purchased Business has the meaning set forth in the Recitals.

Purchase Price has the meaning set forth in Section 2.1.

Seller has the meaning set forth in the Preamble.

Seller Indemnitees has the meaning set forth in Section 5.2.

Seller's Knowledge means the actual knowledge of the following persons without any investigation or inquiry: Scott Wakser and Doug Sharpe.

1709970                                    24

Tax means any federal, state, provincial, local, foreign or other income, alternative, minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code), real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers compensation, payroll, health care, withholding, estimated or other similar tax, duty or other governmental charge or assessment or deficiencies thereof (including all interest and penalties thereon and additions thereto whether disputed or not).

Tax Return means any return, report, declaration, form, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

Treasury Regulations means the regulations prescribed pursuant to the Code.

1709970

IN WITNESS WHEREOF, the Parties have duly executed this Asset Purchase Agreement as of the date first above written.

MEDLINE DIAMED, LLC

By: _____

    Name:

    Title:

DIAMED USA, LLC

By: _____

    Name:

    Title:

Formatted: DocID

1709970

# DiaMed USA, LLC
## Employee Handbook

### Revised January 2009



DISCLAIMER................................................................................................................3

GENERAL INFORMATION .......................................................................................4
  Mission Statement ...................................................................................................4
  DiaMed History .......................................................................................................4
  What DiaMed Expects from You..............................................................................4
  Confidential Information...........................................................................................4
  Scope of Services ...................................................................................................5
  Hours of Operation..................................................................................................5
  Accommodations for Disabilities..............................................................................5

GENERAL EMPLOYMENT PRACTICES ....................................................................5
  General Employment Practices ...............................................................................5
  At-Will Employment Policy.......................................................................................6
  Immigration Law Compliance ..................................................................................6
  Driver Qualifications.................................................................................................6
  Types of Employees ................................................................................................6
  Performance Evaluation...........................................................................................7

COMPENSATION......................................................................................................7
  Wages.....................................................................................................................7
  Payday ....................................................................................................................7
  Overtime .................................................................................................................7
  Paid Time Off..........................................................................................................8
  Bereavement Leave.................................................................................................7
  Leave of Absence (Unpaid) .....................................................................................8
  Holidays ..................................................................................................................9
  Jury Duty.................................................................................................................9
  Health Insurance ....................................................................................................10
  Dental Insurance.....................................................................................................10
  COBRA ...................................................................................................................10
  Worker's Compensation...........................................................................................11
  SocialSecurity..........................................................................................................11
  Long Term Disability ...............................................................................................11
  Supplemental Life Insurance....................................................................................12
  Retirement Plan ......................................................................................................12

CONDUCT.................................................................................................................12
  Employee Conduct ..................................................................................................12
  Lunch and Breaks ...................................................................................................12
  No Smoking Policy ..................................................................................................13
  Time Cards ..............................................................................................................13
  Attendance ..............................................................................................................13
  Job Abandonment....................................................................................................13
  Dress Code .............................................................................................................13
  Personal Phone Calls ..............................................................................................14
  Alcohol and Drug Abuse Policy ...............................................................................14
    *Generally* ..............................................................................................................14
    *Definitions* ............................................................................................................14
    *Drug & Alcohol Testing Procedure* .......................................................................14
    *Disciplinary Consequences* ..................................................................................15
    *Prescribed Treatment* ..........................................................................................15
    *Reporting Violations* .............................................................................................15
    *Imminent Threat to Safety* .....................................................................................15
    *Ineligibility for Workers' Compensation Benefits* ...................................................16
  Grievance Procedure ..............................................................................................16
  Discipline / Termination............................................................................................16
  Resignation .............................................................................................................17

Use of Company Resources ..................................................................................................17
Weapons and Violence in the Workplace .............................................................................17
  Anti-Discrimination/Harassment Policy ............................................................................18
  Sexual Harassment ..........................................................................................................18
  Other Harassment Is Prohibited ......................................................................................19
  Making Complaints and Reporting Violations ..................................................................19
  Investigation of Complaints and Reports .........................................................................19
  Penalties for Violations ....................................................................................................19
  Additional Information ......................................................................................................19

## Disclaimer

This handbook supersedes all previous handbooks, policies and procedures and or prior practices assumed. It will remain in effect until written changes have been distributed.

# General Information

## Mission Statement

To be a leading provider of equipment and supplies in the professional arena all provided with the highest level of quality and maximum customer satisfaction system to provide quality health care. DiaMed shall employ quality, skilled professionals who put these beliefs into action daily. DiaMed is committed to providing superior quality and service with integrity in all aspects of its business.

## DiaMed History

DiaMed, Inc. was founded in 1994 by Doug Sharpe and Scott Wakser. The company was incorporated in the State of Ohio as a Sub Chapter S corporation. On January 1, 2008, DiaMed Inc. merged with Community Surgical Supply in Toms River, NJ to become DiaMed USA, LLC. The new owners are Scott Wakser, Doug Sharpe, Michael Freid, Jerry Freid and Howard Freid. Scott Wakser remains the President and CEO.

## What DiaMed Expects from You

DiaMed needs your help in making each working day enjoyable and rewarding. Your first responsibility is to know your own duties and how to do them promptly, correctly and pleasantly. Secondly, you are expected to cooperate with management and your fellow employees and to maintain a good team attitude.

How you interact with fellow employees and those whom DiaMed serves, and how you accept direction can affect the success of your department. In turn, the performance of one department can impact the entire service offered by DiaMed. Consequently, whatever your position, you have an important assignment: perform every task to the very best of your ability.

You are encouraged to grasp opportunities for personal development offered to you. This manual offers insight on how you can perform positively and to the best of your ability to meet and exceed DiaMed expectations.

