2010 DEC 20  AM II: 38

# IN THE COURT OF COMMON PLEAS
## STARK COUNTY, OHIO

**MEDLINE DIAMED, LLC**
3670 PROGRESS STREET
CANTON, OHIO 44705

    Plaintiff,

-vs.-

**LINDA LIBASSI**
3 BRANCHWOOD PLACE
BAYVILLE, NEW JERSEY 08721

-and-

**LAURA CRONIN**
107 DRIFTWOOD LANE
LANOKA HARBOR, NEW JERSEY 08734

-and-

**MELISSA HAITHCOCK**
12 UNION PLACE
KEANSBURG, NEW JERSEY 07734

-and-

**JERROLD FRIED**
28 PACIFIC AVE
BAYVILLE, NEW JERSEY 08721

-and-

**MICHAEL FRIED**
7029 HUNTLEY ROAD
SUITE H
COLUMBUS, OHIO 43229

-and-

CASE NO: **2010 CV 0 4 5 5 4**

JUDGE: Heath,

**VERIFIED COMPLAINT:**
MISAPPROPRIATION OF TRADE
SECRETS, R.C. § 1333.61, ET SEQ.;
BREACH OF FIDUCIARY DUTY;
UNFAIR COMPETITION, R.C. § 4165.02
ET SEQ.;
COMMON LAW UNFAIR
COMPETITION;
TORTIOUS INTERFERENCE;
CIVIL CONSPIRACY;
SPOLIATION OF EVIDENCE; AND
INJUNCTIVE RELIEF

ENTERED BY 6

**HOWARD FRIED**
183 CEDAR RUN ROAD
BAYVILLE, NEW JERSEY 08721

-and-

**COMMUNITY SURGICAL SUPPLY OF
TOMS RIVER, INC.**
1390 ROUTE 37 W
TOMS RIVER, NEW JERSEY 08755

Defendants.

Now comes Plaintiff, Medline DiaMed, LLC ("Medline DiaMed"), and for its Complaint against Defendants Linda Libassi, Laura Cronin, Melissa Haithcock, Jerrold Fried, Michael Fried, Howard Fried,[1] and Community Surgical Supply of Toms River, Inc. ("CSS") (collectively, "Defendants"), hereby states as follows:

## INTRODUCTION

1. With the assistance three trusted former employees, CSS, a competitor of Medline DiaMed operated by the Fried Brothers, is using stolen trade secret information to wage an illegal campaign against Medline DiaMed. The objective of this assault is to steal Medline DiaMed's customers, divert potential and existing sales, and ultimately destroy Medline DiaMed's business. The attack is the culmination of a confirmed conspiracy between Medline DiaMed's former employees, the Fried Brothers, and their company, CSS. The two-pronged illegal plan consisted of CSS, by and through the Fried Brothers, soliciting Medline DiaMed's former employees to divert business while they were employed by Medline DiaMed, and then illegally accessing Medline DiaMed's computer system to steal volumes of Medline DiaMed's confidential trade secret information to divert even more business. The former trusted employees are now employed by the Fried Brothers through CSS, and they are all using this information to cause disastrous and irreparable harm to Medline DiaMed. In an effort to

---

[1] Jerrold Fried, Michael Fried, and Howard Fried are brothers and collectively referred to herein as the "Fried Brothers."

stop this ongoing illegal activity and to remedy the devastating harm that has been done, Medline DiaMed brings the instant cause of action and seeks immediate injunctive relief.

## SUMMARY OF THE CASE

2.     Libassi, Cronnin, and Haithcock were employed by DiaMed USA, LLC ("DiaMed USA"). a medical supply distributorship that operated primarily in the office-based physician market with its principal place of business located in Canton, Stark County, Ohio. Libassi, Cronnin, and Haithcock all worked for DiaMed USA in its New Jersey sales area. Libassi and Cronnin worked as sales representatives. Haithcock worked as an administrative support assistant. DiaMed USA treated Libassi, Cronnin, and Haithcock very well and they were all highly compensated employees.

3.     Before working with DiaMed USA, Libassi, Cronnin, and Haithcock were former employees of CSS, one of DiaMed USA's owning members. CSS is a distributor of oxygen, respiratory, and durable home medical equipment located in New Jersey. Jerrold Fried, Michael Fried, and Howard Fried are brothers and are the owners/managing officers of CSS. Due to its ownership interest in DiaMed USA, and pursuant to the operating agreement of DiaMed USA. CSS was prohibited from competing with DiaMed USA, soliciting customers of DiaMed USA, or soliciting employees of DiaMed USA. As a result, until recently, CSS has refrained from entering into the office based medical supply market.

4.     On or about October 28, 2010, Medline Industries, Inc. purchased the assets of DiaMed USA through its wholly owned subsidiary, Medline DiaMed. The assets purchased by Medline DiaMed included all customer accounts, business processes and methods, intellectual property, inventory, and the extensive goodwill developed by DiaMed USA. This purchase by Medline Industries, Inc. was hailed as a significant step toward spurring economic growth and job stability in Stark County, Ohio.[2] The vast majority of DiaMed USA's employees, including Libassi, Cronnin, and Haithcock, accepted

---

[2] See, *Medline Buys Canton-Based DiaMed USA*, CantonRep.com, Nov. 17, 2010, attached hereto and incorporated herein as **Exhibit A.**

3

employment with Medline DiaMed commencing upon the completion of this transaction. Medline DiaMed currently employs 31 people in its Stark County, Ohio facilities alone, and hopes to hire many more in the future.

5.      Upon information and belief, Libassi, Cronnin, Haithcock, and the Fried Brothers formulated and put into action an illegal plan (the "Plan") to target Medline DiaMed's clients.[3] The objective of the Plan was to divert sales from Medline DiaMed and induce Medline DiaMed's clients to cease doing business with Medline DiaMed and become clients of CSS or a related entity. The Plan was formulated and implemented by Defendants while Libassi and Cronnin were employees of Medline DiaMed and before they officially became employed by CSS or another entity.

6.      As part of the illegal Plan, Libassi, Cronnin, Haithcock, the Fried Brothers, and CSS have illegally accessed Medline DiaMed's computer databases and misappropriated Medline DiaMed's trade secrets, including customer and sales information, in an effort to divert Medline DiaMed's clients to CSS (Count I). In connection with the Plan, Libassi and Cronnin breached their fiduciary duty of loyalty to Medline DiaMed by conspiring to divert customers from Medline DiaMed to CSS while they were still employed by Medline DiaMed (Count II). Further, by engaging in the Plan, Libassi, Cronnin, Haithcock, the Fried Brothers, and CSS have tortiously interfered with Medline DiaMed's prospective business or economic advantage, engaged in unfair competition in violation of both statutory and common law, and illegally conspired with one another to effectuate the Plan (Counts III, IV, V, VI). Finally, Libassi, Cronnin, Haithcock, the Fried Brothers, and CSS have engaged in overt efforts to conceal the Plan by spoliating evidence. (Count VII).

7.      As explained herein, Haithcock revoked her acceptance of employment with Medline DiaMed on October 28, 2010. Libassi and Cronnin resigned employment with Medline DiaMed on December

---

[3] The terms "clients" and "customers" will be used interchangeably in this pleading.

11, 2010. Upon information and belief, they all immediately then began their employment with CSS. Among other conduct, Haithcock, Libassi, and Cronnin have continued their blatant solicitation of Medline DiaMed's clients through the use of Medline DiaMed's trade secrets. To date, it is estimated that the Defendants' illegal use of Medline DiaMed's trade secrets has already resulted in at least 50 Medline DiaMed clients transferring their accounts to CSS or a related entity, with lost revenue to Medline DiaMed expected to exceed $1.7 million.

## THE PARTIES

8.      Medline DiaMed is an Illinois limited liability company with its principal place of business at 3670 Progress Street, Canton, Stark County, Ohio 44705. Medline DiaMed distributes its office-based physician products nationwide, and has distribution centers in Ohio, Tennessee, and New Jersey.

9.      Libassi is a resident of the State of New Jersey, residing in Bayville, Ocean County. She was formerly an employee of DiaMed USA and Medline DiaMed, and upon information and belief, is currently employed by CSS. Libassi has maintained continuous and systematic contacts with the State of Ohio, including employment by an Ohio limited liability company, numerous appearances in Ohio in connection with her employment, daily engagement with Ohio by telephone, email, mail, and facsimile in connection with her employment, and misappropriating and using electronic information located in Ohio, all of from which this cause of action arises.

10.     Cronin is a resident of the State of New Jersey, residing in Lanoka Harbor, Ocean County. She was formerly an employee of Medline USA and Medline DiaMed, and upon information and belief, is currently employed by CSS. Cronin has maintained continuous and systematic contacts with the State of Ohio, including employment by an Ohio limited liability company, numerous trips to Ohio in connection with her employment, daily engagement with Ohio by telephone, email, mail, and facsimile

in connection with her employment, and misappropriating and using electronic information located in Ohio, all of from which this cause of action arises.

11.     Haithcock is a resident of the State of New Jersey, residing in Keansburg, Monmouth County. She was formerly an employee of DiaMed USA, and upon information and belief, is currently employed by CSS. Haithcock has maintained continuous and systematic contacts with the State of Ohio, including employment by an Ohio limited liability company, numerous appearances in Ohio in connection with her employment, daily engagement with Ohio by telephone, email, mail, and facsimile in connection with her employment, and misappropriating and using electronic information located in Ohio, all of from which this cause of action arises.