We strongly believe you should have the right to make your own choices in matters that concern and control your life. We believe in direct access to management. We are dedicated to making DiaMed a company where you can approach your manager, or any member of management, to discuss any problem or question. We expect you to voice your opinions and contribute your suggestions to improve the quality of DiaMed. We are all human, so please communicate with each other and with management.

Remember, you help create the pleasant and safe working conditions that DiaMed intends for you. The result will be better performance for the company overall, and personal satisfaction for you.

## Confidential Information

All DiaMed employees are obligated to maintain confidentiality, even after they are no longer employed by DiaMed.

Additionally, our customers and suppliers entrust DiaMed with important information relating to their health, lives and businesses. The nature of this relationship requires maintenance of confidentiality. In safeguarding the information received, DiaMed earns the respect and further trust of our customers and suppliers.

If you are questioned by someone outside the company or your department and you are concerned about the appropriateness of giving them certain information, you are not required to answer. Instead, as politely as possible, refer the request to your supervisor.

No one is permitted to remove or make copies of any DiaMed records, reports, or documents without prior management approval. Disclosure of confidential information could lead to termination, as well as other possible legal action.

## Scope of Services

DiaMed shall provide medical equipment and supplies in the professional arena. The scope of services includes the following equipment and supply items. This list may change, as client needs change at which time this policy will be updated. The equipment and supplies distributed by DiaMed includes the following:

> Diagnostic Equipment and Supplies
> Wound Care Supplies
> Surgical Supplies
> Orthopedic Supplies
> Non Controlled Pharmaceuticals
> Office Furniture
> Exam Room Furniture and Supplies
> Paper Supplies (medical/disposable)
> CLIA-Waived Tests and Supplies
> Lab Supplies
> Safety Products

DiaMed does not discriminate in providing service to customers in accordance with current federal laws and statutes.

## Hours of Operation

DiaMed's hours of operation are 8:30 a.m. to 5:00 p.m. Monday through Friday. Some employees may be required to work after hours on an on call basis. Start times may vary.

## Accommodations for Disabilities

DiaMed is committed to providing equal employment opportunities to otherwise qualified individuals with disabilities, which may include providing reasonable accommodation where appropriate. In general, it is your responsibility to notify the president of the need for accommodation. Upon doing so, the president may ask you for your input or the type of accommodation you believe may be necessary or the functional limitations caused by your disability. Also, when appropriate, we may need your permission to obtain additional information from your physician or other medical professionals.

## General Employment Practices

### General Employment Practices

DiaMed provides equal opportunities to all individuals. Because we are an equal opportunity employer, all employees and prospective employees will be recruited, selected and trained without regard to race, color, creed, sex, national origin, disability, age ancestry, veteran status, or any other legally protected basis. This same non-discriminatory consideration will be used in all other aspects of the employment relationship.

All applicants are carefully screened and full consideration is given to their training, education, skills, experiences, growth potential and previous work record. All company managers and employees are charged with fulfilling their responsibilities for the active support of our equal employment opportunity program. Our equal opportunity policy applies to all phases of employment.
DiaMed uses many methods of recruitment of new employees. Below is a partial list:

- Word of mouth
- Newspaper advertising

5

- Employment agencies
- Referrals

## At-Will Employment Policy

All employment with DiaMed is for no definite period of time and may be terminated at any time, without prior notice by either DiaMed or the employee. It is understood that no employee or representative of the company, other than the president, has any authority to enter into any agreement for employment for any specific period of time, or any agreement for benefits, and that any such agreement entered into by DiaMed's President will not be enforceable unless it is in writing and signed by DiaMed's President.

## Immigration Law Compliance

All offers of employment are contingent on verification of the employee's right to work in the United States. All employees have to provide original documents verifying their right to work and as required by federal law, to sign Federal Form I-9, Employment Eligibility Verification Form. If an employee can not verify the right to work in the United States, DiaMed is obliged to terminate employment.

## Driver Qualifications

All employees who are required to operate a motor vehicle in the course of their duties are required to have a valid state driver's license appropriate to the type of vehicle being operated in compliance with state laws. Employment may be terminated if DiaMed's insurance company will not insure an employee. Employees who drive their own vehicle on company business are required to maintain adequate automobile insurance. A copy of the driver's license and automobile insurance declaration page will be placed in the employee's personnel file. The General Manager will maintain of list of employees required to have a driver's license with expiration date. Any changes in your driving record must be reported to your supervisor immediately. Failure to maintain your license or to report changes in your driving record may result in disciplinary action, up to and including termination.

## Types of Employees

Full-time: An employee that is scheduled to work 32 or more hours per week
Part-time: An employee that works less than 32 hours per week.
Salary: An employee that is scheduled to work 32 or more hours per week and is considered exempt (Exempt is defined as employees whose positions meet specific tests established by the Fair Labor Standards Act (FLSA) and applicable state law and who are exempt from overtime pay requirements.)

Temporary: An employee hired on a short-term basis and may be working either full or part-time. This employee is not eligible for any benefits.

## Performance Evaluation

It is the policy of DiaMed to have regularly scheduled employee evaluations to assess the performance of job duties. All employees will undergo a performance evaluation by their supervisor approximately 90 days after their first day of work. Their supervisor will perform a second performance evaluation approximately 180 days after their first day of work. The third evaluation will be performed approximately 365 days after their first day of work. An annual evaluation will be performed thereafter.

Annual evaluations for both full-time and part-time employees are based on an employee's previous 12 months of service.

Performance evaluations are based on the employee's job description and compliance with the company's policies and procedures.

A copy of the performance evaluation shall be reviewed by each individual and signed by both the supervisor and the individual. Signatures verify that the information has been given and received. The performance evaluation will be shared with the employee via a face-to-face conference with the supervisor.