12.     Upon information and belief, Jerrold Fried is a resident of the State of New Jersey, residing in Bayville, Ocean County. He is currently employed as Vice-President of CSS. Jerrold Fried has maintained continuous and systematic contacts with the State of Ohio, including indirect ownership of an Ohio limited liability company, ownership of a New Jersey corporation with Ohio offices and an Ohio foreign for-profit corporation license, appearances in Ohio in connection with these ownership interests, frequent engagement with Ohio by telephone, email, mail, and facsimile in connection with these ownership interests, and misappropriating and using electronic information located in Ohio, all of from which this cause of action arises. In addition, Jerrold Fried is a partner in a New Jersey limited partnership, The Fried Group, LP, that owns real property in Ohio.

13.     Upon information and belief, Michael Fried is a resident of the State of Ohio, residing in Columbus, Franklin County. He is currently employed as Vice-President of CSS. Michael Fried has maintained continuous and systematic contacts with the State of Ohio, including the acceptance of the appointment of statutory agent as a natural person who is a resident of the State of Ohio on behalf of The Fried Group, LP pursuant to R.C. § 1782.04(A) and CSS pursuant to R.C. § 1703.041(A).

Further, additional contacts include indirect ownership of an Ohio limited liability company, ownership of a New Jersey corporation with Ohio offices and an Ohio foreign for-profit corporation license, numerous appearances in Ohio in connection with these ownership interests, frequent engagement with Ohio by telephone, email, mail, and facsimile in connection with these ownership interests, and misappropriating and using electronic information located in Ohio, all of from which this cause of action arises. Finally, Michael Fried is a partner in a New Jersey limited partnership, The Fried Group, LP, that owns real property in Ohio.

14. Upon information and belief, Howard Fried is a resident of the State of New Jersey, residing in Bayville, Ocean County. He is currently employed as President of CSS. Howard Fried has maintained continuous and systematic contacts with the State of Ohio, including indirect ownership of an Ohio limited liability company, ownership of a New Jersey corporation with Ohio offices and an Ohio foreign for-profit corporation license, appearances in Ohio in connection with these ownership interests, frequent engagement with Ohio by telephone, email, mail, and facsimile in connection with these ownership interests, and misappropriating and using electronic information located in Ohio, all of from which this cause of action arises. In addition, Howard Fried is a partner in a New Jersey limited partnership, The Fried Group, LP, that owns real property in Ohio.

15. CSS is a New Jersey corporation with its principle place of business located at 1390 Route 37 W., Toms River, New Jersey 08755. In addition to its New Jersey offices, CSS also has offices in Ohio, New York, and Pennsylvania. CSS has maintained continuous and systematic contacts with the State of Ohio, including ownership of an Ohio limited liability company, daily use of telephone, email, mail, and facsimile in connection with doing business in Ohio, and misappropriating and using electronic information located in Ohio, all of from which this cause of action arises. Further,

additional contacts include the maintenance of Ohio offices, the appointment of a statutory agent in Ohio, holding an Ohio foreign for-profit corporation license, and leasing real property in Ohio.

## FACTUAL BACKGROUND

### *Medline DiaMed Has Developed Extensive, Proprietary Information In Order to Gain a Competitive Advantage*

16.    Medline DiaMed has made a significant investment in acquiring, developing, and enhancing relationships with its clients for whom it supplies office-based physician medical products.

17.    Medline DiaMed has also made a significant investment in obtaining and compiling a substantial body of confidential and proprietary information and trade secrets that is critical to its ability to serve existing and prospective clients and to compete for their business. This information includes, but is not limited to, the combination of knowledge of (a) the identity of clients and prospective clients, including the identity of the key decision maker, purchasing history, projected supply needs, desired sales terms, delivery preferences, financial information, and service expectations, (b) suppliers and wholesalers that are willing and available to provide the products necessary to satisfy the needs of clients and prospective clients; and (c) its pricing structures and margins.

18.    The client relationships and confidential and proprietary information that Medline DiaMed has acquired are essential to the success of its business.

19.    To preserve and protect the value of its investment and resulting client goodwill, Medline DiaMed treats the confidential and proprietary client and prospect information described herein as trade secrets, and has taken specific measures to preserve the information's secrecy and to protect Medline DiaMed's relationships with its clients and prospects.

20.    Both DiaMed USA and Medline DiaMed invested a substantial amount of time, money, and resources to teach Libassi, Cronnin, and Haithcock, among other things, their business methods.

8

processes, and confidential and proprietary information concerning their business, customers, and prospects.

21.     During their employment with DiaMed USA and Medline DiaMed, Libassi, Cronnin, and Haithcock had access to and used the client and prospect lists acquired by Medline DiaMed, as well as other highly confidential and proprietary information generated and/or obtained by Medline DiaMed. Such confidential and proprietary information includes, but is not limited to, the identities and specifications of clients and prospective clients, including their medical supply purchasing history, projected supply needs, desired sales terms, delivery preferences, financial information, and service information, and Medline DiaMed's business plans, pricing structures, and margins.

22.     As Libassi, Cronnin, and Haithcock were well aware, Medline DiaMed maintained a highly confidential and proprietary electronic database of its clients and prospects on its secure computer network server located in its Ohio office, to which Libassi and Cronnin, through the use of secure passwords, had direct access to facilitate the duties of their employment with Medline DiaMed. Medline DiaMed management personnel frequently advised Libassi, Cronnin, and other trusted employees to enter client and prospect information into the database regularly where such information could be securely maintained by Medline DiaMed. In addition, sales history reports, customer deviations reports, pricing sheets, and other forms of sensitive, proprietary information were also maintained on this secure server.

23.     DiaMed USA, and subsequently Medline DiaMed, took reasonable steps to ensure the confidentiality of its trade secrets and proprietary information. Protocols for logging into the computer network server are only granted to employees. Access requires the employee to know and use two usernames and passwords, which must be different from each other. By way of operation, after the employee connects to the secure network, they are prompted for their first set of credentials. Next, the

9

employee connects to the ERP Prophet 21® software, where they are asked for the second, different user name and password. Only then may the trade secrets and proprietary information of Medline DiaMed be accessed, and such access has never been granted to any non-DiaMed employees. Moreover, while general access to Medline DiaMed's secure servers is granted to many employees of Medline DiaMed, only select, trusted employees are granted access to Medline DiaMed's confidential proprietary information and trade secrets.

24.    In addition to its use of password-protected servers, DiaMed USA and Medline DiaMed maintained confidentiality policies internally with its employees. By way of example, the employee handbook of DiaMed USA reads:

> ### Confidential Information
>
> All DiaMed employees are obligated to maintain confidentiality, even after they are no longer employed by DiaMed.
>
> Additionally, our customers and suppliers entrust DiaMed with important information relating to their health, lives and business. The nature of this relationship requires maintenance of confidentiality. In safeguarding the information received, DiaMed earns the respect and further trust of our customers and suppliers.
>
> If you are questioned by someone outside the company or your department and you are concerned about the appropriateness of giving them certain information, you are not required to answer. Instead, as politely as possible, refer the request to your supervisor.
>
> No one is permitted to remove or make copies of any DiaMed records, reports, or documents without prior management approval. Disclosure of confidential information could lead to termination, as well as other possible legal action.[4]

DiaMed USA and Medline DiaMed also included confidentiality covenants in their employment agreements to further safeguard their trade secrets. As will be more specifically described below, Libassi, Cronnin, and Haithcock were well aware of DiaMed USA and Medline DiaMed's substantial efforts to ensure the confidentiality of their trade secret and proprietary information.

---

[4] DiaMed USA, LLC Employee Handbook, attached hereto and incorporated herein as **Exhibit B.**

### *Libassi, Cronin, and Haithcock were Critical to*
### *Medline DiaMed's New Jersey and Nationwide Success*

25.     The use of effective sales agents is at the heart of Medline DiaMed's business. Their job is to generate new business from existing clients and to develop new business. In turn, their efforts are supported by administrative staff located at Medline DiaMed's Ohio office. Nearly all of Medline DiaMed's sales are generated from the use of its sales agents.

26.     Due to the varying medical supplies required by office-based physicians, sales agents are required to know the full spectrum of Medline DiaMed's products and services. In addition, it is important that the sales agents understand and appreciate the needs of the clients whom they are servicing. As a result, it is necessary to provide sales agents access to the confidential trade secrets of Medline DiaMed, including customer lists, sales history reports, customer deviations reports, pricing sheets, cost sheets, and other forms of sensitive information in order for the sales agents to successfully market Medline DiaMed's products.

27.     Libassi, Cronnin, and Haithcock all became employees of DiaMed USA on January 1, 2008. Libassi and Cronnin were sales agents, and Haithcock was an administrative support assistant. All three operated in DiaMed USA's New Jersey sales territory, comprising the entirety of DiaMed USA's New Jersey sales team. The majority of Libassi and Cronnin's sales originated from New Jersey and were supported and processed by the Ohio office. From New Jersey, Haithcock provided assistance in managing the accounts receivables generated from these sales. While they typically worked from home, at times, Libassi and Cronnin would work out of CSS's office in New Jersey. Haithcock operated from office space within CSS's New Jersey location where she interfaced directly with DiaMed USA's Canton, Ohio office.

*The Plan:*
*A Two Pronged Attack to Steal and Divert*
*Business from Medline DiaMed to CSS*

28.     In the summer of 2010, DiaMed USA began to explore the possibility of selling its business. After testing the market, DiaMed USA received interest from two medical supply organizations. Medline Industries, Inc. offered DiaMed USA a very fair price, and further agreed to employ all of DiaMed USA's current employees, in both Ohio and elsewhere.  The offer from the other medical supply organization was for a slightly higher price, but would have resulted in the termination of a significant number of DiaMed USA's staff.  CSS and the Fried Brothers preferred to accept the larger sum of money, showing no interest in preserving Ohio jobs.  Ultimately, after substantial negotiation, the offer of Medline Industries, Inc. was accepted.  Libassi, Cronnin, and Haithcock all accepted employment with Medline DiaMed, as did the vast majority of Medline USA's employees.  Medline DiaMed was formed and acquired all of the assets, customer accounts, trade secrets, and employees of DiaMed USA, effective October 28, 2010.