# Compensation

## Wages
The General Manager will determine an applicant's wages based upon the following: 1) Average pay in the area for a specific job description, 2) Experience, 3) Credentials, and 4) Education. The Manager will evaluate each employee annually and determine any raises that might be awarded. The President will approve all raises. Employees are not to discuss their salary with anyone except their supervisor.

## Payday
Payday is every other Friday. If payday falls on a holiday, paychecks will be distributed the day before the holiday. Direct deposit is available. The money will be directly deposited following the above schedule for paycheck distribution.

Expense reports have to be turned in to the Payroll Administrator by the 9th of each month. An expense report that is received after the 9th will not be paid.

## Overtime
Hourly employees that work more than 40 hours during a week are eligible for overtime. Overtime is paid at one and one half times the regular hourly salary. Overtime must be held to a minimum and requires the approval of your supervisor. An Overtime Worksheet must be attached to the employee's time card to be paid for overtime.

## Paid Time Off
It is the policy of DiaMed, Inc. to provide paid sick leave and paid vacation for its employees. This policy is referred to as PTO. The PTO year extends from January 1 through December 31. The amount of accrued PTO is determined on January 1. A week corresponds to the regular scheduled hours worked by the employee. (For example, if an employee is scheduled to work 35 hours per week, their PTO is 35 hours. If they are scheduled to work 40 hours then it is 40.) PTO is calculated on the weeks worked for the first year, then full calendar years of service thereafter. A week is 5 days corresponding to the scheduled work week of the employee. Below is a schedule:

| Length of Service as of January 1 | PTO |
|---|---|
| **Salary Employees** | |
| Less than 1 year | Pro-rated* |
| 1 full calendar year to less than 2 | 8 days |
| 2 full calendar years to less than 3 | 13 days |
| 3 full calendar years to less than 5 | 14 days |
| 5 full calendar years or more | 19 days |
| **Full-time Employees** | |
| Less than 1 year | Pro-rated* |
| 1 full year to less than 2 | 8 days |
| 2 full years or more | 13 days |
| **Part-time Employees** | |
| Less than 1 year | No PTO |
| 1 full year or more | 7 days (corresponding to Scheduled Hours in a week) |

*The pro-rated schedule is based on the number of weeks worked the previous year.

7

| 0 to 4 weeks worked | 0 days |
| 5 to 12 weeks worked | 1 day |
| 13 to 24 weeks worked | 3 days |
| 25 to 32 weeks worked | 5 days |
| 33 to 42 weeks worked | 6 days |
| 43 to 51 weeks worked | 7 days |

PTO cannot be held over to the next year unless authorized by the President of DiaMed, Inc. Any PTO that is not used by December 31st will not be paid to the employee.

PTO can be taken in minimum increments of 4 hours. All PTO needs to be approved by the employee's immediate supervisor and the HR Manager. PTO's will be approved based upon staffing and seniority.

## Bereavement Leave

Full-time employees may be permitted up to three (3) working days with pay in the event of a death in their immediate family. Additional time off without pay may be granted whenever such additional time is reasonably required.

The employee's immediate family is defined as spouse, children, mother, father, stepchildren, stepparent, sister, brother, grandchildren, grandparents, mother-in-law, father-in-law, and son or daughter-in-law.

If a death occurs in the employee's immediate family during a scheduled vacation, bereavement days may be substituted for the PTO.

When a fellow employee or a family member other than those previously listed dies, absence from work may be granted to attend the funeral with approval of the supervisor.

## Leave of Absence (Unpaid)

DiaMed does not fall under the Family and Medical Leave Act of 1993; however, it is the policy of DiaMed to allow an employee leave of absence when the situation is justified. The employee must request the leave in writing. The immediate supervisor will evaluate and determine whether leave will be granted.

If an employee has a condition or situation where it is not possible to request a leave in advance and the situation has not been deemed job abandonment, a leave of absence will be automatic after 14 days.

The employee must be in good standing and have worked for DiaMed for at least 90 days to be eligible for leave.

Leaves of absence will be considered for the following reasons:

Educational
Medical
Personal

A leave of absence will not be extended for more than 6 months. If the leave extends beyond 6 months, employment will terminate.

Existing seniority, prior to a leave, is unaffected. However, further seniority does not accumulate while on leave. Accumulation of benefits (if any) is suspended during a leave. Evaluations and salary reviews may be extended the amount of time equal to the leave.

All or portions of earned vacation time (if any) must be used while on leave. All or portions of sick time (if any) must be used if leave is medical. If an employee wishes to continue group insurance, the employee must pay the full premium on a monthly basis, due the first of each month. Failure to pay on time will result in the termination of benefits.

8

Employees may discontinue insurance coverage while on a leave, but are subject to the insurance carrier's qualifications if they wish to be re-insured. Re-insurance is not guaranteed.

If it is not possible to return from a leave within the approved time, the supervisor must be notified, either in writing or in person, and permission requested to extend the leave before it expires. If an employee fails to return to work upon expiration of leave (and a request for extension is not made on or before expiration of leave) then DiaMed will assume the intention is not to return and employment will be terminated.

Reasonable effort will be made to return the employee to the same or similar position held before the leave. If the leave was medical, a physician statement is required approving a return to work.