29.     Prior to Medline Industries, Inc.'s acquisition of DiaMed USA, the Fried Brothers had disclaimed any intent to enter into the physician-office based medical supply market.  These intentions were reiterated during negotiations of the purchase of DiaMed USA by Medline Industries, Inc.  However, CSS and the Fried Brothers felt that they had left money on the table by accepting Medline Industries, Inc.'s offer.  They then set out to get this money back – by illegally stealing trade secrets and clients from Medline DiaMed.

30.     Upon information and belief, in or around September 2010, CSS, and the Fried Brothers constructed the Plan, which involved, among other components: (a) encouraging Libassi, Cronnin, and Haithcock to leave Medline DiaMed after employment was accepted; (b) offering positions with CSS to Libassi, Cronnin, and Haithcock with the purpose of positioning CSS to unfairly compete with Medline DiaMed; (c) encouraging Libassi, Cronnin, and Haithcock to misappropriate and use the

12

trades secrets of Medline DiaMed to identify and convince the clients of Medline DiaMed to join them at CSS; and (d) encouraging Libassi, Cronnin, and Haithcock to use Medline DiaMed's trade secrets to divert Medline DiaMed clients to CSS. Upon information and belief, actions in support of (c) and (d) above were undertaken both before and after Libassi, Cronnin, and Haithcock resigned from Medline DiaMed.

31.     As further explained herein, upon information and belief, over the following months Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers worked to enact the Plan. The Plan culminated with the resignation of Haithcock on October 28, 2010 (two days after she had accepted employment with Medline DiaMed), the coordinated and abrupt resignations of Libassi and Cronnin on Saturday, December 11, 2010, the solicitations of dozens of Medline DiaMed's clients (including while Libassi and Cronnin were still employed by Medline DiaMed), and the diversion of numerous Medline DiaMed clients to CSS.

32.     Upon information and belief, throughout 2010, Libassi, Cronnin, and Haithcock frequently communicated with each other, and with CSS and the Fried Brothers, about Medline DiaMed's business and the Plan, in person, on Facebook, by telephone and/or by email. These email communications were on Medline DiaMed's computer systems, and also on home or personal computers that the Defendants used. Explained more fully below, one simple example includes the following exchange that occurred on Facebook between Haithcock and Cronin:

 **Melissa Haithcock** Feel like CRAP!!!
December 8 at 2:51pm · Like · Comment

 **Laura Cox Cronin** No time to feel like crap...get better we have a lot of shit to do!
December 8 at 8:14 pm · Like

 **Melissa Haithcock** NO KIDDING!!!!
December 9 at 8:25 pm · Like

Write a comment...

This communication occurred after Haithcock revoked her acceptance of employment with Medline DiaMed and just three days *before* Cronin and Libassi resigned from Medline DiaMed.

### The First Prong:
### *Disloyally Diverting Business to CSS While Employed by Medline DiaMed*

33.     As part of the Plan, and at the direction Haithcock, CSS and the Fried Brothers, Libassi, and Cronin acted contrary to their employer Medline DiaMed's interests by, among other things, improperly diverting customers from Medline DiaMed to CSS while employed by Medline DiaMed.

34.     By way of example, prior to her resignation from Medline DiaMed, on approximately November 29, 2010, Libassi solicited and obtained an order for office supplies from the Star Career Academy located in Egg Harbor Township, New Jersey. The Star Career Academy had been a customer of DiaMed USA, and subsequently Medline DiaMed, since 2008. However, as a part of the Plan, instead of placing the order with her employer, Medline DiaMed, Libassi placed the order with CSS. This order was fulfilled with products shipped by CSS and received by the Star Career Academy on December 13, 2010. Thereafter, on December 15, 2010, Star Career Academy placed another order for office supplies with Libassi. Libassi again placed this order with CSS, even though it is undisputed that this is a customer of Medline DiaMed.

14

35.    As another example, before resigning her employment with Medline DiaMed, Cronnin solicited and obtained an order for office supplies from Dr. William Humen of Jersey City, New Jersey. Dr. Humen had been a customer of DiaMed USA, and subsequently Medline DiaMed, since 2008. During this solicitation, Cronnin confirmed to Dr. Humen the existence of the Plan, and stated that "Linda [Libassi] and the Fried Brothers are starting a new company," but they "need time so they don't get into trouble." In an effort to effectuate the Plan, Cronnin obtained a substantial order for medical supplies from Dr. Humen, but only placed a small fraction of the order with her employer, Medline DiaMed. The remainder of the order was held so that Cronnin could place the order with CSS at the end of January when the Defendants felt it would be "safe" to start accepting sizeable orders.

36.    Further, while employed by Medline DiaMed, Libassi directly placed orders through CSS for product that was carried by, and should have been placed with, Medline DiaMed. To illustrate, while employed by Medline DiaMed, Libassi solicited and obtained an order for medical supplies from Ocean Orthopedic Associates of Toms River New Jersey. Though the order was placed for products offered by Medline DiaMed, in facilitation of the Plan and in direct violation of her duties to her employer, Libassi placed this order directly with CSS instead of her employer, Medline DiaMed.

### The Second Prong:
### Stealing Trade Secrets from Medline DiaMed in
### Order to Steer Even More Business to CSS

37.    The Plan has further been facilitated by theft and misappropriation by Cronnin and Libassi of Medline DiaMed's confidential trade secrets, which, upon information and belief, has been encouraged, facilitated, and directed by Haithcock, the Fried Brothers, and CSS.

38.    By way of illustration, as of November 1, 2010, during her employment with Medline DiaMed, Libassi began forwarding emails that contained confidential trade secrets in her Medline DiaMed

issued email account to her own personal Gmail email address. This activity is confirmed by images generated from Medline DiaMed's secure email servers:

| | | |
|---|---|---|
| 'lindalibassi1972@gmail.com' | FW: | Sat 12/11/2010 10:59 AM |
| 'lindalibassi1972@gmail.com' | FW: | Thu 12/9/2010 8:26 AM |
| 'lindalibassi1972@gmail.com' | FW: Follow-up on Sony 110HG and EKG paper | Wed 12/8/2010 12:14 PM |
| 'lindalibassi1972@gmail.com' | FW: NEW - MEDLINE DIAMED DIADVANTAGE SHEET - VERSION = MD02 | Wed 12/8/2010 12:12 PM |
| 'lindalibassi1972@gmail.com' | | Tue 12/7/2010 2:48 PM |
| 'lindalibassi1972@gmail.com' | FW: pricing | Tue 12/7/2010 11:49 AM |
| 'lindalibassi1972@gmail.com' | FW: Diamed Product Cost | Tue 12/7/2010 11:48 AM |
| 'lindalibassi1972@gmail.com' | FW: 19" TRANSPORT WHEELCHAIR | Tue 12/7/2010 11:42 AM |
| 'lindalibassi1972@gmail.com' | FW: white boards | Wed 12/1/2010 12:22 PM |
| 'lindalibassi1972@gmail.com' | FW: | Wed 12/1/2010 10:58 AM |
| 'lindalibassi1972@gmail.com' | FW: Employment agreements | Wed 12/1/2010 10:57 AM |
| 'lindalibassi1972@gmail.com' | FW: | Fri 11/19/2010 11:29 AM |
| 'lindalibassi1972@gmail.com' | FW: FINAL ----- DIADVANTAGE ORDER FORM_REPS_MD01_111710.xls | Fri 11/19/2010 11:28 AM |
| 'lindalibassi1972@gmail.com' | | Mon 11/15/2010 8:10 AM |
| 'lindalibassi1972@gmail.com' | FW: CLIENT LETTER | Fri 11/12/2010 9:20 AM |
| 'lindalibassi1972@gmail.com' | FW: thank you | Fri 11/12/2010 8:45 AM |
| 'lindalibassi1972@gmail.com' | FW: New employee packet | Mon 11/1/2010 2:00 PM |

The information contained in these emails includes Medline DiaMed's customer identities, product prices, and product costs. If Libassi were faithfully performing her duties as a Medline DiaMed employee, there would be no reason to forward this information to her personal email account. In fact, this is expressly prohibited by Medline DiaMed policies. These actions occurred to enable Libassi to misappropriate for her own use and the use of Cronin, Haithcock, the Fried Brothers, and CSS the trade secrets of Medline DiaMed and facilitate the Plan.

39. In addition, on the day of her abrupt resignation, Libassi entered Medline DiaMed's secure network servers multiple times and copied volumes of Medline DiaMed's confidential trade secret information. Libassi's access occurred on Saturday, December 11, 2010 at 9:24 AM, 10:35 AM, and 2:51 PM, as confirmed by Medline DiaMed's network access logs. The confidential files that were copied included:

- Customer_List.xls. A spreadsheet containing all of Medline DiaMed's New Jersey customer names, account numbers, phone numbers, fax numbers, addresses, and email addresses.

- RadGridExport.xls. A spreadsheet containing Medline DiaMed's customer deviations from month to month, including year to date sales of Medline DiaMed's customers.

- CUSTOEMR.xls. A spreadsheet containing sales tracing of Medline DiaMed's customers.

16

- Sales History Report.pdf.  A document listing the sales history of all Medline DiaMed's customers.

- Sales History Report LC.pdf and Sales History Report LC2.pdf.  Documents listing the sales history of all Medline DiaMed's customers serviced by Cronin.

- Sales History Report LL.pdf.  Documents listing the sales history of all Medline DiaMed's customers serviced by Libassi.

- geffner sales analysis (2).xls.  A spreadsheet containing information relating to a significant customer of Medline DiaMed, Dr. Rami Geffner, of Fork River, New Jersey.