## Holidays
DiaMed will be closed the following holidays if they fall on Monday through Friday:

| | |
|---|---|
| New Year's Day | Labor Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Eve Day* |
| Christmas Day | New Years Eve Day* |
| Day after Thanksgiving* | |

**Any Holiday with an * will not be paid. Only PTO can be applied to these dates.**

All full-time hourly and salary employees will be paid eight (8) hours for each of the above days without an *. If a holiday falls on a Saturday or Sunday, management may choose, at its sole discretion, from the following options:

- Select the preceding Friday or following Monday to observe the holiday.
- If it is determined to not be administratively feasible to observe the holiday on the preceding Friday or following Monday, management may:
  o Provide each employee with an additional PTO day to be taken during the same calendar year in accordance with the PTO policy, or
  o Pay each employee an additional 8 hours of straight time for the pay period in which the holiday falls.

Part-time employees will be paid according to the hours of their normal workday for New Year's Day and Christmas Day if it falls on Monday through Friday.

## Jury Duty
Employees must notify their supervisor upon their being notified of the possibility of jury duty. Employees who are required to serve jury duty during their regularly scheduled workday will be paid the difference between compensation received from the court and their regular pay. If the employee is released from jury duty before 2:00 P.M., they must return to work.

## Health Insurance
It is the policy of DiaMed to provide group health insurance for full-time employees. An employee is eligible for group health insurance after he/she has been employed for 60 days or defined by the insurance company. The insurance will be effective on the first day of the month after the 60 day waiting period. The employee is responsible for a portion of the premium. It is paid through payroll deduction before taxes.

If you have left DiaMed, Inc. and are rehired within 63 days, you are eligible to be reinstated to the plan on your rehire date. However, if you return to DiaMed after 63 days, the above waiting policy applies. It is the discretion of the President to cover your cobra payment if you are returning in an executive management position.

9

## Dental Insurance

All full-time employees are eligible for DiaMed's group dental policy after he/she has been employed for 90 days. The employee is responsible for the entire premium. It is paid through payroll deduction before taxes.

## COBRA

On April 7, 1986, a federal law was enacted [Public Law 99-272, Title X] requiring that most employers sponsoring group health plans offer employees and their families the opportunity for a temporary extension of health coverage (called "continuation coverage") at group rates in certain instances where coverage under the plan would otherwise end. This notice is intended to inform you, in a summary fashion, of your rights and obligations under the continuation coverage provisions of the new law. *[Both you and your spouse should take the time to read this notice carefully.]*

If you are an employee of DiaMed covered by the group health insurance plan, you have the right to choose this continuation coverage at your own expense if you lose your group health coverage because of a reduction in your hours of employment or the termination of your employment (for reasons other than gross misconduct on your part).

If you are the spouse of an employee covered by the group health insurance plan, you have the right to choose this continuation coverage for yourself at your own expense if you lose group health coverage for any of the following four reasons:

1. The death of your spouse;
2. A termination of your spouse's employment (for reasons other than gross misconduct) or reduction in your spouse's hours of employment.
3. Divorce or legal separation from your spouse; or
4. Your spouse becomes entitled to Medicare.

In the case of a dependent child of an employee covered by the group health insurance plan, he or she has the right to continuation coverage at his or her expense if group health coverage is lost for any of the following five reasons:

1. The death of a parent;
2. A termination of parent's employment (for reasons other than gross misconduct) or reduction in a parent's hours of employment with DiaMed;
3. Parent's divorce or legal separation;
4. A parent becomes entitled to Medicare; or
5. The dependent child ceases to be a "dependent child" under the group health insurance plan.

Under the law, the employee or a family member has the responsibility to inform the group health insurance administrator of a divorce, legal separation, or a child losing dependent status under the group health insurance plan within 60 days of the date of the event or the date in which coverage would end under the plan because of the event, whichever is later. DiaMed has the responsibility to notify the Plan Administrator of the employee's death, termination, reduction in hours of employment or Medicare entitlement. Similar rights may apply to certain retirees, spouses, and dependent children if your employer commences a bankruptcy proceeding and these individuals lose coverage.

When the Plan Administrator is notified that one of these events has happened, the Plan Administrator will in turn notify you that you have the right to choose continuation coverage. Under the law, you have a least 60 days from the date you would lose coverage because of one of the events described above, or the date notice of your election rights is sent to you, whichever is later, to inform the Plan Administrator that you want continuation coverage.

If you do not choose continuation coverage, your group health insurance will end.

10

If you choose continuation coverage, DiaMed is required to give you coverage which, as of the time coverage if being provided, is identical to the coverage provided under the plan to similarly situated employees or family members. The new law requires that you be afforded the opportunity to maintain continuation coverage at your own expense for three years unless you lose group health coverage because of a termination of employment or reduction in hours. In that case, the required continuation coverage period is 18 months. These 18 months may be extended to 36 months if other events (such as death, divorce, legal separation, or Medicare entitlement) occur during that 18-month period.

This 18 months may be extended to 29 months if an individual is determined (under Title II or XVI of the Social Security Act) to be disabled and the Plan Administrator is notified of that determination within 60 days. The affected individual must also notify the Plan Administrator within 30 days of any final determination that the individual is no longer disabled. IN no event will continuation coverage last beyond 3 years from the date of the event that originally made a qualifying beneficiary eligible to elect coverage.

However, the law also provides that your continuation coverage may be terminated for any of the five following reasons:

1. DiaMed no longer provides group health coverage to any of its employees;
2. The premium for your continuation coverage is not paid on time;
3. You become covered by another group plan, unless the plan contains any exclusions or limitation with respect to any pre-existing condition you or your covered dependents may have;
4. You become entitled to Medicare;
5. You extend coverage for up to 29 months due to your disability, and there has been a final determination that you are no longer disabled.

You do not have to show that you are insurable to choose continuation coverage. However, you are required to pay the entire premium for your continuation coverage. There is a grace period of at least 30 days for payment of the regularly scheduled premium. [The law also says that at the end of the 18-month or 3 year continuation coverage period, you must be allowed to enroll in an individual conversion health plan.]