Upon information and belief, these files, each of which contain highly confidential trade secret information of Medline DiaMed, are being used by Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers in furtherance of the Plan.

40.    The same day Libassi accessed Medline DiaMed's secure servers to copy Medline DiaMed's confidential trade secret information, she also accessed Medline DiaMed's business management software.  Once accessed, she modified over 52 active orders containing 104 products that were solicited by Libassi and Cronin and placed with Medline DiaMed by changing the status of these orders to "cancelled" or "deleted."  The net effect of the modifications caused the products requested by these orders to not be shipped by Medline DiaMed to its customers.  Upon information and belief, Libassi re-submitted these pending orders to Cronnin, Haithcock, and the Fried Brothers for fulfillment by CSS in furtherance of the Plan.

41.    After Libassi entered Medline DiaMed's secure server to steal and modify Medline DiaMed's confidential trade secrets and proprietary information in furtherance of the Plan, she tried to cover her tracks to conceal detection of the Plan by Medline DiaMed.  Fortunately, as explained below, these efforts failed.  Highly confidential trade secret information deserves effective security systems.  Medline DiaMed has both.  Medline DiaMed's secure server monitoring and audit software confirms Libassi's theft as well as her efforts to conceal her wrongdoing in furtherance of the Plan.

17

42.    Libassi continues to take active steps to utilize the confidential trade secret information she misappropriated by soliciting Medline DiaMed's customers for placement with CSS in furtherance of the Plan.  By way of one example, using the confidential customer information she obtained from Medline DiaMed, on December 15, 2010, Libassi sent the following text message: "Good morning everyone its linda libassi going forward this will be my new cell number."  Upon information and belief, this text message was sent to scores of Medline DiaMed's clients, and was a part of a deliberate attempt by Libassi to utilize Medline DiaMed's confidential information to drive business to her new employer, CSS, in furtherance of the Plan.

43.    Not only is the Fried Brothers' and CSS's involvement in the Plan confirmed by the actions of Cronnin and Libassi, but it is also confirmed by their own actions.  In late November / early December 2010, Jerrold Fried contacted wholesaler JAL Associates, a medical supplier of Medline DiaMed.  During this conversation, Jarrold Fried confirmed the existence of the Plan, and further stated that CSS would be attempting to provide office-based medical supplies to the current customers of Medline DiaMed.

### The Cover-Up

44.    In an effort to prevent detection of the Plan by Medline DiaMed, Libassi, Cronin, Haithcock, the Fried Brother, and CSS have engaged in substantial efforts to conceal the Plan.  While the full dynamic of the Plan continues to be uncovered by Medline DiaMed, it is clear that their cover-up efforts have failed.

45.    As one example, after Libassi misappropriated Medline DiaMed's confidential trade secret information in furtherance of the Plan while she was employed by Medline DiaMed by forwarding emails containing this information from her Medline DiaMed email account to her own personal Gmail account (in violation of Medline DiaMed policy), she deleted the emails containing confidential trade secret information from the inbox of her Medline DiaMed account.  She left other benign, non-

18

sensitive emails in her Medline DiaMed email inbox unaltered. Presumably, Libassi thought that after she destroyed the trade secret information residing in the inbox of her Medline DiaMed email account, Medline DiaMed would not realize this information resided in her inbox, and the misappropriation would remain undetected. However, Libassi neglected to delete the emails from the outgoing box from her Medline DiaMed email account. Therefore, not only can Medline DiaMed confirm the trade secrets stolen by Libassi, but Medline DiaMed can demonstrate Libassi's failed attempts to conceal these efforts.

46.     It is also apparent that CSS and the Fried Brothers participated in the cover-up of the Plan. By way of illustration, for all emails sent to CSS by Medline DiaMed, Medline DiaMed's email software generates a return receipt. This receipt notifies Medline DiaMed when an email is opened or modified. At the same time Medline DiaMed was receiving information from its customers confirming the existence of the Plan, on December 16, 2010, Medline DiaMed began to receive scores of email return receipts notifying Medline DiaMed that emails received by CSS from Medline DiaMed were being deleted. Medline DiaMed had never received these types of email return receipts from CSS before. It was readily apparent that CSS was purging its systems of all emails received from Medline DiaMed in an effort to destroy the emails that evidenced the Plan.

### The Effects of the Plan Upon Medline DiaMed

47.     Upon information and belief, the Plan has already resulted in the loss of dozens of Medline DiaMed's clients being steered to CSS. As a result of the Plan, it is estimated that at least 50 Medline DiaMed clients have already transferred their accounts to CSS or a related entity, with lost revenue to Medline DiaMed expected to exceed $1.7 million. If the Plan continues, Medline DiaMed's business will be irreparably harmed. The Plan must be stopped immediately.

## COUNT I
## MISAPPROPRIATION OF TRADE SECRETS
### R.C. § 1333.61, ET SEQ.

48.     Medline DiaMed restates each preceding paragraph as if fully rewritten herein.

49.     As alleged hereinabove, Medline DiaMed has acquired and developed confidential trade secret information. That confidential trade secret information includes, but is not limited to, confidential business information and procedures, sales history reports, customer deviations reports, pricing sheets, and other forms of sensitive, proprietary information, the public dissemination of which would cause immediate and irreparable harm to Plaintiff's business.

50.     Throughout the course of Libassi, Cronnin, and Haithcock's employment with DiaMed USA and Medline DiaMed, Libassi, Cronnin, and Haithcock had access to, received, and utilized the confidential trade secret information owned by Medline DiaMed.

51.     Libassi, Cronnin, and Haithcock have a duty to Medline DiaMed to maintain the secrecy of Medline DiaMed's confidential trade secret information.

52.     CSS and the Fried Brothers have a duty to refrain from utilizing Libassi, Cronnin, and Haithcock to acquire or otherwise provide the confidential trade secret information of Medline DiaMed for use by CSS and/or the Fried Brothers.

53.     Upon information and belief, Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers have maliciously, knowingly, intentionally, and willfully, without the consent of Medline DiaMed, misappropriated the confidential trade information of Medline DiaMed, and Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers are using said trade secrets and confidential information for their own benefit in order to unfairly compete with Medline DiaMed.

54.     The misappropriation of Medline DiaMed's trade secrets by Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers has clearly caused permanent and irreparable damage to Medline DiaMed for which no adequate remedy at law exists.

55.     Accordingly, pursuant to R.C. § 1333.62, MedLine DiaMed is entitled to relief enjoining Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers from utilizing Medline DiaMed's trade secret information.

56.     In addition, pursuant to R.C. §§ 1333.63 and 1333.64, Medline DiaMed is entitled to recover damages for Libassi, Cronnin, Haithcock, CSS and the Fried Brothers' misappropriation, and is entitled to recover treble damages and attorney fees for this willful and malicious conduct.

57.     As a direct and proximate result of Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers' improper and unlawful use of Medline DiaMed's confidential information and trade secrets, Medline DiaMed has suffered and will continue to suffer immediate, irreparable and permanent damage to its business, business good will, and general standing in the community for which no adequate remedy at law exists.

## COUNT II
## BREACH OF FIDUCIARY DUTY

58.     Medline DiaMed restates each preceding paragraph as if fully rewritten herein.

59.     At all times during their employment with Medline DiaMed, Libassi and Cronnin had a fiduciary duty of good faith loyalty to act in its best interests. At all times during the course of their employment with Medline DiaMed, Libassi and Cronnin were obligated to act exclusively in Medline DiaMed's best interests, and were prohibited from acting in a manner contrary to Medline DiaMed's legitimate business interests.

60.     After their resignation from Medline DiaMed, Libassi and Cronnin continued to owe Medline DiaMed fiduciary duties with respect to the confidential and proprietary information and/or trade

secrets to which they had gained access during the course of their employment with Medline DiaMed, as well as the client transactions on behalf of Medline DiaMed that they had worked on or were working on at the time of their resignation.

61.     At the encouragement and direction of Haithcock, CSS, and the Fried Brothers, Libassi and Cronnin breached their fiduciary duties to Medline DiaMed as described hereinabove. This breach was willful and malicious. As a direct and proximate result of Libassi and Cronnin's breaches of their fiduciary duties, Medline DiaMed has suffered and will continue to suffer, substantial damages, harm, and irreparable harm for which no remedy exists. In addition, Libassi and Cronnin are obligated to disgorge all compensation paid by Medline DiaMed during the period of their disloyalty.

**COUNT III**
**UNFAIR COMPETITION**
**R.C. § 4165.02**

62.     Medline DiaMed restates each preceding paragraph as if fully rewritten herein.

63.     The acts and conduct of Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers set forth hereinabove constitute unfair competition, as defined by R.C. § 4165.02, et seq.

64.     Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers' unfair competition includes, but is not limited to:

- Passing off the goods of the Medline DiaMed as the goods of another;

- Causing a likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of CSS's goods;

- Causing a likelihood of confusion or misunderstanding as to affiliation, connection, or association between Medline DiaMed and CSS; and

- Representing that CSS's goods have sponsorship, approval, or characteristics that they do not have.

65.     The unfair competition by Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers has clearly caused permanent and irreparable damage to Medline DiaMed for which no adequate remedy at law exists.

66.     Accordingly, pursuant to R.C. § 4165.03(A)(1), MedLine DiaMed is entitled to relief enjoining Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers from utilizing Medline DiaMed's trade secret information.

67.     In addition, Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers' conduct as alleged hereinabove has damaged and will continue to damage Medline DiaMed and Medline DiaMed's good will and reputation, and has resulted in losses to Medline DiaMed and an elicit gain of profit to Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers in an amount to be proven at trial pursuant to R.C. § 4165.03(A)(2).