If you have any questions about this law, please see the Plan Administrator at DiaMed, 3670 Progress St. N.E., Canton, OH 44705. Also if you have changed marital status, or you or your spouse have changed addresses, please notify the Plan Administrator.

## Worker's Compensation
DiaMed has Worker's Compensation Insurance. All on the job injuries must be reported immediately to your supervisor. Failure to report an injury could result in loss of Worker's Compensation benefits. DiaMed requires the timely reporting of any injury or potential injury or harm to employees, clients, visitors or property. The reporting will be documented on an Incident Report Form.

## Social Security
The Federal government administers the Social Security system that covers you for retirement, survivors' disability and health insurance benefits. A required percentage of your pay is deducted from your paycheck to pay the employee's portion of this protection, and the company matches your deduction dollar for dollar.

## Long Term Disability
In order to secure the future for you and your families, DiaMed has added Long Term Disability Insurance to the benefit package. This benefit is for all full-time employees who have worked for DiaMed at least 90 days. There is no cost to the employee.

## Supplemental Life Insurance
All full-time employees who have worked for DiaMed for 90 days are eligible to participate in our group life insurance policy. The cost is minimal and is paid in full by the employee.

## Retirement Plan

DiaMed is concerned about the future of its employees and their retirement options. Therefore, DiaMed has established a 401K Plan through Fidelity. An employee may choose to participate in the plan after 6 months of employment. Enrollment dates are Jan 1 and July 1. The Employee may opt to contribute up to 15% (pretax) of their gross salary. DiaMed USA will match 10% of the employee's contribution.

# Conduct

## Employee Conduct

DiaMed expects its employees to comply with all applicable laws and regulations. The company and its employees will maintain our reputation for integrity and dealing fair with clients, referral sources and the community. We are dedicated to maintaining the trust of our clients and the community.

In general we expect the use of good judgment and high ethical standards. If a situation arises that is difficult for you to determine the proper course of action, you should immediately discuss it with your supervisor.

## Lunch and Breaks

All employees are required to use their time card to record lunch and break times.

Full-time employees are permitted to take:
- Two (2) – ten (10) minute breaks, one for every four (4) hours worked
- One half (1/2) hour lunch
- 

Part-time employees who work a minimum of four (4) hours but less than eight (8) hours in a day are permitted to take
- One (1) – ten (10) minute break

An employee may be able to take a longer lunch break if necessary. The employee is required to get approval from their supervisor. If his or her supervisor is unavailable, the Operation's Manager can give approval. In such a case, the employee should bundle their breaks with their lunch.

Salaried employees can take one (1) hour for lunch as long as they work at least eight hours per day.

Each Manager will coordinate lunch and break times for their personnel. Times may vary depending on the activities of the day.

Any employee leaving the premises for lunch, a break or for personal reasons should have the approval of their supervisor. The employee should also inform the Secretary when leaving and upon arriving back. It is important that the whereabouts of all employees are known at all times. The employee should clock out for breaks, lunch and if they leave the building for personal reasons.

## No Smoking Policy

No smoking is permitted anywhere in the building. Smoking is permitted at the back of the building with the door closed during breaks and lunches. Please dispose of the cigarette butts outside in the container provided. Absolutely no cigarette butts should be disposed of inside a DiaMed building.

## Web Based Time System

All hourly employees must use the web based time system to clock in and out. No one should clock in or out for another person. The only exception to this rule is if an employee is performing job duties off-site. He or she may call into their supervisor who has authority to clock them in and out.

If an employee forgets to clock in or out, he or she should alert their manager to adjust their time.

## Attendance

It is critical for all employees to be at work and on time so that our company can run smoothly. However, if the need arises that an employee must call off sick, he or she is to call the office between 7:30 and 8:30. They should speak to their supervisor or the General Manager. If neither of them is available, the employee should leave a message on their supervisor's voice mail.

Failure to provide proper notification may result in an unexcused absence and payment for sick leave not allowed. Possible probation and/or termination may result. Excessive absenteeism is defined as more than 2 episodes within a 30-day period. Management may require medical documentation for any absenteeism.

For routine medical/dental appointments, advance approval must be obtained from the immediate supervisor for time off and sick leave payment, if available. Management retains the right to approve the use of sick leave for routine medical/dental appointments, depending on particular location/department staffing needs.

Excessive tardiness will result in disciplinary actions.

## Job Abandonment

Any employee who does not report for work and does not call for two consecutive days will be considered terminated.

## Dress Code

DiaMed has established an image of professionalism and wants its employees to maintain that image. Employees must dress in business like attire and use good judgment in selecting clothing appropriate to their position. Employee's dress must be tasteful, clean, ironed, safe, not provocative, and professional appearing at all times. All employees are expected to practice good personal hygiene and be clean shaven, or have their beard, goatee, and mustache neatly trimmed.

T-shirts, sweatshirts, and sweatpants are prohibited; skirts and shorts must be at least finger tip length. Shoes are to be worn at all times. No backs or bellies are to be shown. Casual day is on Fridays; jeans may be worn only on this day, and must not be torn, tattered or frayed and worn in good taste.

Employees arriving to work wearing something that is not in the dress code policy or is deemed inappropriate by the employer will be sent home to change and are subject to disciplinary action. Any employee sent home to change will not be paid until returning to work appropriately attired.

Warehouse employees are subject to the above policy except that they are allowed to wear jeans, shorts, t-shirts, and sweatshirts that meet the guidelines for professional appearance at all times, as outlined above. Warehouse employees are encouraged to use proper safety procedures and techniques when handling heavy and bulky items. This includes the wearing of proper safety equipment including, but not limited to, steel toed shoes and lifting belts.

Drivers will be required to wear the company's logo shirts and ID badges at all times.