68.     Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers have willfully and maliciously engaged in the unfair practices alleged hereinabove, thereby entitling Medline DiaMed to recover their reasonable attorney fees pursuant to R.C. § 4165.03(B) and punitive damages.

## COUNT IV
## OHIO COMMON LAW UNFAIR COMPETITION

69.     Medline DiaMed restates each preceding paragraph as if fully rewritten herein.

70.     The persistent and continuous acts and conduct of Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers alleged hereinabove, including but not limited to, misappropriating of Medline DiaMed's trades secrets, breaching and encouraging the breach of fiduciary duties owed to Medline DiaMed, and encouraging the deceitful diversion of customers to CSS, constitute unfair competition pursuant to the common law of the State of Ohio.

71.     Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers' conduct as alleged above has damaged, and will continue to damage, Medline DiaMed's good will and reputation and has resulted in

23

losses to Medline DiaMed and an elicit gain of profit to Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers in an amount to be proven at trial

72.     Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers have engaged in the conduct alleged hereinabove with actual malice, therefore entitling Medline DiaMed to an award of punitive damages and attorneys' fees.

## COUNT V
## TORTIOUS INTERFERENCE

73.     Medline DiaMed restates each preceding paragraph as if fully rewritten herein.

74.     Medline DiaMed has and had valid contractual relationships and business expectancies with its clients which created a reasonable probability of future economic benefit to Medline DiaMed.

75.     As a result of Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers' conduct, many of these customers have transferred some or all of their business to CSS.

76.     Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers had actual knowledge of the contractual relationships and business expectancies Medline DiaMed has and had with its clients.

77.     Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers have intentionally interfered and continue to interfere with Medline DiaMed's client relationships and expectancies by using confidential trade secret information to engage in direct and active competition with Medline DiaMed, even while Libassi and Cronnin were still employed by Medline DiaMed.

78.     Medline DiaMed had a reasonable and objective expectation that absent the misconduct alleged herein, Medline DiaMed would have continued the contractual relationships and/or realized the business expectancies it had with its clients and accordingly received substantial future economic benefits.

79.     Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers' intentional interference induced or caused termination of the relationships and/or failure to realize the business expectancies that Medline DiaMed had with its clients.

80.     Despite knowing about Medline DiaMed's expectation of the economic advantage that would result from Medline DiaMed's ongoing contractual relationships with its customers, Libassi, Cronnin, and Haithcock have, on behalf of CSS and the Fried Brothers, contacted and solicited these customers that they serviced while at Medline DiaMed and/or used Medline DiaMed's confidential information to induce those customers to terminate their relationships with Medline DiaMed and move their business to CSS.

81.     Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers engaged in their intentional interference with malice towards Medline DiaMed and through improper means and methods. The improper means and methods employed include, but are not limited to: (a) Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers' misappropriation of Medline DiaMed's trade secrets; (b) breaching and encouraging the breach of fiduciary duties to Medline DiaMed; and (c) engaging in statutory and common law unfair competition with respect to the Plan as alleged herein.

82.     As a result of the intentional and interfering conduct of Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers, Medline DiaMed has been injured and damaged, and will continue to be injured and damaged.

83.     Medline DiaMed has suffered, and will continue to suffer, substantial harm, damage, and irreparable damage as a result of Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers' interference with its contractual relationships and business expectancies.

**COUNT VI**
**CIVIL CONSPIRACY**

84.     Medline DiaMed restates each preceding paragraph as if fully rewritten herein.

85.     Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers unlawfully combined, in a manner not competent for a single actor, to commit the unlawful conduct described above in an effort to injure Medline DiaMed.   The unlawful conduct includes, but is not limited to: (a) the concerted misappropriation of Medline DiaMed's trade secrets; (b) breaching and encouraging the breach of fiduciary duties to Medline DiaMed; and (c) engaging in statutory and common law unfair competition with respect to the Plan as alleged herein.

86.     Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers engaged in this unlawful civil conspiracy willfully, with malicious purpose, and in bad faith.

87.     Medline DiaMed has suffered, and will continue to suffer, substantial harm, damage, and irreparable damage as a result of Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers' civil conspiracy.

## COUNT VII
## SPOLIATION OF EVIDENCE

88.     Medline DiaMed restates each preceding paragraph as if fully rewritten herein.

89.     Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers were in possession of a multitude of evidentiary documents, including emails, spreadsheets, and word processing documents, that were used in connection with the effectuation of the Plan as alleged herein.

90.     Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers had a duty to preserve this evidence as they knew or had reason to know that litigation was probable concerning the Plan as alleged herein.

91.     Upon information and belief, Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers have willfully destroyed this evidence.

92.     Defendants' intentional destruction of this evidence has deprived Medline DiaMed of the ability to discover the full scope of the Plan and the full extent of the injury caused to Medline DiaMed by the Plan as alleged herein.

93.     Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers have engaged in the conduct alleged hereinabove with actual malice, therefore entitling Medline DiaMed to an award of punitive damages.

## COUNT VIII
## INJUNCTIVE RELIEF

94.     Medline DiaMed restates each preceding paragraph as if fully rewritten herein.

95.     Medline DiaMed is likely to succeed on the merits of its cause of action because Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers' conduct is patently illegal, as set forth herein.

96.     As set forth above, Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers have misappropriated, and have utilized, are utilizing, and/or are about to utilize and continue to utilize the confidential business information regarding Medline DiaMed's business, thereby providing CSS with an unfair competitive advantage against and over Medline DiaMed.

97.     As a direct and proximate result of Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers' unlawful misappropriation, transfer, disclosure, use, and intended use of Medline DiaMed's confidential business information, Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers are causing, and will continue to cause, great and irreparable interference and damage to the Medline DiaMed's business, customer relations, and goodwill, which damage cannot be compensated adequately in money damages.

98.     These irreparable injuries will continue to be suffered by Medline DiaMed unless and until Libassi, Cronnin, Haithcock, CSS, and the Fried Brothers are enjoined by this Honorable Court from using Medline DiaMed's confidential information, ordered to cease diverting customers and/or sales from Medline DiaMed, ordered to cease competing with Medline DiaMed in the office-based physician market, ordered to cease all solicitation of Medline DiaMed's customers, and further ordered and/or compelled to destroy and/or return all of the aforementioned confidential business information to Medline DiaMed.

**WHEREFORE**, Plaintiff, Medline DiaMed, LLC demands judgment against Defendants Linda Libassi, Laura Cronin, Melissa Haithcock, Jerrold Fried, Michael Fried, Howard Fried, and Community Surgical Supply of Toms River, Inc. as follows:

A.  A temporary retraining order, preliminary injunction, and permanent injunction;

B.  Compensatory damages in excess of $25,000.00;

C.  Punitive damages in an amount to be determined at trial;

D.  Attorneys' fees in an amount to be determined by the Court, pursuant to both the common and statutory law of this State;

E.  Treble damages pursuant to the statutory law of this State;

F.  Prejudgment and post judgment interest in accordance with the statutory rate;

G.  Costs of the within action; and

H.  Any further relief that this Court deems just and equitable.

DATED:    December 20, 2010          Respectfully submitted,

**TZANGAS, PLAKAS,
MANNOS & RAIES, LTD.**

Lee E. Plakas (0008628)
Gary A. Corroto (0055270)
Edmond J. Mack (0082906)
220 Market Avenue South
Eighth Floor
Canton, Ohio 44702
Telephone:    (330) 455-6112
Facsimile:    (330) 455-2108
Email:        emack@lawlion.com

*Attorneys for Plaintiffs*

## VERIFICATION

Medline DiaMed, LLC, through its authorized representative, and being first duly sworn, says that it has read the Verified Complaint above, has personal knowledge of the facts sworn to therein, and the same are true and correct to the best of its knowledge, information and belief.

MEDLINE DIAMED, LLC

By: _____
Scott Wasker, President

**STATE OF OHIO**
          **SS:**
**STARK COUNTY**

**BEFORE ME,** a Notary Public in and for said county and state, personally appeared the above-named Scott Wasker, who acknowledged that he did sign the foregoing instrument, that the same is his free act and deed, and that the statements contained therein are true as he verily believes.

**IN TESTIMONY WHEREOF,** I have hereunto set my hand and official seal at Canton, Ohio, this 20th day of December 2010.

EDMOND J. MACK
Attorney at Law
Notary Public, State of Ohio
My commission has no expiration
Under Section 47.03 R.C.

_____
Notary Public

**TO THE CLERK:**

Please issue service of summons and complaint in this action against the Defendants at the addresses listed in the caption of the Complaint and deliver the same to counsel for Plaintiff for service by process server.

Edmond J. Mack
*Attorney for Plaintiffs*

Medline buys Canton-based DiaMed USA - Canton, OH - CantonRep.com    http://www.cantonrep.com/news/x290100839/Medline-buys-Canton-b...



## Medline buys Canton-based DiaMed USA

**CantonRep.com staff report**

Posted Nov 17, 2010 @ 11:30 AM



CANTON — Medline Industries, which recently purchased property to open an office in Canton, has acquired DiaMed USA, a Canton-based physician office supplier.

Medline Industries is the nation's largest privately held manufacturer and distributor of healthcare supplies and services.

"This acquisition is an excellent strategic fit for Medline and will substantially increase our base of service for physicians and home care customers," David Greenberg, Medline's executive vice president of strategy, said in a statement.

"DiaMed shares our vision and commitment to providing outstanding service, which will only be enhanced with the addition of Medline's products and resources."

Corporate headquarters for DiaMed USA are at 3670 Progress St. NE. DiaMed USA was founded in 1995, according to the company's website.

The business will be operating under the name Medline DiaMed, LLC.