While this policy is intended to be complete, there will be instances of employee dress that may not be specifically included in this policy. If you are uncertain that something you have is appropriate to wear then ask or bring it in for management approval prior to wearing it. The employer reserves the right to assess and determine the appropriateness of employees dress on a case by case basis. All decisions made under the policy by the employer are final.

## Personal Phone Calls

Employees must keep personal telephone calls to a minimum. Long distance personal calls are prohibited. Telephones in client's homes may not be used for any reason.

## Alcohol and Drug Abuse Policy
### Generally
For the protection of all of our employees and clients, all employees are strictly forbidden to use, possess, be under the influence of, sell, or purchase alcohol or illegal drugs at any time during the work day anywhere on DiaMed's premises, at a work site, or anywhere else while on duty. Off duty sale or use of illegal drugs, or abuse of prescription drugs, is also prohibited. DiaMed reserves the right to search company property, e.g., lockers, vehicles, etc., to determine whether an employee is in possession of illegal drugs, alcohol, or other controlled substances. Employees who are convicted of a criminal drug statute, or any other law, must report the conviction to their immediate supervisor as soon as possible.

This policy is not a contract of employment or otherwise, either express or implied, between DiaMed and any employee. DiaMed can amend the terms of this policy at any time without the prior notice or agreement by the employees. All employees remain employees-at-will.

### Definitions
- Alcohol. Any beverage that may be consumed and has alcohol content and any other substance containing alcohol.
- Disciplinary Action. Action taken against an employee whom DiaMed has found in violation of DiaMed's policies
- Drug. Any physical or mind-altering substance or any controlled substance as defined by applicable stand and/or federal law. These include, but are not limited to; any non-prescribed drug, narcotic, heroin, cocaine, or marijuana or a prescribed drug with is abused or not used a directed by a physician.
- Employee. All employees regardless of position or work location.
- Responsible Supervisor. The supervisor to whom the employee directly reports.
- Drug and Alcohol Policy Coordinator (the "Policy Coordinator"): The Policy Coordinator is

### Drug & Alcohol Testing Procedure
To help ensure an alcohol and drug-free workplace, DiaMed may search employees' work areas and employees' personal effects located on DiaMed property. DiaMed also reserves the right to require an employee to submit to testing for the presence of illegal drugs or alcohol in the following cases:
- *Reasonable Suspicion Testing.* An employee may be required to submit to alcohol and/or drug testing if there are reasonable grounds for believing that the employee is under the influence of either alcohol or drugs. Reasonable grounds include, but are not limited to, observed changes in performance, appearance, behavior, speech, or other suspect conduct.
- *Post-Accident Testing.* An employee may be required to submit to alcohol and/or drug testing if an employee is involved in an accident at work. For purposes of this policy, "accident" is defined as:

     An unplanned, unexpected, and unintended occurrence during the conduct of the employer's business, or during working hours, or if it involves employer's supplied motor vehicles used in the conduct of the employer's business, or within the scope of employment that results in any of the following:
     1. A fatality of anyone involved in the accident;
     2. Bodily injury requiring off-site medical attention; or
     3. Any vehicular or non-vehicular damage.

     Any Employee involved in a serious near miss at the work site or while on duty may be subject to drug or alcohol testing.
- *Follow-up Testing.* Any employee who is participating in or has completed a rehabilitation program for alcohol or substance abuse may be subject to periodic, unannounced follow-up testing.
- *Random Testing.* DiaMed may arrange for random drug/alcohol testing to be conducted. Random testing is conducted without individualized suspicion of a violation of DiaMed's substance abuse policy. Selection is made by neutral criteria so that all employees eligible for testing have an equal opportunity of being tested.

14

Employees determined to be involved in an accident may be required to submit to a breath test and urine test as soon as practicable after the accident. In all events, the employee must report for testing within six (6) hours of the accident and may not consume anything prior to the test being conducted. The employee shall remain readily available for such testing and may be deemed by the Policy Coordinator to have refused to submit to testing if they failed to do so. If the employee is seriously injured and cannot provide a specimen at the time of the accident, he or she shall provide the necessary authorizations for obtaining hospital reports and other documents that would indicate whether there were any controlled substances in his or her system.

If the drug or alcohol testing reveals positive results, the employee will be suspended without pay pending an evaluation by an independent medical professional to whom the employee will be referred. Employees whose test results and/or physical examinations are positive for drug or alcohol use are subject to disciplinary action up to and including termination. If the test results are negative, the matter will be closed.

*Disciplinary Consequences*
Discipline taken against an employee found in violation of this Policy will include a full range of sanctions, up to and including termination of employment. The severity of the action chosen will depend on the circumstances of each case, and will be consistent with this policy. Any individual found to have a verified positive drug and/or alcohol test result will be subject to disciplinary action, up to and including termination.

Any employee who refuses to be tested or intentionally fails to provide adequate substance samples for testing when requested will be terminated. Attempts to alter or substitute a specimen are grounds for termination.

DiaMed will not initiate disciplinary action against any employee who voluntarily identifies him/herself as having a substance abuse problem prior to being identified through other means or becoming involved in an accident or near miss, if the employee obtains counseling or rehabilitation through any program(s) identified in the list of resource information provided by DiaMed and refrains from drug and alcohol abuse thereafter.

*Prescribed Treatment*
Employees who are undergoing prescribed medical treatment with a substance that may alter physical or mental capacity must report this to the Policy Coordinator.

*Reporting Violations*
Any supervisor, who observes a violation or receives a violation report must, as soon as practicable, report the information to the Policy Coordinator. Employees who observe or have knowledge of a violation of this policy by any employee or other person are obligated to promptly report this knowledge to their supervisor and or the Policy Coordinator.