Medline is the first tenant in the Mills Industrial Park at Faircrest Street and Sherman Church Avenue SW, a joint venture of the Canton Regional Chamber of Commerce Foundation and the DeHoff Family Foundation. The company previously said it plans to create 25 to 30 permanent full-time jobs in an energy-efficient and environmentally friendly building, estimated to be 300,000 square feet.

Medline manufactures and distributes more than 100,000 products to hospitals, extended-care facilities, surgery centers, home care dealers and agencies. It has more than 900 dedicated sales representatives nationwide to support its product line and cost management services.

Medline serves as the primary distributor to more than 450 major hospitals and healthcare systems.

Copyright 2010 CantonRep.com. Some rights reserved

### Popular Videos

      

| Optimism Surrounds Bipartisan Agreements | Holiday Bargain Battle | US Senate scraps gay military ban | Pregnant Woman Attacked | Kidnapped Woman Found | Suspected Killer's Victim Count Unknown |

**Mortgage Rates Hit 2.99%**
With rates lower than ever, now is the time to refinance
www.SeeRefinanceRates.com

**EHSI Buys Biotech Leader**
Breaking News - EHSI just acquired biotech leader celulas
www.TheStemCellGroup.com

**1 Tip To Lose Stomach Fat**
Follow This 1 Simple Diet Tip And Lose 9 Lbs A Week
CDKitchen.com

Ads by Yahoo!

Comments (1)
gottheanswer
1 month ago
Report Abuse
You must be logged in to report abuse.



PLAINTIFF'S
EXHIBIT

A

12/20/2010 9:32 AM

# DiaMed USA, LLC
## Employee Handbook

**Revised January 2009**



**PLAINTIFF'S EXHIBIT**

B

DISCLAIMER..................................................................................................................3

GENERAL INFORMATION ............................................................................................4
   Mission Statement ......................................................................................................4
   DiaMed History ...........................................................................................................4
   What DiaMed Expects from You...................................................................................4
   Confidential Information ...............................................................................................4
   Scope of Services .......................................................................................................5
   Hours of Operation......................................................................................................5
   Accommodations for Disabilities..................................................................................5

GENERAL EMPLOYMENT PRACTICES .......................................................................5
   General Employment Practices ...................................................................................5
   At-Will Employment Policy...........................................................................................6
   Immigration Law Compliance ......................................................................................6
   Driver Qualifications....................................................................................................6
   Types of Employees ...................................................................................................6
   Performance Evaluation..............................................................................................7

COMPENSATION .........................................................................................................7
   Wages .......................................................................................................................7
   Payday .......................................................................................................................7
   Overtime ....................................................................................................................7
   Paid Time Off .............................................................................................................8
   Bereavement Leave....................................................................................................7
   Leave of Absence (Unpaid) ........................................................................................8
   Holidays .....................................................................................................................9
   Jury Duty ....................................................................................................................9
   Health Insurance.......................................................................................................10
   Dental Insurance.......................................................................................................10
   COBRA .....................................................................................................................10
   Worker's Compensation............................................................................................11
   Social Security...........................................................................................................11
   Long Term Disability .................................................................................................11
   Supplemental Life Insurance.....................................................................................12
   Retirement Plan .......................................................................................................12

CONDUCT...................................................................................................................12
   Employee Conduct ...................................................................................................12
   Lunch and Breaks ....................................................................................................12
   No Smoking Policy....................................................................................................13
   Time Cards ...............................................................................................................13
   Attendance................................................................................................................13
   Job Abandonment.....................................................................................................13
   Dress Code ...............................................................................................................13
   Personal Phone Calls ...............................................................................................14
   Alcohol and Drug Abuse Policy .................................................................................14
      *Generally* ............................................................................................................14
      *Definitions*...........................................................................................................14
      *Drug & Alcohol Testing Procedure* .....................................................................14
      *Disciplinary Consequences* ................................................................................15
      *Prescribed Treatment* .........................................................................................15
      *Reporting Violations* ...........................................................................................15
      *Imminent Threat to Safety*...................................................................................15
      *Ineligibility for Workers' Compensation Benefits* ................................................16
   Grievance Procedure ...............................................................................................16
   Discipline / Termination.............................................................................................16
   Resignation ..............................................................................................................17

Use of Company Resources ....................................................................................... 17
Weapons and Violence in the Workplace ................................................................... 17
Anti-Discrimination/Harassment Policy ................................................................... 18
Sexual Harassment .................................................................................................. 18
Other Harassment Is Prohibited .............................................................................. 19
Making Complaints and Reporting Violations ......................................................... 19
Investigation of Complaints and Reports ................................................................ 19
Penalties for Violations ............................................................................................ 19
Additional Information .............................................................................................. 19

## Disclaimer

This handbook supersedes all previous handbooks, policies and procedures and or prior practices assumed.  It will remain in effect until written changes have been distributed.

# General Information

## Mission Statement

To be a leading provider of equipment and supplies in the professional arena all provided with the highest level of quality and maximum customer satisfaction system to provide quality health care. DiaMed shall employ quality, skilled professionals who put these beliefs into action daily. DiaMed is committed to providing superior quality and service with integrity in all aspects of its business.

## DiaMed History

DiaMed, Inc. was founded in 1994 by Doug Sharpe and Scott Wakser. The company was incorporated in the State of Ohio as a Sub Chapter S corporation. On January 1, 2008, DiaMed Inc. merged with Community Surgical Supply in Toms River, NJ to become DiaMed USA, LLC. The new owners are Scott Wakser, Doug Sharpe, Michael Freid, Jerry Freid and Howard Freid. Scott Wakser remains the President and CEO.

## What DiaMed Expects from You

DiaMed needs your help in making each working day enjoyable and rewarding. Your first responsibility is to know your own duties and how to do them promptly, correctly and pleasantly. Secondly, you are expected to cooperate with management and your fellow employees and to maintain a good team attitude.

How you interact with fellow employees and those whom DiaMed serves, and how you accept direction can affect the success of your department. In turn, the performance of one department can impact the entire service offered by DiaMed. Consequently, whatever your position, you have an important assignment: perform every task to the very best of your ability.

You are encouraged to grasp opportunities for personal development offered to you. This manual offers insight on how you can perform positively and to the best of your ability to meet and exceed DiaMed expectations.

We strongly believe you should have the right to make your own choices in matters that concern and control your life. We believe in direct access to management. We are dedicated to making DiaMed a company where you can approach your manager, or any member of management to discuss any problem or question. We expect you to voice your opinions and contribute your suggestions to improve the quality of DiaMed. We are all human, so please communicate with each other and with management.

Remember, you help create the pleasant and safe working conditions that DiaMed intends for you. The result will be better performance for the company overall, and personal satisfaction for you.

## Confidential Information

All DiaMed employees are obligated to maintain confidentiality, even after they are no longer employed by DiaMed.

Additionally, our customers and suppliers entrust DiaMed with important information relating to their health, lives and businesses. The nature of this relationship requires maintenance of confidentiality. In safeguarding the information received, DiaMed earns the respect and further trust of our customers and suppliers.

If you are questioned by someone outside the company or your department and you are concerned about the appropriateness of giving them certain information, you are not required to answer. Instead, as politely as possible, refer the request to your supervisor.

4

No one is permitted to remove or make copies of any DiaMed records, reports, or documents without prior management approval. Disclosure of confidential information could lead to termination, as well as other possible legal action.

## Scope of Services

DiaMed shall provide medical equipment and supplies in the professional arena. The scope of services includes the following equipment and supply items. This list may change, as client needs change at which time this policy will be updated. The equipment and supplies distributed by DiaMed includes the following:

> Diagnostic Equipment and Supplies
> Wound Care Supplies
> Surgical Supplies
> Orthopedic Supplies
> Non Controlled Pharmaceuticals
> Office Furniture
> Exam Room Furniture and Supplies
> Paper Supplies (medical/disposable)
> CLIA-Waived Tests and Supplies
> Lab Supplies
> Safety Products

DiaMed does not discriminate in providing service to customers in accordance with current federal laws and statutes.

## Hours of Operation

DiaMed's hours of operation are 8:30 a.m. to 5:00 p.m. Monday through Friday. Some employees may be required to work after hours on an on call basis. Start times may vary.

## Accommodations for Disabilities

DiaMed is committed to providing equal employment opportunities to otherwise qualified individuals with disabilities, which may include providing reasonable accommodation where appropriate. In general, it is your responsibility to notify the president of the need for accommodation. Upon doing so, the president may ask you for your input or the type of accommodation you believe may be necessary or the functional limitations caused by your disability. Also, when appropriate, we may need your permission to obtain additional information from your physician or other medical professionals.

# General Employment Practices

## General Employment Practices

DiaMed provides equal opportunities to all individuals. Because we are an equal opportunity employer, all employees and prospective employees will be recruited, selected and trained without regard to race, color, creed, sex, national origin, disability, age ancestry, veteran status, or any other legally protected basis. This same non-discriminatory consideration will be used in all other aspects of the employment relationship.

All applicants are carefully screened and full consideration is given to their training, education, skills, experiences, growth potential and previous work record. All company managers and employees are charged with fulfilling their responsibilities for the active support of our equal employment opportunity program. Our equal opportunity policy applies to all phases of employment.
DiaMed uses many methods of recruitment of new employees. Below is a partial list:

- Word of mouth
- Newspaper advertising

- Employment agencies
- Referrals

## At-Will Employment Policy

All employment with DiaMed is for no definite period of time and may be terminated at any time, without prior notice by either DiaMed or the employee. It is understood that no employee or representative of the company, other than the president, has any authority to enter into any agreement for employment for any specific period of time, or any agreement for benefits, and that any such agreement entered into by DiaMed's President will not be enforceable unless it is in writing and signed by DiaMed's President.