*Imminent Threat to Safety*
In any instance where an employee feels there is an imminent threat to safety of persons or property, he or she must immediately contact the responsible supervisor and/or the Policy Coordinator.

*Ineligibility for Workers' Compensation Benefits*
If an employee tests positive for the use of drugs or alcohol or if she or she refuses to submit to such test(s), the employee's eligibility for workers' compensation and/or benefits for work-related injuries pursuant to Ohio Revised Code Chapters 4121 and 4123 may be detrimentally affected.

## Grievance Procedure
The purpose of this procedure is to provide a process by which an employee may file a grievance. An employee may file a grievance if they believe they have not been treated fairly within the guidelines of DiaMed policy.

STEP 1

The employee should bring the problem to the attention of their immediate supervisor for discussion. DiaMed expects that most problems be resolved at this stage of the procedure. The grievance should be logged on the Concern form for retrospective review information and performance improvement activity.

## STEP 2

If the employee feels that a satisfactory solution has not been reached by using Step 1 they may submit a written grievance as follows:

a.  Within five working days of receipt, the President will contact the employee to review the complaint.

b.  Within five working days of discussing the matter with the employee, the President will make a decision concerning the grievance and notify the employee of the decision.

## STEP 3

If the employee is not satisfied with the Presidents' decision, or the grievance is not resolved to the employee's satisfaction, the employee may request that the grievance to be forwarded to the Board of Directors for final disposition.

a.  Within ten working days of receipt, the Board will review the complaint and issue a decision. The decision will be delivered in writing to the employee. The decision of the Board is final and binding.

## Discipline / Termination

The following list infractions that will warrant employee counseling or termination by his/her supervisor. The list includes, but is not limited to the following:

Infractions of DiaMed policy
Misrepresentations of the organization, and/or services
Misuse of DiaMed resources
Refusing to perform tasks described in the job description
Unauthorized revelation of client information
Frequent tardiness
Frequent absenteeism
Unexcused absence
Sexual Harassment

It is the policy of DiaMed that all employees are treated fairly and objectively. Employees will be counseled after his/her first infraction in an attempt to correct inappropriate behavior, not to punish employees. After the first infraction the employee will have a counseling session with his/her supervisor to identify the problem and seek appropriate solutions to resolve the problem. The counseling session will be recorded on the Employee Counseling Form and signed by the employee and supervisor.

Upon a second infraction the employee will have another counseling session with his/her supervisor. The counseling session will be recorded on the Employee Counseling Form and signed by the employee and supervisor. The employee will be given a copy of the Employee Counseling Form noting that this is the second infraction.

All counseling forms will be stored inside the employee's Personnel File.

The third infraction may result in termination.

Serious violations of rules and regulations may cause immediate dismissal of employees. Some examples of gross misconduct and violation of rules include, but are not limited to, the following:

16

Insubordination
Theft
Falsification of records
Fighting or threats of violence
Possession of weapons
Destruction of property
Intoxication or consumption of controlled substance while on the job
DUI charge with conviction (if it affects the employee's job duties)

Every employee has the right to participate in the Employee Grievance Procedure if he/she feels that unfair treatment has occurred. See the Employment at Will Policy.

## Resignation

Employees should provide a written notice of intent to resign their position to their immediate supervisor. Employees are requested to give a 2-week notice. If a two week notice is not provided, employees are no longer eligible to receive any unpaid PTO. Management maintains the right to decide whether the employee may work through the notice period.

An exit interview will be done by a member of the management staff.

## Use of Company Resources

DiaMed is committed to providing its employees the proper tools to perform daily tasks. No DiaMed equipment or information is to be used for private use unless authorized. This includes computers. DiaMed has the right to access all information stored.

No one is permitted to be on the premises after hours without authorization. No one is permitted to have a guest on the premises after hours without authorization. Persons not authorized or employed by DiaMed cannot operate or ride in a company vehicle. Company vehicles are not to be used for personal use unless authorized.

## Weapons and Violence in the Workplace

DiaMed believes it is important to establish a clear policy that addresses weapons in the workplace. Specifically, DiaMed prohibits all persons who enter company property from carrying a handgun, firearm, knife or other prohibited weapon of any king regardless of whether the person is licensed to carry the weapon or not.

The only exception to this policy will be police officers, security guards or other persons who have been given written consent by DiaMed to carry a weapon on the property.

Any employee disregarding this policy will be subject to immediate termination.

DiaMed prohibits workplace violence. Consistent with this policy, acts or threats of physical violence, including intimidation, harassment, and /or coercion which involve or affect DiaMed or which occur on DiaMed property will not be tolerated.

Act or threats of violence include conduct, which is sufficiently severe, offensive, or intimidating to alter the employment conditions at DiaMed, or to create a hostile, abusing, or intimidating work environment for one or several employees. Examples of workplace violence include, but are not limited to the following:

1. All threats or acts of violence occurring on DiaMed's premises, regardless of the relationship between DiaMed and the parties involved.
2. All threats or acts of violence occurring off DiaMed's premises involving someone who is acting in the capacity of a representative of DiaMed.

Specific examples of conduct, which may be considered threats or acts of violence include, but are not limited to the following:

17

1. Hitting or shoving an individual.
2. Threatening an individual or his/her family, friends, associates, or property with harm.
3. Intentional destruction or threatening to destroy DiaMed's property.
4. Making harassing or threatening phone calls.
5. Harassing surveillance or stalking (following or watching someone).
6. Unauthorized possession or inappropriate use of firearms or weapons.

DiaMed's prohibition against threats and act of violence applies to all persons involved in DiaMed's operation, including but not limited to personnel, contract, and temporary workers and anyone else on DiaMed property. Violation of this policy by any individual on DiaMed property will lead to disciplinary action, up to and including termination and/or legal action as appropriate.