## Immigration Law Compliance

All offers of employment are contingent on verification of the employee's right to work in the United States. All employees have to provide original documents verifying their right to work and as required by federal law, to sign Federal Form I-9, Employment Eligibility Verification Form. If an employee can not verify the right to work in the United States, DiaMed is obliged to terminate employment.

## Driver Qualifications

All employees who are required to operate a motor vehicle in the course of their duties are required to have a valid state driver's license appropriate to the type of vehicle being operated in compliance with state laws. Employment may be terminated if DiaMed's insurance company will not insure an employee. Employees who drive their own vehicle on company business are required to maintain adequate automobile insurance. A copy of the driver's license and automobile insurance declaration page will be placed in the employee's personnel file. The General Manager will maintain of list of employees required to have a driver's license with expiration date. Any changes in your driving record must be reported to your supervisor immediately. Failure to maintain your license or to report changes in your driving record may result in disciplinary action, up to and including termination.

## Types of Employees

Full-time: An employee that is scheduled to work 32 or more hours per week
Part-time: An employee that works less than 32 hours per week.
Salary: An employee that is scheduled to work 32 or more hours per week and is considered exempt (Exempt is defined as employees whose positions meet specific tests established by the Fair Labor Standards Act (FLSA) and applicable state law and who are exempt from overtime pay requirements.)

Temporary: An employee hired on a short-term basis and may be working either full or part time. This employee is not eligible for any benefits.

## Performance Evaluation

It is the policy of DiaMed to have regularly scheduled employee evaluations to assess the performance of job duties. All employees will undergo a performance evaluation by their supervisor approximately 90 days after their first day of work. Their supervisor will perform a second performance evaluation approximately 180 days after their first day of work. The third evaluation will be performed approximately 365 days after their first day of work. An annual evaluation will be performed thereafter.

Annual evaluations for both full-time and part-time employees are based on an employee's previous 12 months of service.

Performance evaluations are based on the employee's job description and compliance with the company's policies and procedures.

A copy of the performance evaluation shall be reviewed by each individual and signed by both the supervisor and the individual. Signatures verify that the information has been given and received. The performance evaluation will be shared with the employee via a face-to-face conference with the supervisor.

6

## Compensation

### Wages

The General Manager will determine an applicant's wages based upon the following: 1) Average pay in the area for a specific job description, 2) Experience, 3) Credentials, and 4) Education. The Manager will evaluate each employee annually and determine any raises that might be awarded. The President will approve all raises.  Employees are not to discuss their salary with anyone except their supervisor.

### Payday

**Payday is every other Friday.   If payday falls on a holiday, paychecks will be distributed the day before the holiday.  Direct deposit is available.  The money will be directly deposited following the above schedule for paycheck distribution**

**Expense reports have to be turned in to the Payroll Administrator by the 9th of each month.  An expense report that is received after the 9th will not be paid.**

### Overtime

Hourly employees that work more than 40 hours during a week are eligible for overtime. Overtime is paid at one and one half times the regular hourly salary. Overtime must be held to a minimum and requires the approval of your supervisor. An Overtime Worksheet must be attached to the employee's time card to be paid for overtime.

### Paid Time Off

It is the policy of DiaMed, Inc. to provide paid sick leave and paid vacation for its employees.  This policy is referred to as PTO.  The PTO year extends from January 1 through December 31.  The amount of accrued PTO is determined on January 1.  A week corresponds to the regular scheduled hours worked by the employee.  (For example, if an employee is scheduled to work 35 hours per week, their PTO is 35 hours.  If they are scheduled to work 40 hours then it is 40.)  PTO is calculated on the weeks worked for the first year, then full calendar years of service thereafter.  A week is 5 days corresponding to the scheduled work week of the employee.  Below is a schedule:

| Length of Service as of January 1 | PTO |
|---|---|
| **Salary Employees** | |
| Less than 1 year | Pro-rated* |
| 1 full calendar year to less than 2 | 8 days |
| 2 full calendar years to less than 3 | 13 days |
| 3 full calendar years to less than 5 | 14 days |
| 5 full calendar years or more | 19 days |
| **Full-time Employees** | |
| Less than 1 year | Pro-rated* |
| 1 full year to less than 2 | 8 days |
| 2 full years or more | 13 days |
| **Part-time Employees** | |
| Less than 1 year | No PTO |
| 1 full year or more | 7 days (corresponding to Scheduled Hours in a week) |

*The pro-rated schedule is based on the number of weeks worked the previous year.

7

| | |
|---|---|
| 0 to 4 weeks worked | 0 days |
| 5 to 12 weeks worked | 1 day |
| 13 to 24 weeks worked | 3 days |
| 25 to 32 weeks worked | 5 days |
| 33 to 42 weeks worked | 6 days |
| 43 to 51 weeks worked | 7 days |

PTO cannot be held over to the next year unless authorized by the President of DiaMed, Inc. Any PTO that is not used by December 31st will not be paid to the employee.

PTO can be taken in minimum increments of 4 hours. All PTO needs to be approved by the employee's immediate supervisor and the HR Manager. PTO's will be approved based upon staffing and seniority.

## Bereavement Leave

Full-time employees may be permitted up to three (3) working days with pay in the event of a death in their immediate family. Additional time off without pay may be granted whenever such additional time is reasonably required.

The employee's immediate family is defined as spouse, children, mother, father, stepchildren, stepparent, sister, brother, grandchildren, grandparents, mother-in-law, father-in-law, and son or daughter-in-law.

If a death occurs in the employee's immediate family during a scheduled vacation, bereavement days may be substituted for the PTO.

When a fellow employee or a family member other than those previously listed dies, absence from work may be granted to attend the funeral with approval of the supervisor.

## Leave of Absence (Unpaid)

DiaMed does not fall under the Family and Medical Leave Act of 1993; however, it is the policy of DiaMed to allow an employee leave of absence when the situation is justified. The employee must request the leave in writing. The immediate supervisor will evaluate and determine whether leave will be granted.

If an employee has a condition or situation where it is not possible to request a leave in advance and the situation has not been deemed job abandonment, a leave of absence will be automatic after 14 days.

The employee must be in good standing and have worked for DiaMed for at least 90 days to be eligible for leave.

Leaves of absence will be considered for the following reasons:

Educational
Medical
Personal

A leave of absence will not be extended for more than 6 months. If the leave extends beyond 6 months, employment will terminate.

Existing seniority, prior to a leave, is unaffected. However, further seniority does not accumulate while on leave. Accumulation of benefits (if any) is suspended during a leave. Evaluations and salary reviews may be extended the amount of time equal to the leave.

All or portions of earned vacation time (if any) must be used while on leave. All or portions of sick time (if any) must be used if leave is medical. If an employee wishes to continue group insurance, the employee must pay the full premium on a monthly basis, due the first of each month. Failure to pay on time will result in the termination of benefits.

Employees may discontinue insurance coverage while on a leave, but are subject to the insurance carrier's qualifications if they wish to be re-insured. Re-insurance is not guaranteed.

If it is not possible to return from a leave within the approved time, the supervisor must be notified, either in writing or in person, and permission requested to extend the leave before it expires. If an employee fails to return to work upon expiration of leave (and a request for extension is not made on or before expiration of leave) then DiaMed will assume the intention is not to return and employment will be terminated.

Reasonable effort will be made to return the employee to the same or similar position held before the leave. If the leave was medical, a physician statement is required approving a return to work.

## Holidays
DiaMed will be closed the following holidays if they fall on Monday through Friday:

| | |
|---|---|
| New Year's Day | Labor Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Eve Day* |
| Christmas Day | New Years Eve Day* |
| Day after Thanksgiving* | |

**Any Holiday with an * will not be paid. Only PTO can be applied to these dates.**

All full-time hourly and salary employees will be paid eight (8) hours for each of the above days without an *. If a holiday falls on a Saturday or Sunday, management may choose, at its sole discretion, from the following options:

- Select the preceding Friday or following Monday to observe the holiday.
- If it is determined to not be administratively feasible to observe the holiday on the preceding Friday or following Monday, management may:
  - Provide each employee with an additional PTO day to be taken during the same calendar year in accordance with the PTO policy, or
  - Pay each employee an additional 8 hours of straight time for the pay period in which the holiday falls.

Part-time employees will be paid according to the hours of their normal workday for New Year's Day and Christmas Day if it falls on Monday through Friday.

## Jury Duty
Employees must notify their supervisor upon their being notified of the possibility of jury duty. Employees who are required to serve jury duty during their regularly scheduled workday will be paid the difference between compensation received from the court and their regular pay. If the employee is released from jury duty before 2:00 P.M., they must return to work.

## Health Insurance
It is the policy of DiaMed to provide group health insurance for full-time employees. An employee is eligible for group health insurance after he/she has been employed for 60 days or defined by the insurance company. The insurance will be effective on the first day of the month after the 60 day waiting period. The employee is responsible for a portion of the premium. It is paid through payroll deduction before taxes.

If you have left DiaMed, Inc. and are rehired within 63 days, you are eligible to be reinstated to the plan on your rehire date. However, if you return to DiaMed after 63 days, the above waiting policy applies. It is the discretion of the President to cover your cobra payment if you are returning in an executive management position.

## Dental Insurance

All full-time employees are eligible for DiaMed's group dental policy after he/she has been employed for 90 days. The employee is responsible for the entire premium. It is paid through payroll deduction before taxes.

## COBRA

On April 7, 1986, a federal law was enacted [Public Law 99-272, Title X] requiring that most employers sponsoring group health plans offer employees and their families the opportunity for a temporary extension of health coverage (called "continuation coverage") at group rates in certain instances where coverage under the plan would otherwise end. This notice is intended to inform you, in a summary fashion, of your rights and obligations under the continuation coverage provisions of the new law. [*Both you and your spouse should take the time to read this notice carefully.*]

If you are an employee of DiaMed covered by the group health insurance plan, you have the right to choose this continuation coverage at your own expense if you lose your group health coverage because of a reduction in your hours of employment or the termination of your employment (for reasons other than gross misconduct on your part).