Every employee is encouraged to report incidents of threats or acts of physical violence of which he/she is aware. The report should be made to your supervisor.

## Anti-Discrimination/Harassment Policy
DiaMed is committed to maintaining a professional and friendly work environment that is free of discrimination and harassment based on a person's sex, race, color, creed, age, religion, disability, veteran status, marital status, ancestry or national origin, or other legally protected status, consistent with applicable laws.

All employees should respect the rights, opinions, and beliefs of others. Discrimination or harassment of any person because of sex, race, color, age, religion, disability, veteran status, ancestry, or national origin is strictly prohibited, whether directed at an employee, vendor, or customer. Any such discrimination or harassment is prohibited by this policy without regard to whether or not it also violates any equal employment opportunity laws. This policy applies to all employees, officers, and directors of DiaMed and applies to the workplace, to job sites, to job assignments away from the office, at DiaMed sponsored functions and anywhere else.

### Sexual Harassment Is Prohibited
No one may threaten or imply that an employee's submission to or rejection of sexual advances will in any way influence any decision about that employee's employment, advancement, duties, compensation, or any other terms or conditions of employment. No one may take any personnel action based on an employee's submission to or rejection of sexual advances.

No one may subject another employee to any unwelcome conduct of a sexual nature. This includes both unwelcome physical conduct, such as touching, blocking, staring, making sexual gestures, and making or displaying sexual drawings or photographs, and unwelcome verbal conduct, such as sexual propositions, slurs, insults, jokes and other sexual comments. An employee's conduct will be considered unwelcome and in violation of this policy when the employee knows or should know it is unwelcome to the person subjected to it or when it substantially interferes with an individual's employment or creates an intimidating, hostile, or offensive work environment.

Additionally, due to the potential for abuse and violations of this policy, romantic and sexual relationships between employees are strongly discouraged.

### Other Harassment Is Prohibited
No one may harass anyone because of that person's race, color, age, religion, disability, veteran status, ancestry, or national origin. Some examples of conduct prohibited by this policy include using racial and ethnic slurs or offensive stereotypes and making jokes about these characteristics.

### Making Complaints and Reporting Violations
If you believe that you have been subject to either discrimination or harassment, you should immediately make a complaint pursuant to this policy. You may complain directly to your supervisor, to the Director of Human Resources, or to the President. You may complain in writing or verbally, however, any verbal complaint will be required to be reduced to writing within 24 hours. Supervisors must forward any and all

18

complaints or concerns raised to the Director of Human Resources immediately or not later than twenty-four (24) hours after receiving such complaint(s) or concern(s).

Similarly, if you observe what you believe constitutes discrimination or harassment toward another employee, you are requested and encouraged to report this to one of the personnel described above. No reprisal, retaliation, or other adverse action will be taken against any employee for making, in good faith, a complaint or report of discrimination or harassment, or for assisting in, good faith, in the investigation of any such complaint or report. Any suspected retaliation or intimidation should be reported immediately to one of the personnel described above. Any individual found to have retaliated against another individual for making a complaint or report under this policy, or against anyone participating in the investigation of a complaint under this policy, may be subject to discipline up to and including termination.

*Investigation of Complaints and Reports*
DiaMed will promptly and thoroughly investigate any complaint or report of a violation of this policy and expect all employees contacted regarding a complaint to cooperate fully. Please understand that a thorough investigation can, in some cases, take several weeks. During the investigation, to the extent possible, measures will be taken to prevent any further contact or interaction between the person who believes he or she has been subject to harassment and the alleged violator of this policy. At any time, you may ask the person to whom you made a complaint or report under this policy about the status of the investigation. While it is the intent of DiaMed to attempt to keep any complaints or reports under this policy as confidential as possible, in order to ensure a fair and thorough investigation, completed confidentiality may not be possible. However, all persons with whom the allegations are discussed will be reminded of the confidential nature of the process.

*Penalties for Violations*
DiaMed will take prompt and appropriate disciplinary and remedial action, if its investigation shows a violation of this policy. Depending on the circumstances, the disciplinary action may range from a warning to a discharge.

A complaint or report that this policy has been violated is a serious matter. Dishonest complaints or reports are also against our policy, and DiaMed will take appropriate disciplinary action up to and including termination if its investigation shows that deliberately dishonest and bad faith accusations have been made.

Disciplinary action will also be taken against any employee who does not cooperate fully in any investigation conducted pursuant to this policy.

*Additional Information*
DiaMed has developed this policy to ensure that all of its employees can work in an environment free from discrimination or harassment. This policy will be disseminated to all current employees as well as to all new employees upon their arrival at DiaMed. DiaMed will periodically conduct or arrange for mandatory informational sessions concerning the policy, so as to ensure that all employees understand DiaMed's commitment to eliminating any discrimination or harassment in the workplace, are familiar with the policy and its complaint procedures, and know that any complaint received will be investigated promptly and appropriately resolved.

If you have any questions about this policy, please contact the Human Resource Manager for additional information.

19

## DiaMed Employee Handbook Compliance

I have read the DiaMed Employee Handbook and understand the policies it contains. I agree to comply with these policies.

I understand that DiaMed has the right to make changes to the Employee Handbook with written notice.

I agree to adhere to any revisions to the Employee Handbook.

I agree to read the DiaMed Policy and Procedure Manual during my orientation period. I agree to adhere to all policies and procedures and revisions to the DiaMed Policy and Procedure Manual.

I understand that the signing on this statement does not imply the existence of an employee contract. I understand that my employment may be terminated at any time, with or without cause, or with or without notice.


Employee Signature_____     Date_____


Supervisor Signature_____     Date_____

20