If you are the spouse of an employee covered by the group health insurance plan, you have the right to choose this continuation coverage for yourself at your own expense if you lose group health coverage for any of the following four reasons:

1. The death of your spouse;
2. A termination of your spouse's employment (for reasons other than gross misconduct) or reduction in your spouse's hours of employment.
3. Divorce or legal separation from your spouse; or
4. Your spouse becomes entitled to Medicare.

In the case of a dependent child of an employee covered by the group health insurance plan, he or she has the right to continuation coverage at his or her expense if group health coverage is lost for any of the following five reasons:

1. The death of a parent;
2. A termination of parent's employment (for reasons other than gross misconduct) or reduction in a parent's hours of employment with DiaMed;
3. Parent's divorce or legal separation;
4. A parent becomes entitled to Medicare; or
5. The dependent child ceases to be a "dependent child" under the group health insurance plan.

Under the law, the employee or a family member has the responsibility to inform the group health insurance administrator of a divorce, legal separation, or a child losing dependent status under the group health insurance plan within 60 days of the date of the event or the date in which coverage would end under the plan because of the event, whichever is later. DiaMed has the responsibility to notify the Plan Administrator of the employee's death, termination, reduction in hours of employment or Medicare entitlement. Similar rights may apply to certain retirees, spouses, and dependent children if your employer commences a bankruptcy proceeding and these individuals lose coverage.

When the Plan Administrator is notified that one of these events has happened, the Plan Administrator will in turn notify you that you have the right to choose continuation coverage. Under the law, you have a least 60 days from the date you would lose coverage because of one of the events described above, or the date notice of your election rights is sent to you, whichever is later, to inform the Plan Administrator that you want continuation coverage.

If you do not choose continuation coverage, your group health insurance will end.

10

If you choose continuation coverage, DiaMed is required to give you coverage which, as of the time coverage if being provided, is identical to the coverage provided under the plan to similarly situated employees or family members. The new law requires that you be afforded the opportunity to maintain continuation coverage at your own expense for three years unless you lose group health coverage because of a termination of employment or reduction in hours. In that case, the required continuation coverage period is 18 months. These 18 months may be extended to 36 months if other events (such as death, divorce, legal separation, or Medicare entitlement) occur during that 18-month period.

This 18 months may be extended to 29 months if an individual is determined (under Title II or XVI of the Social Security Act) to be disabled and the Plan Administrator is notified of that determination within 60 days. The affected individual must also notify the Plan Administrator within 30 days of any final determination that the individual is no longer disabled. IN no event will continuation coverage last beyond 3 years from the date of the event that originally made a qualifying beneficiary eligible to elect coverage.

However, the law also provides that your continuation coverage may be terminated for any of the five following reasons:

1. DiaMed no longer provides group health coverage to any of its employees;
2. The premium for your continuation coverage is not paid on time;
3. You become covered by another group plan, unless the plan contains any exclusions or limitation with respect to any pre-existing condition you or your covered dependents may have;
4. You become entitled to Medicare;
5. You extend coverage for up to 29 months due to your disability, and there has been a final determination that you are no longer disabled.

You do not have to show that you are insurable to choose continuation coverage. However, you are required to pay the entire premium for your continuation coverage. There is a grace period of at least 30 days for payment of the regularly scheduled premium. [The law also says that at the end of the 18 month or 3 year continuation coverage period, you must be allowed to enroll in an individual conversion health plan.]

If you have any questions about this law, please see the Plan Administrator at DiaMed, 3870 Progress St. N.E., Canton, OH 44705. Also if you have changed marital status, or you or your spouse have changed addresses, please notify the Plan Administrator.

## Worker's Compensation

DiaMed has Worker's Compensation Insurance. All on the job injuries must be reported immediately to your supervisor. Failure to report an injury could result in loss of Worker's Compensation benefits. DiaMed requires the timely reporting of any injury or potential injury or harm to employees, clients, visitors or property. The reporting will be documented on an Incident Report Form.

## Social Security

The Federal government administers the Social Security system that covers you for retirement, survivors' disability and health insurance benefits. A required percentage of your pay is deducted from your paycheck to pay the employee's portion of this protection, and the company matches your deduction dollar for dollar.

## Long Term Disability

In order to secure the future for you and your families, DiaMed has added Long Term Disability Insurance to the benefit package. This benefit is for all full-time employees who have worked for DiaMed at least 90 days. There is no cost to the employee.

## Supplemental Life Insurance

All full-time employees who have worked for DiaMed for 90 days are eligible to participate in our group life insurance policy. The cost is minimal and is paid in full by the employee.

## Retirement Plan

DiaMed is concerned about the future of its employees and their retirement options. Therefore, DiaMed has established a 401K Plan through Fidelity. An employee may choose to participate in the plan after 6 months of employment. Enrollment dates are Jan 1 and July 1. The Employee may opt to contribute up to 15% (pretax) of their gross salary. DiaMed USA will match 10% of the employee's contribution.

# Conduct

## Employee Conduct

DiaMed expects its employees to comply with all applicable laws and regulations. The company and its employees will maintain our reputation for integrity and dealing fair with clients, referral sources and the community. We are dedicated to maintaining the trust of our clients and the community.

In general we expect the use of good judgment and high ethical standards. If a situation arises that is difficult for you to determine the proper course of action, you should immediately discuss it with your supervisor.

## Lunch and Breaks

All employees are required to use their time card to record lunch and break times.

Full-time employees are permitted to take:
- Two (2) – ten (10) minute breaks, one for every four (4) hours worked
- One half (1/2) hour lunch
- 

Part-time employees who work a minimum of four (4) hours but less than eight (8) hours in a day are permitted to take:
- One (1) – ten (10) minute break

An employee may be able to take a longer lunch break if necessary. The employee is required to get approval from their supervisor. If his or her supervisor is unavailable, the Operation's Manager can give approval. In such a case, the employee should bundle their breaks with their lunch.

Salaried employees can take one (1) hour for lunch as long as they work at least eight hours per day.

Each Manager will coordinate lunch and break times for their personnel. Times may vary depending on the activities of the day.

Any employee leaving the premises for lunch, a break or for personal reasons should have the approval of their supervisor. The employee should also inform the Secretary when leaving and upon arriving back. It is important that the whereabouts of all employees are known at all times. The employee should clock out for breaks, lunch and if they leave the building for personal reasons.

## No Smoking Policy

No smoking is permitted anywhere in the building. Smoking is permitted at the back of the building with the door closed during breaks and lunches. Please dispose of the cigarette butts outside in the container provided. Absolutely no cigarette butts should be disposed of inside a DiaMed building.

## Web Based Time System

All hourly employees must use the web based time system to clock in and out. No one should clock in or out for another person. The only exception to this rule is if an employee is performing job duties off-site. He or she may call into their supervisor who has authority to clock them in and out.

If an employee forgets to clock in or out, he or she should alert their manager to adjust their time.

12

## Attendance

It is critical for all employees to be at work and on time so that our company can run smoothly. However, if the need arises that an employee must call off sick, he or she is to call the office between 7:30 and 8:30. They should speak to their supervisor or the General Manager. If neither of them is available, the employee should leave a message on their supervisor's voice mail.

Failure to provide proper notification may result in an unexcused absence and payment for sick leave not allowed. Possible probation and/or termination may result. Excessive absenteeism is defined as more than 2 episodes within a 30-day period. Management may require medical documentation for any absenteeism.

For routine medical/dental appointments, advance approval must be obtained from the immediate supervisor for time off and sick leave payment, if available. Management retains the right to approve the use of sick leave for routine medical/dental appointments, depending on particular location/department staffing needs.

Excessive tardiness will result in disciplinary actions.

## Job Abandonment

Any employee who does not report for work and does not call for two consecutive days will be considered terminated.

## Dress Code

DiaMed has established an image of professionalism and wants its employees to maintain that image. Employees must dress in business like attire and use good judgment in selecting clothing appropriate to their position. Employee's dress must be tasteful, clean, ironed, safe, not provocative, and professional appearing at all times. All employees are expected to practice good personal hygiene and be clean shaven, or have their beard, goatee, and mustache neatly trimmed.

T-shirts, sweatshirts, and sweatpants are prohibited; skirts and shorts must be at least finger tip length. Shoes are to be worn at all times. No backs or belties are to be shown. Casual day is on Fridays; jeans may be worn only on this day, and must not be torn, tattered or frayed and worn in good taste.

Employees arriving to work wearing something that is not in the dress code policy or is deemed inappropriate by the employer will be sent home to change and are subject to disciplinary action. Any employee sent home to change will not be paid until returning to work appropriately attired.

Warehouse employees are subject to the above policy except that they are allowed to wear jeans, shorts, t-shirts, and sweatshirts that meet the guidelines for professional appearance at all times, as outlined above. Warehouse employees are encouraged to use proper safety procedures and techniques when handling heavy and bulky items. This includes the wearing of proper safety equipment including, but not limited to, steel toed shoes and lifting belts.

Drivers will be required to wear the company's logo shirts and ID badges at all times.

While this policy is intended to be complete, there will be instances of employee dress that may not be specifically included in this policy. If you are uncertain that something you have is appropriate to wear then ask or bring it in for management approval prior to wearing it. The employer reserves the right to assess and determine the appropriateness of employees dress on a case by case basis. All decisions made under the policy by the employer are final.

## Personal Phone Calls

Employees must keep personal telephone calls to a minimum. Long distance personal calls are prohibited. Telephones in client's homes may not be used for any reason.